Jeff S. Westerman (SBN 94559)
**WESTERMAN LAW CORP.**
16133 Ventura Blvd., Suite 685
Encino, CA 91436
Tel: (310) 698-7450
jwesterman@jswlegal.com

Michael M. Buchman (*pro hac vice* forthcoming)
Michelle C. Clerkin (*pro hac vice* forthcoming)
Jacob O. Onile-Ere (*pro hac vice* forthcoming)
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
Tel: (212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

*Attorneys for Plaintiff and the Proposed Class*

*[Additional Counsel listed on signature page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRCT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AGUSTIN CACCURI, on behalf of himself and all others similarly situated, | Civil Action No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| SONY INTERACTIVE ENTERTAINMENT LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Agustin Caccuri, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Sony Interactive Entertainment LLC for violation of federal and state antitrust and unfair competition laws. Based upon personal knowledge, information and belief, and the investigation of counsel, Plaintiff alleges as follows:

## I.    INTRODUCTION

1.      This is an antitrust and unfair competition class action seeking damages and injunctive relief for violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the California Business and Professions Code § 17200, against Sony Interactive Entertainment LLC ("Sony" or "Defendant"). Plaintiff brings this action on behalf of himself and all other similarly situated Class members who purchased digital video games on Sony's PlayStation Store (the "Class") between April 1, 2019 and the present (the "Class Period").

2.      Sony manufactures the PlayStation, a line of video game consoles that launched in 1994 and has become one of the most popular video game systems in the world. Sony's most recent model, the PlayStation 5, is expected to become the best-selling video game console of all time. PlayStation 5 launched on November 12, 2020, and by March 31, 2021, Sony had sold 7.8 million units.[1] Despite record sales numbers, Sony has been unable to supply anywhere close to enough units to meet consumer demand.[2] Sales are predicted to surpass 200 million units within the next five years.[3]

---

[1] *See* Sam Byford, *Sony has sold 7.8 million PS5 consoles*, The Verge (Apr. 28, 2021), https://www.theverge.com/2021/4/28/22407195/sony-ps5-sales-numbers-q4-2020-earnings.

[2] *See* N.F. Mendoza, *PlayStation rakes in $2.6 billion in PS5 sales*, TechRepublic (Feb. 25, 2021), https://www.techrepublic.com/article/playstation-rakes-in-2-6-billion-in-ps5-sales/.

[3] Aernout van de Velde, *PS5 Sales to Exceed 200 to 300 Million Units in 5 to 6 Years, Analyst Says; Could Terminate the Long-Running Console War*, WCCF Tech (Oct. 17, 2020), https://wccftech.com/ps5-sales-200-300-million-700-console-war/; Lionel Sujay Vailshery, *Forecast unit sales of the PlayStation 5 worldwide from 2020 to 2024 (*Apr 12, 2021), https://www.statista.com/statistics/1124784/unit-sales-ps5-worldwide/.

3.     Sony has used the console's popularity to build PlayStation into a multinational and multifaceted digital entertainment brand[4] which includes an online store for purchasing and downloading digital video games directly to the console (the PlayStation Store),[5] a unified online multiplayer gaming and digital media delivery service (the PlayStation Network),[6] a subscription-based digital video game streaming service (PlayStation Now)[7], a digital movie and TV distribution service (PlayStation Video),[8] and Sony's video game development arm (PlayStation Studios).[9]

4.     The bulk of the profits Sony derives from the PlayStation franchise come not from sales of its consoles, but from the digital video games and other digital content sold through the PlayStation Store and the PlayStation Network, which produced over $17 billion in revenues for Sony in the fiscal year ending March 31, 2021.[10]

5.     The PlayStation Store launched in 2006 alongside the PlayStation 3 console, allowing users to purchase digital copies of PlayStation games and download them directly to the console as an alternative to buying physical disks and inserting them into the console's disk drive. Since the launch of the original PlayStation in 1994, the games had been available only on disks. Now users can access the PlayStation Store from their console, purchase games, and

---

[4] *See About Us: We are PlayStation,* Sony Interactive Entm't, https://www.playstation.com/en-us/corporate/about-us/ (last visited Apr. 29, 2021).

[5] *See About PlayStation Store,* Sony Interactive Entm't, https://www.playstation.com/en-us/about-playstation-store/ (last visited Apr. 29, 2021).

[6] *See PlayStation Network*, Sony Interactive Entm't, https://www.playstation.com/en-us/playstation-network/ (last visited Apr. 29, 2021).

[7] *See PlayStation Now,* Sony Interactive Entm't, https://www.playstation.com/en-us/ps-now/ (last visited Apr. 29, 2021).

[8] *See PlayStation Video,* Sony Interactive Entm't, https://www.playstation.com/en-us/playstation-video/ (last visited Apr. 29, 2021).

[9] *See SIE PlayStation Studios,* Sony Interactive Entm't, https://www.playstation.com/en-us/corporate/playstation-studios/ (last visited May 3, 2021).

[10] *See* Sony Corporation, Financial Statements and Consolidated Financial Results for the Fiscal Year Ended March 31, 2021 (Apr, 28, 2021), available at https://www.sony.com/en/SonyInfo/IR/library/presen/er/pdf/20q4_sony.pdf. Dollar figure based on the following exchange rate from April 28, 2021: 1 JPY = 0.0092 USD.

CLASS ACTION COMPLAINT

download them directly to their console through the PlayStation Network. In 2020, digital downloads made up 62% of sales for PlayStation games, compared to only 43% in 2018.[11]

6.    Until recently, consumers could also purchase download codes for digital PlayStation games from the same online and brick-and-mortar retailers who also sell physical games such as Amazon, GameStop, Best Buy, and Wal-Mart. The codes could be redeemed on the PlayStation Store for digital copies of PlayStation games.

7.    On April 1, 2019, Sony eliminated retailers' ability to sell download codes for digital PlayStation games. Because delivering digital content to PlayStation consoles requires access to Sony's PlayStation Network, the new policy established the PlayStation Store as the only source from which consumers can purchase digital PlayStation games, and the only source to which video game publishers can sell digital PlayStation games. Sony also requires publishers who sell digital games on the PlayStation Store to relinquish full control over the retail price. As a result, the policy swiftly and effectively foreclosed any and all price competition in the retail market for digital PlayStation games.

8.    Sony's new restrictions established a monopoly over the sale of digital PlayStation games. Sony's monopoly allows it to charge supracompetitive prices for digital PlayStation games, which are significantly higher than their physical counterparts sold in a competitive retail market, and significantly higher than they would be in a competitive retail market for digital games.

9.    A comparison of prices for the most popular digital games on the PlayStation Store with prices for the same games available on disk from an array of retailers suggests prices on the PlayStation store are, on average, about 75% percent higher than those for games on disk, and in some cases closer to 175% higher.[12] There is no legitimate reason digital games should be

---

[11] Mustafa Mahmoud, *62% of all full PlayStation game sales were digital in 2020*, Kitguru (Mar. 12, 202), https://www.kitguru.net/gaming/mustafa-mahmoud/62-of-all-full-playstation-game-sales-were-digital-in-2020/.

[12] See ¶¶ 56-58 and Table 1, *infra.*

CLASS ACTION COMPLAINT

more expensive than their physical counterparts. In fact, given the costs saved on packaging and distribution, prices for digital games in a truly competitive market would likely be lower than they are for games on disk.

10.    Sony's ability to maintain supracompetitive prices on the PlayStation Store while consumers continue to switch from disks to digital game in ever increasing numbers, along with Sony's skyrocketing revenues from digital games, demonstrate that prices for digital games on the PlayStation store are not responsive to changes in prices for PlayStation games on disk.

11.    The relevant product market in this case is the market for downloadable, digitally-delivered video game content that is compatible with a PlayStation console ("digital PlayStation games").

12.    As a direct and proximate result of Sony's unlawful acquisition and maintenance of a monopoly over the sale of digital PlayStation games, Plaintiff and Class members have paid and will continue to pay significantly more for digital games than they would have absent Sony's monopoly. Plaintiff seeks damages for himself and Class members equal to the amount they have already overpaid, treble damages, and injunctive relief to end to the overcharges they will continue to pay as long as Sony is allowed to keep its unlawful monopoly.

## II.    THE PARTIES

13.    Plaintiff Agustin Caccuri is an individual residing in Santa Monica, California. Plaintiff owns a PlayStation 5 Digital Edition console, has purchased digital video games on the PlayStation Store and downloaded them to his console during the Class period, and plans to purchase and download more digital games from the PlayStation Store in the future.

14.    Defendant Sony Interactive Entertainment LLC ("Sony") is a corporation organized and existing under the laws of California, with its headquarters and principal place of business at 2207 Bridgepointe Parkway, San Mateo, California. It is a wholly-owned subsidiary of the Japanese consumer electronics and media conglomerate Sony Corporation, and is the sole owner the PlayStation digital entertainment brand.

### III. JURISDICTION AND VENUE

15. This action arises, in part, under section 2 of the Sherman Act, 15 U.S.C. § 2. The Court has federal question jurisdiction pursuant to the Clayton Antitrust Act, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

16. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a different state than the Defendant.

17. The Court has personal jurisdiction over Sony because Sony is headquartered in California. The Court also has jurisdiction pursuant to Cal. Code Civ. P. § 410.10, as a result of Sony's substantial, continuous and systematic contacts with the State, and because Sony has purposely availed itself of the benefits and privileges of conducting business activities within the State.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Class members purchased digital video games from Sony in this District, Sony has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here, and Sony is a corporation subject to personal jurisdiction in this District and, therefore, resides here for venue purposes.

### IV. INTRADISTRICT ASSIGNMENT

19. Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to the San Francisco division because a substantial part of the events and omissions which give rise to the claim emanated from California and from San Mateo County in particular.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.   FACTUAL ALLEGATIONS

### A.   Industry Background

20.     The video game market has grown substantially in recent years. Revenues in the video game industry reached $180 billion worldwide in 2020, exceeding those from movies and from the major North American sports leagues combined.[13]

21.     Video games are played on one of several different electronic platforms, including: (i) smartphones and tablets; (ii) personal computers; (iii) video game consoles; and (iv) specialized handheld devices. This case concerns video games consoles, specifically the market for downloadable, digitally-delivered video game content that is compatible with a PlayStation console ("digital PlayStation games").

22.     For the past two decades, three companies have dominated the market for video game consoles: Sony, which manufactures the PlayStation console; Microsoft, manufacturer of the Xbox; and Nintendo. All three companies periodically release new models of their consoles, with updated hardware and software and new design features.

23.     The original PlayStation launched in 1994, and Sony recently released the fifth iteration of that console.[14] Microsoft has released eight versions of its Xbox since 2001, when it entered the market.[15] Nintendo has the longest history of the three, having released seven console models since its 1985 debut.[16]

24.     Games are not cross-compatible on different consoles, so once a consumer purchases a console, he or she must purchase games that are designed for that particular console.

---

[13] Jordan Williams, *Video game industry bigger than sports, movies combined: report*, The Hill (Dec. 23, 2020), https://thehill.com/blogs/in-the-know/in-the-know/531479-video-game-industry-bigger-than-sports-movies-combined-report.

[14] *See* Jimmy Thang, *The Evolution of PlayStation Consoles*, GameSpot (Sept. 7, 2020), https://www.gamespot.com/gallery/the-evolution-of-playstation-consoles/2900-899/.

[15] *See* Gabe Gurwin, *The History of the Xbox*, Digital Trends (Mar. 16, 2021), https://www.digitaltrends.com/gaming/the-history-of-the-xbox/.

[16] *See* Jeff Dunn and Kevin Webb, *A visual history of Nintendo's video game consoles*, Bus. Insider (May 16, 2019), https://www.businessinsider.com/nintendo-consoles-in-history-photos-switch-2017-1.

CLASS ACTION COMPLAINT

The consoles are substantially differentiated, with distinctively designed controllers and other factors that lead to a different experience for the player, even where the same games are available on more than one console. Consumers, therefore, tend to prefer one console over the others, and are far more likely to continue buying the new models of one console than to switch to a different console entirely.

25.     The supply chain for video games has historically been characterized by three players: (i) developers, who design and execute the creation of games and produce the software; (ii) publishers, who handle funding, marketing, and distribution to retailers; and (iii) retailers, who sell games to the console-owning public.[17]

26.     The relationship between developers and publishers is akin to that between book authors and publishing houses. The author produces a manuscript and then relies on a publishing house to print and market the books, and deliver them to bookstores. Similar to the way that publishing houses often offer advances to authors who agree to write manuscripts for them, video game publishers also provide funding to developers.

27.     The three major video game console manufacturers also develop and publish games for their consoles in-house, called "first-party games" which are often available exclusively on that company's console. Nintendo relies heavily on first-party games, which make up about 85% of game sales for its Switch console.[18] Most PlayStation games, on the other hand, are developed and published by third parties, with about 17% of game sales being first-party in 2020.[19]

---

[17] *See Intro to the Industry: The difference between game developers and publishers,* Gaming Street (Sept. 18, 2019), https://gamingstreet.com/intro-to-the-industry-the-difference-between-game-developers-and-publishers/.

[18] Ben Gilbert, *Nintendo's recent success highlights a critical risk to the gaming giant's business*, Bus. Insider (Feb. 4, 2019), https://www.businessinsider.com/nintendo-reliance-on-first-party-games-huge-risk-to-business-2019-2.

[19] Sony Corporation, Supplemental Information for the Consolidated Financial Results for the Fourth Quarter Ended March 31, 2021 at 9 (Apr. 28, 2021), sony.com/en/SonyInfo/IR/library/presen/er/pdf/20q4_supplement.pdf

CLASS ACTION COMPLAINT

1    **B.    The Rise of Digital Video Games**

2        28.    Historically, video games were sold exclusively on disks that users inserted into

3    the console. Games could be purchased or rented from a variety of online and brick-and-mortar

4    retailers, including many that bought and sold used copies. The disks could also be traded and

5    shared amongst friends.

6        29.    More recent versions of all three consoles also allow users to purchase and

7    download digital copies of games directly to the console, which connects to the internet, thereby

8    avoiding the need for any physical disk. Sony, Microsoft, and Nintendo each operate their own

9    virtual store where consumers can buy and download digital games directly on their console.

10       30.    Sales of digital games for the three consoles exceeded sales of their physical

11   counterparts for the first time in 2020, and the trend is likely to continue, with video game disks

12   following the path taken by DVDs and CDs towards the history books.[20]

13       31.    All three digital stores operate in a similar fashion: game publishers provide the

14   game software to the digital store, which then makes the games available for purchase. The store

15   collects payment, and facilitates digital delivery to users' console. For their services maintaining

16   the platform and the necessary infrastructure for delivering digital content, Sony, Microsoft, and

17   Nintendo take a cut of every sale on their respective stores, remitting the balance to the

18   publishers.

19       32.    Sony's PlayStation Store differs from both Microsoft and Nintendo's digital

20   stores, however, in that game developers must cede total control over the retail price to Sony.[21]

21   Microsoft and Nintendo, on the other hand, allow developers who sell games through their

22   _____

23   [20] *See* Dylan Warman, *For the First Time, Digital Game Sales Outnumber Physical Sales*,
     ScreenRant (Aug. 12, 2020), https://screenrant.com/digital-game-sales-consoles-outnumber-
24   physical-first-time/

25   [21] *See* PlayStation Global Developer & Publisher Agreement ¶ 15.2.2 (effective Mar. 23, 2017)
     ("Each SIE Company has the sole and exclusive right to set the retail price to Users for Digitally
26   Delivered Products sold or otherwise made available for purchase on or through [PlayStation
     Network]."), *available at* https://www.sec.gov/Archives/edgar/data/946581/00016282801700
27   5833/ex10-48.htm.

28

CLASS ACTION COMPLAINT

platforms to set the retail price, and then take 30% of that price on each sale for platform fees.[22] Sony follows a similar revenue sharing model with some publishers, and is reported to take the same 30% cut.[23] With other publishers, however, Sony maintains agreements whereby it pays the publisher an agreed upon "wholesale price" for each game sold, with the full retail markup going to Sony.[24]

### C.  Competition in the Retail Market for Digital Video Games

33.     In the retail market for digital video games, price competition occurs principally in one of two ways. First, where publishers maintain some control over the retail price, they compete with one another to gain market share by offering a lower price to consumers. Second, where download codes are available from outside retailers, the retailers compete amongst themselves and with the in-console stores to offer the best price.

34.     For Xbox and Nintendo games, consumers can buy these download codes from the same retailers who sell games on disks, which they then use to download the games directly to their consoles.

35.     PlayStation games were previously sold in the same manner, but as of April 1, 2019, Sony stopped allowing retailers to sell download codes for PlayStation games. As a direct and proximate result, the only place consumers can purchase digital copies of PlayStation games is directly from the PlayStation Store, where Sony has complete control over retail prices.

### D.  The PlayStation 5 Launch

36.     On November 12, 2020, Sony launched the PlayStation 5. As of March 31, 2021, Sony had sold over 7.8 million units, making the PlayStation 5 the fastest-selling console of all

---

[22] *See Frequently Asked Questions,* Nintendo Developer Portal, https://developer.nintendo .com/faq (last visited Apr. 28, 2021); Microsoft Store App Developer Agreement, Version 8.6 (effective July 10, 2020), *available at* https://query.prod.cms.rt.microsoft.com/cms/api/am/ binary/RE4o4bH

[23] *See* Tom Marks, Report: *Steam's 30% Cut Is Actually the Industry Standard*, IGN (Jan. 13, 2020), https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

[24] PlayStation Global Developer & Publisher Agreement ¶ 15.2.1.

CLASS ACTION COMPLAINT

time,[25] but Sony has nevertheless been unable to meet demand for the console. Upon release, PlayStation 5 consoles were almost immediately sold out at every retailer. Today, it is still very difficult for consumers to get their hands on a PlayStation 5 gaming console, with inventory restocks at major retailers and on Sony's website selling out almost instantaneously.[26] PlayStation 5 sales are expected to eventually surpass 200 million units.[27]

37.     The PlayStation 5 is available in two versions: the Base Model which is available for $499 retail, and the Digital Edition which is $100 less expensive at $399 retail.

38.     The Base Model includes the previously-standard optical disk drive, allowing users to choose whether to purchase physical disk copies of games, available from retailers such as those mentioned above, or to buy digital copies and download directly to their console. The less expensive Digital Edition does not include a disk drive, so users can only purchase games in digital format at Sony's monopoly prices.

**E.     Sony Eliminates Retail Competition for Digital PlayStation Games**

39.     Until recently, consumers could purchase download codes for digital PlayStation games from the same array of retailers that sell physical games. This allowed PlayStation users to purchase a digital copy of a video game from their preferred retailer at the retailer's chosen price.

40.     However, starting on April 1, 2019, Sony implemented a new policy preventing retailers from selling digital download codes. Since access to Sony's PlayStation Network is required to enable digital delivery of PlayStation games, the result of this scheme is that consumers can purchase digital games only through the PlayStation Store or not at all. For

---

[25] *See* Andy Robinson, *Sony reports 7.8m PS5s shipped in 'PlayStation's best year ever'*, Video Games Chronicle (Apr. 28, 2021), https://www.videogameschronicle.com/news/sony-reports-7-8m-ps5-sales-in-playstations-best-year-ever/.

[26] *See* Kevin Webb, *Sony's PlayStation 5 remains hard to find months after its launch*, Bus. Insider (Apr. 14, 2021), https://www.businessinsider.com/where-to-buy-ps5.

[27] *See See* Aernout van de Velde, *PS5 Sales to Exceed 200 to 300 Million Units in 5 to 6 Years, Analyst Says; Could Terminate the Long-Running Console War*, WCCF Tech (Oct. 17, 2020), https://wccftech.com/ps5-sales-200-300-million-700-console-war/.

CLASS ACTION COMPLAINT

owners of the PlayStation 5 Digital Edition, that means the only place they are able to purchase any video games for their console is through the PlayStation Store.

41.     Sony, at all relevant times, retained exclusive control over the design, features and operating software for PlayStation consoles, and over the necessary software for delivering digital content to PlayStation consoles.

42.     Sony specifically intended to and did eliminate price competition from other digital video game retailers. As a result, Sony has an unlawful monopoly over the market for digital PlayStation games, from which it derives supracompetitive profits.

43.     Before the April 2019 policy changes, publishers could sell both physical PlayStation games and digital games, via download codes, through a variety of retailers. Retailers profit from markups on the final purchase price, but price competition among them puts downward pressure on retail price markups. Sony also charges a Platform Royalty Fee on each game sold by retailers for use on its gaming consoles, including PlayStation 5. On information and belief, Sony's Platform Royalty Fee for physical games sold at external retailers is 11.5%.

44.     By foreclosing retail competition for digital PlayStation games, Sony effectively takes the retail markup for itself in addition to its royalty fee. It also charges a higher total fee than the sum of both the retail markup and the Platform Royalty Fee for games sold by retailers. Consumers, limited to a single source for purchasing any digital PlayStation content, are forced to pay a higher price for digital PlayStation games than they would in a free and unrestrained competitive retail market.

45.     Additionally, by taking complete control over retail prices for digital PlayStation games, Sony foreclosed price competition among video game publishers to a significant degree, because they can no longer execute a strategy of offering lower retail prices to gain a higher share of sales. Instead, Sony sets the price to maximize its own profits, and Sony's interests in choosing a retail price strategy conflict with the interests of video game publishers. Because Sony is responsible for all the marginal costs associated with each sale, it is incentivized to set the price higher to obtain a greater margin on each sale. Publishers, who incur no additional costs

with each additional game sold, would maximize their profits at a lower price point but greater sales volume, relative to Sony.

46.     Sony owns, possesses or controls 100% of the PlayStation Store, maintains and operates the PlayStation Store with Sony employees or agents, and controls all of the sales, revenue collections and other business operations.

47.     The revenue Sony generates through sales of digital video games has been increasing sharply since it established its monopoly on digital PlayStation games. In 2019, Sony made $12.48 billion through sales of digital PlayStation games and associated content.[28] For the fiscal year ending March 31, 2021, that number was $17.32 billion.[29]

## VI.     MONOPOLY POWER IN THE RELEVANT MARKET

48.     The relevant product market in this case is the market for downloadable, digitally-delivered video game content that is compatible with a PlayStation console ("digital PlayStation games"). The relevant geographic market is the United States, its territories, possessions, and the Commonwealth of Puerto Rico.

49.     As discussed above, the market for video game consoles is dominated by three companies of roughly equal market share: Sony (PlayStation); Microsoft (Xbox); and Nintendo. The price for the consoles is generally between $300 and $600. Games are not cross-compatible on different consoles, so once a consumer purchases a console, he or she must purchase games that are designed for that particular console.

50.     Due to the high cost of consoles, the differentiation among them, and the lack of cross-compatibility, each console creates a separate aftermarket for games that can be played on it. Games that cannot be played on the same console are not substitutable. A small but

---

[28] Ravi Sinha, *PlayStation Network Generated 2nd Highest Revenue Ever in 2019*, GamingBolt (Feb. 2, 2020), https://gamingbolt.com/playstation-network-generated-2nd-highest-revenue-ever-in-2019

[29] Sony Corporation, Financial Statements and Consolidated Financial Results for the Fiscal Year Ended March 31, 2021 (Apr., 28, 2021), available at https://www.sony.com/en/SonyInfo/IR/library/presen/er/pdf/20q4_sony.pdf. Dollar figure based on the following exchange rate from April 28, 2021: 1 JPY = 0.0092 USD.

CLASS ACTION COMPLAINT

significant, non-transitory increase to the price of games for one console will not, therefore, cause a consumer to switch to one of the other consoles.

51.     Prices for digital games on the PlayStation Store are not responsive to changes in prices for physical games available from other retailers, and physical games are not substitutes for digital games. A small but significant, non-transitory increase in price for digital PlayStation games will not cause a significant number of consumers to switch to buying physical copies of PlayStation games instead.

52.     Historically, there was vigorous price competition among retailers and among publishers within the console-specific game markets. Retailers tried to offer the best prices to consumers and thereby gain a higher share of the market while maintaining profits. Publishers had an incentive to lower their wholesale prices so retailers could offer a better price in turn, resulting in pricing and sales volumes that maximized profits for both publishers and retailers.

53.     By prohibiting sale of digital PlayStation games except through the PlayStation Store, Sony established a complete monopoly in the market for digital PlayStation games. Sony has a 100% market share in the relevant market, and complete control over retail prices in the relevant market.

## VII.    ANTICOMPETITIVE EFFECTS

54.     Sony's acquisition and maintenance of a monopoly in the market for digital PlayStation games causes consumers to pay more for their digital PlayStation games than they would have in a competitive market. It has also resulted in reduced output of PlayStation games than would exist in a free and unrestrained competitive market.

55.     The lack of a truly competitive environment has also led to reduced output and supply of PlayStation video games because publishers are barred from selling these games at prices below Sony's chosen retail price. Under basic economic principles, lower prices would generate both increased demand and increased supply to meet that demand. Sony's unlawful monopoly naturally restricts output.

56.     Evidence of the anticompetitive price effect is already manifesting itself as demonstrated by the current price differences for PlayStation video games across different retailers. Table 1, below, reflects the prices of the first ten games listed on the PlayStation Store's "Best-Seller" list[30] as of this writing, along with the prices of the same games on disk from four prominent retailers. As shown, Sony's prices on the PlayStation Store are between 12% and 171% higher for these games than the average prices for each across the other four retailers.

**Table 1**

| Game | PS Store | Wal-Mart | GameStop | Best Buy | Amazon | Non-PS Store Average | Price Δ on PS Store |
|------|----------|----------|----------|----------|--------|---------------------|---------------------|
| Madden NFL 21 | $59.99 | $19.98 | $27.99 | $19.99 | $29.16 | $24.28 | +147% |
| Ghost of Tsushima | $59.99 | $56.50 | $37.99 | $59.99 | $59.99 | $53.62 | +12% |
| NBA 2K21 | $59.99 | $29.72 | $18.99 | $19.99 | $19.99 | $22.17 | +171% |
| Watch Dogs Legion | $59.99 | $36.49 | $49.99 | $59.99 | $30.00 | $44.12 | +36% |
| Marvel's Avengers | $39.99 | $29.00 | $22.99 | $24.99 | $24.99 | $25.49 | +57% |
| MLB The Show 20 | $19.99 | $9.99 | $8.99 | $19.99 | $16.97 | $13.99 | +43% |
| Resident Evil 3 | $59.99 | $27.99 | $34.99 | $39.99 | $25.50 | $32.12 | +87% |
| NHL 21 | $59.99 | $28.89 | $29.99 | $19.99 | $25.00 | $25.97 | +131% |
| | | | | | | **Average Price Δ on PS Store:** | **+74%** |

57.     The market for video game on disk provides a helpful benchmark for what prices would look like in a competitive market for digital games. There is no legitimate reason digital games should be more expensive than their physical counterparts. In fact, given the costs saved on packaging and distribution, prices for games in a truly competitive market for digital games would likely be lower than they are for games on disk. The only plausible explanation for the stark price differences is Sony's monopoly power in the market for digital PlayStation games. As video game disks go the way of CDs and DVDs before them, Sony has positioned itself to gain an ever-increasing share of, and eventually, a monopoly in the market for *all* PlayStation games.

---

[30] *See PlayStation Store*: *Best Sellers,* Sony Interactive Entm't, https://store.playstation.com/en-us/category/877e5ce2-4afc-4694-9f69-4758e34e58cd/1 (last visited May 4, 2021).

14

58.     Sony made approximately $17 billion in revenue from the sale of digital PlayStation games in the fiscal year ending March 31, 2021.[31] If the average price difference of +74% indicated by the above data is representative of the broader market, then overcharges resulting from Sony's monopoly could be in the range of $7 billion *per year* as long as Sony's monopoly continues.

59.     The existence of supracompetitive pricing, reduced consumer choice among market alternatives, and reduced output and supply demonstrate that Sony's monopolistic conduct has injured competition generally in the market for digital PlayStation games, precisely the type of harm the antitrust laws were intended to prevent.

## VIII.    ANTITRUST INJURY

60.     Plaintiff and Class members have been injured by Sony's anticompetitive conduct because they paid more for digital PlayStation games than they would have paid in a competitive market.

61.     Plaintiff and Class members have also been injured because Sony's unlawful monopolization of the relevant market extinguished Plaintiff and Class members' freedom of choosing between video games sold through the PlayStation Store and lower cost alternatives that would have been available had Sony not monopolized the market.

## IX.    EFFECT ON INTERSTATE COMMERCE

62.     During the relevant time period, Sony produced, marketed, sold, and delivered digital PlayStation games across state lines in an uninterrupted flow of interstate commerce.

63.     During the relevant time period, Plaintiff and Class members purchased digital PlayStation games, other digital content, and related services from Sony and/or its agents. As result of Sony's illegal and anticompetitive conduct, Plaintiff and Class members were

---

[31] *See* Sony Corporation, Financial Statements and Consolidated Financial Results for the Fiscal Year Ended March 31, 2021 (Apr, 28, 2021), available at https://www.sony.com/en/SonyInfo /IR/library/presen/er/pdf/20q4_sony.pdf. Dollar figure based on the following exchange rate from April 28, 2021: 1 JPY = 0.0092 USD.

compelled to pay, and did pay, artificially inflated prices for one or more of the aforementioned products and services.

64.    During the relevant time period, Sony employed various instrumentalities of interstate commerce to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce.

65.    Defendant's conduct was within the flow of and was intended to have and did have a direct, substantial, and foreseeable effect on interstate commerce.

66.    Sony's conduct has also had substantial intrastate effects in that, among other things, consumers paid overcharges in each state. Sony's conduct materially deprived the consuming public—including of purchasers in each state—of any choice to purchase more affordable digital PlayStation games from retailers other than Sony. The absence of competition for PlayStation 5 games has, and continues to, directly and substantially affect and disrupt commerce within each state.

## X.    CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a), (b)(2) and (3), seeking damages and injunctive relief on behalf of the following Class:

> All persons in the United States, exclusive of Sony and its employees, agents and affiliates, and the Court and its employees, who purchased any digital video game content directly from the PlayStation Store at any time from April 1, 2019 through the present.

68.    Plaintiff and the Class seek damages for the overcharges they have paid since Sony monopolized the relevant market, and permanent injunctive relief to prevent or remedy the unlawful conduct alleged herein and thereby ensure competition in the relevant market.

69.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there are at least ten million Class members, who reside in and have purchased digital PlayStation games in every state and territory throughout the United States. Moreover, given the costs of complex antitrust litigation, it would

be uneconomic for many class members to bring individual claims and join them together. The Class is readily identifiable from information and records in the possession of Defendant.

70.     Plaintiff is a member of the Class he seeks to represent, and his claims arise from the same factual and legal bases as those of the Class; he asserts the same legal theories as do all Class members.

71.     Plaintiff's claims are typical of the claims of Class members. Plaintiff's claims arise out of the same course of anticompetitive conduct that gives rise to the claims of the other Class members. Plaintiff and all members of the Class were damaged by the same wrongful conduct: Sony's monopolization of the retail market for digital PlayStation games. Plaintiff and all members of the Class paid supracompetitive prices for digital PlayStation games and were deprived of the benefits of retail competition as a result of Sony's unlawful monopoly.

72.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are aligned with, and not antagonistic to, those of the other members of the Class.

73.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

74.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. Overcharge damages with respect the Class as a whole are appropriate because Sony acted on grounds generally applicable to the entirety of the Class. Such generally applicable conduct is inherent in Sony's unlawful creation and maintenance of a monopoly in the market for digital PlayStation games. Questions of law and fact common to the Class include, but are not limited to:

   a)  Whether Sony unlawfully created, maintained and continues to maintain monopoly power in the relevant market;

   b)  Whether Sony's unlawful monopoly has caused and continues to cause anticompetitive effects in the relevant market;

   c)  Whether procompetitive justifications exist, and if they do, whether there were less restrictive means of achieving them;

17

d) Whether Sony's unlawful monopoly has substantially affected intrastate and/or interstate commerce;

e) Whether Sony's unlawful monopoly caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

f) Whether injunctive relief is warranted to restore competition in the relevant market;

g) The quantum of overcharges paid by the Class in the aggregate.

75. The common questions of law and fact are identical for each and every member of the Class.

76. Plaintiff will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent himself and those similarly situated.

77. The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and cause needless expenditure of judicial resources.

78. Plaintiff is typical of the Class in that his claims, like those of the Class, are based on the same anticompetitive business practices and the same legal theories.

79. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

80. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

18

# XI.    CLAIMS FOR RELIEF

## FIRST CLAIM

### Monopolization Under Section 2 of The Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. 4

81.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

82.    Sony has willfully and unlawfully acquired, maintained, and continues to maintain monopoly power in the market for digital PlayStation video games. Specifically, Sony has unlawfully acquired monopoly power by: (i) establishing the PlayStation Store as the exclusive distributor of digital PlayStation games; and (iii) maintaining complete control over retail prices on the PlayStation Store.

83.    Sony's unlawful acquisition of monopoly power has reduced competition in the relevant market resulting in decreased output and supracompetitive prices for digital PlayStation games.

84.    There is and was no legitimate, non-pretextual, procompetitive business justification for Sony's conduct that outweighs its harmful effect.

85.    Plaintiff and Class members have been injured by Sony's unlawful monopolization because they have been: (a) deprived of lower cost alternatives for digital PlayStation games; (b) forced to pay supracompetitive prices for those games; and/or (c) subjected to a lower of those games. Plaintiff and Class members paid more for digital PlayStation games than they otherwise would have absent Sony's unlawful monopolization of the digital PlayStation game market.

86.    Plaintiff and Class members have suffered economic injury to their property as a direct and proximate result of Sony's monopolization of the relevant market in violation of 15 U.S.C. § 2, and are, therefore, entitled to treble damages, costs, and attorneys' fees in amounts to be proved at trial.

87.     Plaintiff and Class members have suffered economic injury to their property as a direct and proximate result of Sony's unlawful monopolization, and Sony is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

## SECOND CLAIM

**For Attempted Monopolization Under Section 2 of The Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. 4**

88.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

89.     Sony has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the market digital PlayStation games. Specifically, Sony has unlawfully attempted to acquire monopoly power by; (i) establishing the PlayStation Store as the exclusive distributor of digital PlayStation games; and (ii) maintaining complete control over retail prices on the PlayStation Store.

90.     Sony's attempted acquisition of monopoly power has reduced competition in the relevant market resulting in decreased output and supracompetitive prices for digital PlayStation games.

91.     There is and was no legitimate, non-pretextual, procompetitive business justification for Sony's conduct that outweighs its harmful effect.

92.     Plaintiff has been injured by Sony's unlawful attempted monopolization because they have been: (a) deprived of lower cost alternatives for digital PlayStation games; (b) forced to pay supracompetitive prices for those games; and (c) subjected to a lower output of those games. Plaintiff and Class members paid more for digital PlayStation games than they otherwise would have absent Sony's unlawful monopolization of the digital PlayStation game market.

93.     Plaintiff and Class members have suffered economic injury to their property as a direct and proximate result of Sony's attempted monopolization of the relevant market in violation of 15 U.S.C. § 2, and are, therefore, entitled to treble damages, costs, and attorneys' fees in amounts to be proved at trial.

## THIRD CLAIM

### Declaratory and Injunctive Relief Under Section 2 of The Sherman Act, 15 U.S.C. § 2 and Sections 2 and 16 of the Clayton Act, 15 U.S.C. § 26

94.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

95.     Sony's unlawful creation and maintenance of a monopoly in the digital PlayStation game market violates Section 2 of the Sherman Act, 15 U.S.C § 2. Its unlawful conduct is continuing and will continue unless it is permanently enjoined. The anticompetitive effects of Sony's unlawful conduct in the relevant market are continuing and will continue absent an injunction.

96.     Plaintiff and the Class have been injured in their business or property by reason of Sony's antitrust violations alleged in this Count. These injuries will continue until Sony's anticompetitive conduct ceases and competition is restored.

## FOURTH CLAIM

### Damages Under the California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.*

97.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

98.     Sony's monopolization of the market for digital PlayStation games locks consumers into purchasing digital PlayStation games from the PlayStation Store. This video game aftermarket restriction is unfair, immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

99.     Sony's monopolizing conduct is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including the Sherman Act.

100.    Sony's monopolizing conduct is also unfair because the consumer injury is substantial, is not outweighed by benefits to consumers or competition, and is not one consumers themselves could reasonably have avoided.

## FIFTH CLAIM

### Unjust Enrichment

101.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

102.    As a result of Sony's monopolization of the digital PlayStation video game market, Sony has been unjustly enriched at the expense of Plaintiff and Class members, who purchased digital PlayStation games from the PlayStation Store when they otherwise might not have, or spent more to purchase digital PlayStation games than they otherwise would have absent Sony's wrongful acts described herein.

103.    It would be inequitable for Sony to retain the profits, benefits, and other compensation obtained from its wrongful conduct.

104.    As a result, Plaintiff seeks, on behalf of himself and other Class Members, restitution from Sony and an Order disgorging all of Sony's inequitably-obtained revenue, profits, benefits, or other compensation.

105.    Because the Court has broad discretion to find Sony was unjustly enriched, and because the Court has broad discretion to award appropriate relief, and because Sony may have been unjustly enriched in an amount different than the amount Plaintiff and Class Members were damaged, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of Sony's challenged behavior.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, prays for judgment against Sony as to each and every claim made herein and for the following relief:

A.    An Order determining that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and directing

22

CLASS ACTION COMPLAINT

that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appointing the Plaintiff as the named representative of the Class;

C.      Injunctive relief ensuring free and unrestrained competition in the market for digital PlayStation games, and preliminarily and permanently enjoining Sony from continuing the unlawful conduct alleged herein, and from engaging in similar or related conduct in the future;

D.      Monetary relief consisting of treble damages in an amount to be determined at trial; pre- and post-judgment interest; and costs, expenses, and reasonable attorneys' fees; and

G.      Any other and further relief the case may require and the Court may deem just and proper under the circumstances.

## XIII.   JURY DEMAND

106.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Dated: May 5, 2020                     Respectfully submitted,

/s/ Jeff S. Westerman

Jeff S. Westerman (SBN 94559)
**WESTERMAN LAW CORP.**
16133 Ventura Blvd., Suite 685
Encino, CA 91436
Tel: (310) 698-7450
jwesterman@jswlegal.com

Michael M. Buchman (*pro hac vice* forthcoming)
Michelle C. Clerkin (*pro hac vice* forthcoming)
Jacob O. Onile-Ere (*pro hac vice* forthcoming)
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
Tel: (212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

Adrián N. D. Campos (*pro hac vice* forthcoming)
**THE LAW OFFICE OF ADRIAN CAMPOS**

23

40 Bayscape Cardiff Marina
Watkiss Way, Cardiff, CF11 0TA
United Kingdom
Tel: +44 7305 568951
mrcampos15@gmail.com

Barrett Beasley (SBN: 194143)
Robert L. Salim (*pro hac vice* forthcoming)
**SALIM-BEASLEY, LLC**
1901 Texas Street
Natchitoches, LA 71457
Tel: (318) 354-1043
Fax: (318) 354-1227
robertsalim@cp-tel.net

John Alden Meade(*pro hac vice* forthcoming)
**MEADE YOUNG LLC**
909 Poydras St., Suite 1600
New Orleans, LA 70112
Tel: (504) 799-3102
jam@meadeyoung.com

*Attorneys for Plaintiff and the Proposed Class*

24