John F. Cove, Jr. (SBN 212213)
john.cove@shearman.com
Patrick D. Robbins (SBN 152288)
probbins@shearman.com
SHEARMAN & STERLING LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105-2997
Telephone: 415.616.1100
Fax: 415.616.1199

Ryan A. Shores (*pro hac vice*)
ryan.shores@shearman.com
Brian C. Hauser (*pro hac vice*)
brian.hauser@shearman.com
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: 202.508.8000
Fax: 202.508.8100

*Attorneys for Sony Interactive Entertainment LLC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUSTIN CACCURI, ADRIAN CENDEJAS, and ALLEN NEUMARK, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC,<br><br>Defendant. | Case Nos.: 3:21-cv-03361-RS<br>3:21-cv-03447-RS<br>3:21-cv-05031-RS<br><br>**DEFENDANT'S MOTION TO DISMISS**<br>Judge: Hon. Richard Seeborg<br>Date: May 12, 2022<br>Time: 1:30 pm |

1

## NOTICE OF MOTION AND MOTION

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3

     **PLEASE TAKE NOTICE** that, on May 12, 2022 at 1:30 p.m., or as soon thereafter as the

4

matter may be heard before the Honorable Richard Seeborg in Courtroom 3, 17th Floor, 450 Golden

5

Gate Avenue, San Francisco, California, Defendant Sony Interactive Entertainment LLC

6

("Defendant") by and through their undersigned counsel, will, and hereby do, move the Court,

7

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing with

8

prejudice the Consolidated Class Action Complaint ("Complaint") filed on December 20, 2021 by

9

Plaintiffs Agustin Caccuri, Adrian Cendejas, and Allen Neumark (collectively the "Plaintiffs")

10

     This motion is based upon this Notice of Motion and the accompanying Memorandum of

11

Points and Authorities filed with these documents, any matters of which the Court may take judicial

12

notice, the files and records in this action, and such oral and documentary evidence as this Court

13

may allow at the hearing of this motion.

14

15

Dated: February 18, 2022          Respectfully submitted,

16

17

18

               */s/ John F. Cove, Jr.*
               John F. Cove, Jr. (SBN 212213)

19

               Patrick D. Robbins (SBN 152288)
               535 Mission Street, 25th Floor

20

               San Francisco, CA 94105
               Telephone: 415.616.1100

21

               john.cove@shearman.com
               probbins@shearman.com

22

               Ryan A. Shores (*pro hac vice*)

23

               Brian C. Hauser (*pro hac vice*)
               401 9th Street, NW, Suite 800

24

               Washington, DC 20004
               Telephone: 202.508.8058

25

               ryan.shores@shearman.com
               brian.hauser@shearman.com

26

               SHEARMAN & STERLING, LLP

27

               *Attorneys for Defendant*
               *Sony Interactive Entertainment LLC*

28

1

**STATEMENT OF ISSUES TO BE DECIDED**

2      Whether the Consolidated Class Action Complaint should be dismissed under Federal Rule

3  of Civil Procedure 12(b)(6) because:

4   1.  Plaintiffs have failed to allege monopoly power or a dangerous probability of achieving

5        monopoly power in a properly-defined relevant antitrust market. (Counts I–IV).

6   2.  Plaintiffs have failed to allege anticompetitive conduct. (Counts I–IV).

7   3.  Plaintiffs have failed to allege anticompetitive effects or antitrust injury. (Counts I–IV).

8   4.  Plaintiffs have failed to allege facts supporting a claim for unjust enrichment. (Count V).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................iv

PRELIMINARY STATEMENT ........................................................................................1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................................3

      A.   Sony, The PlayStation, And Industry Background ...................................3

      B.   The PlayStation Store And Videogame Distribution ...............................3

      C.   Plaintiffs And Their Claims .....................................................................5

ARGUMENT ....................................................................................................................5

I.    PLAINTIFFS FAIL TO ALLEGE FACTS SHOWING THAT SONY
      POSSESSES MONOPOLY OR NEAR-MONOPOLY POWER IN A
      PLAUSIBLE RELEVANT MARKET. ...........................................................7

      A.   Plaintiffs' Allegations Render Their Single-Brand Market
          Implausible. ...............................................................................................7

      B.   Plaintiffs' Allegations Render Their Aftermarket Theory
          Implausible. .............................................................................................10

      C.   Plaintiffs Do Not Allege That Sony Has Monopoly Power In Any
          Relevant Market. .....................................................................................14

II.   PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT SONY ENGAGED
      IN ANTICOMPETITIVE CONDUCT. ....................................................15

      A.   Sony's Decision to Stop Offering Full-Game Download Codes to
          Third-Party Retailers Is Not Anticompetitive. ......................................15

      B.   Sony's Use Of A Wholesale Model To Sell Digital Games Is Not
          Anticompetitive. .....................................................................................19

III.  PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN ANTICOMPETITIVE
      EFFECT OR ANTITRUST INJURY. ......................................................20

      A.   Plaintiffs Have Not Alleged Facts Demonstrating The Challenged
          Conduct Caused Supracompetitive Prices Or Other Effects. ..................21

          1.   *Plaintiffs Allege No Facts Showing That Sony Charges
              Supracompetitive Prices.* ............................................................21

          2.   *Plaintiffs' Allegations Of Other Alleged Anticompetitive
              Harms Are Speculative, Conclusory, And Contradicted By
              The Complaint.* ..........................................................................23

      B.   Unilateral Termination of A Distribution Channel Does Not Cause
          Antitrust Injury. .....................................................................................23

IV.  PLAINTIFFS' STATE LAW CLAIMS FAIL. ........................................25

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFMS, LLC v. United Parcel Serv. Co.*, No. 10-cv-05830, 2011 WL 13128436 (C.D. Cal. Nov. 23, 2011)...................................................................................................... 8, 11

*In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F.Supp. 324 (E.D.N.Y. 2019)7, 20, 23

*Am. Sales Co., v. AstraZeneca AB*, No. 10-cv-60662 (PKC), 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) ........................................................................................................ 10

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-cv-4903 (JMF), 2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ........................................................................... 17

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................... 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ................ 15, 16, 17, 18

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) .................................................... 19

*In re ATM Fee Antitrust Litig.*, No. 04-cv-2676 (CRB), 2010 WL 2557519 (N.D. Cal. June 21, 2010).................................................................................................................... 9

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227 (C.D. Cal. 2013) ........... 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)............................................ 21

*Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir. 1972)............................................... 2, 14, 17

*City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686 (9th Cir. 2015)....................... 25

*Cont'l Cas. Co. v. Enodis Corp.*, 417 F. App'x 668 (9th Cir. 2011) ............................................ 25

*Coronavirus Reporter v. Apple Inc.*, No. 21-cv-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021)........................................................................................................*passim*

*Epic Games, Inc. v. Apple Inc.*, No. 20-cv-05640-YGR, 2021 WL 4128925 (N.D. Cal. Sep. 10, 2021)................................................................................................................*passim*

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ............................................................*passim*

*In re German Auto. Mfrs. Antitrust Litig.*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).................................................................................................................... 22

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ..................................................... 4, 7, 9

*hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ........................... 1, 8, 9

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691 (9th Cir. 1998), *amended*, 164
F.3d 1243 (9th Cir. 1999) .................................................................................................. 11

*Knutson v. Daily Rev., Inc.*, 383 F. Supp. 1346 (N.D. Cal. 1974), *modified*, 401 F. Supp.
1374 (N.D. Cal. 1975), *and aff'd in part, rev'd in part on other grounds*, 548 F.2d 795
(9th Cir. 1976) ................................................................................................................... 14

*LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008) ...................................... 16

*MetroNet Servs. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) ................................................. 16

*N. Penn Towns, LP v. Concert Golf Partners, LLC*, No. 19-cv-4540-KSM, 2021 WL
3562849 (E.D. Pa. Aug. 12, 2021) ..................................................................................... 8

*Naify v. McClatchy Newspapers*, 599 F.2d 335 (9th Cir. 1979) ................................................. 14

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008) ............................... 10, 11, 12

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.) ........................... 18

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ................................................................. 24

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ........................................... 11, 15, 20, 22

*Oracle Am., Inc. v. CedarCrestone, Inc.*, 938 F. Supp. 2d 895 (N.D. Cal. 2013) .................... 8, 12

*Pac. Bell Tel. Co. v. linkLine Commn'cs, Inc.*, 555 U.S. 438 (2009) ................................. 17, 18

*Pistacchio v. Apple Inc.*, No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11,
2021) ............................................................................................................................... 1, 9

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007) ........... 2, 14, 17, 24

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412 (5th Cir. 2010) ........................ 8

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ................................................................. 24

*Rebel Oil Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ............................................. 20

*Reilly v. Apple Inc.*, No. 21-cv-04601-EMC, 2022 WL 74162 (N.D. Cal. Jan. 7, 2022) ........ 1, 7, 9

*Shaw v. Rolex Watch, USA, Inc.*, 673 F. Supp. 674 (S.D.N.Y. 1987) ......................................... 10

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ................................................................. 22

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ................................................... 5, 20

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) .................................................................................. 20

*Streamcast Networks, Inc. v. Skype Techs., S.A.,* 547 F. Supp. 2d 1086 (C.D. Cal. 2007)....... 9, 10

*Success Sys., Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31 (D. Conn. 2020) ................................... 8

*In re Term Commodities Cotton Futures Litig.,* No. 12-cv-5126, 2013 WL 9815198
    (S.D.N.Y. Dec. 20, 2013) ......................................................................................................... 23

*United States v. Apple,* 791 F.3d 290 (2d Cir. 2015) ............................................................. 19, 20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)............... 15, 18

*In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987 (N.D. Cal. 2010)......................................... 23

*Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563-JCC, 2021 WL 5415305 (W.D.
    Wash. Nov. 19, 2021)................................................................................................... *passim*

**Statutes**

California's Unfair Competition Law ...................................................................................... 5, 25

Sherman Act ............................................................................................................................ *passim*

**Other Authorities**

Lu, L., *A Comparison of the Wholesale Model and the Agency Model in Differentiated
    Markets*, 51 REV. IND. ORGAN. 151, 152 (2017).  ................................................................ 19

N. Statt, *Sony confirms it will stop letting GameStop and other retailers sell PS4 download
    codes*, THE VERGE (Mar. 25, 2019),
    https://www.theverge.com/2019/3/25/18281538/sony-playstation-4-gamestop-stop-
    selling-game-download-codes-retailers ................................................................................ 4

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW...................................................... 11

Tom Marks, *Report: Steam's 30% Cut Is Actually the Industry Standard*, IGN (Jan. 13,
    2020), https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-
    industry-standard ............................................................................................................ 22

**PRELIMINARY STATEMENT**

Apparently searching for a technology platform that had yet to be sued for monopolization, Plaintiffs here landed on Sony Interactive Entertainment LLC ("Sony").  Lacking any viable antitrust theory, however, Plaintiffs stack together two of the most disfavored theories in antitrust law—the single-brand market and a compelled duty to work with competitors—to make out a monopolization claim.  Specifically, Plaintiffs claim that Sony unlawfully monopolized game sales on its own PlayStation Store by: (1) no longer offering to third-party retailers certain full-game download codes that consumers could redeem on the PlayStation Store and (2) using a wholesale/retail distribution model.

No antitrust case suggests these ordinary business decisions are suspect, much less unlawful—even if done by a monopolist (which Sony is not).  Indeed, courts in a line of recent cases consistently rejected similar, if less radical, theories alleging "platform-monopolization."[1]  Here, the lack of merit is even more obvious.  Slapping conclusory antitrust labels on Sony's everyday distribution decisions is not enough to declare Sony an illegal monopolist and force a judicial restructuring of its business model, as Plaintiffs wish.  This Court should reject the claims as deficient as a matter of law.

First, Plaintiffs' claims rest on the flawed premise that Sony has "100% market share" of its *own* digital store.  Single-brand markets, however, are extremely rare and not present here because, as the Complaint alleges, Sony, Microsoft, and Nintendo compete aggressively to sell both gaming consoles and games.  To ignore this robust competition—so Plaintiffs can pronounce Sony a "monopolist" of itself—would ignore settled caselaw and common sense.

Second, even if Plaintiffs adequately pled monopoly power in a relevant market (they have not), Plaintiffs fail to plead anything resembling anticompetitive conduct.  This too requires

---

[1] *E.g.*, *Reilly v. Apple Inc.*, No. 21-cv-04601-EMC, 2022 WL 74162 (N.D. Cal. Jan. 7, 2022); *Coronavirus Reporter v. Apple Inc.*, No. 21-cv-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021); *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563-JCC, 2021 WL 5415305 (W.D. Wash. Nov. 19, 2021); *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-05640-YGR, 2021 WL 4128925 (N.D. Cal. Sep. 10, 2021); *Pistacchio v. Apple Inc.*, No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021); *see also hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020).

dismissal.   Antitrust law does not restrict "the long recognized right" of a supplier, even a monopolist, "freely to exercise his own independent discretion as to parties with whom he will deal." *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).   Indeed, it is well-settled that a supplier may reorganize its distribution system to terminate a third-party distributor without running afoul of the Sherman Act.  *See, e.g.*, *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007); *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972).  That is all that happened here when Sony chose to stop offering download codes to third-party retailers.

Nor does antitrust law punish a company for choosing a wholesale purchasing model—a model that is utilized by thousands, if not millions, of businesses throughout the global economy. Substituting rhetoric for analysis, Plaintiffs claim that Sony "force[d] publishers to cede control over the final retail price" of digital games to Sony.  Compl. ¶ 39.  Of course, that is how a wholesale model works: the wholesaler and retailer agree on a wholesale price and, in turn, the retailer sets the price of the product that it sells to consumers.  In effect, Plaintiffs are asking this Court to order Sony to abandon a wholesale model and use a commission model instead.  There is no basis in antitrust law for such an extraordinary request.

Finally, Plaintiffs do not plausibly plead any anticompetitive effects or any antitrust injury flowing from the challenged conduct.  While Plaintiffs contend that Sony's PlayStation digital-game prices are "supracompetitive," they allege no facts in the Complaint to support that conclusory assertion.  To the contrary, the Complaint suggests, if anything, that digital-game prices on Sony's PlayStation are the same *or less* than those of competitors who do *not* engage in the challenged conduct.  Nor is there any allegation that prices changed after the challenged conduct that supposedly caused "supracompetitive" prices.  Plaintiffs' implausible monopolization claims, as well as their derivative state-law claims, should be dismissed.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS[2]

### A.   Sony, The PlayStation, And Industry Background

Sony operates the PlayStation videogame platform, which includes PlayStation game consoles and the PlayStation Store.  Compl. ¶¶ 2, 36–37.  For at least two decades, Sony has competed with Microsoft, which offers the Xbox videogame platform, and Nintendo, which offers the Switch videogame platform.  *Id.* ¶ 25.  Plaintiffs allege that, in addition to videogame consoles like Xbox, PlayStation, and Switch, consumers play videogames on other devices, including personal computers, specialized handheld devices, and smartphones.  *Id.* ¶ 24.

Sony released the original model of the PlayStation in 1994.  *Id.* ¶ 30.  Since then, Sony has released four generations.  Most recently, the PlayStation 5 ("PS5") was released on November 12, 2020.  Plaintiffs allege it became the fastest selling videogame console of all time.  *Id.*  Sony offers two versions of the PS5: the Base Model and the Digital Edition.  *Id.* ¶ 31.  The Base Model, like earlier PlayStations, has an optical disk drive that allows users to play games on physical disks and can also play "digital games" that users download from the PlayStation Store.  *Id.*  The Digital Edition, which does not contain an optical disk drive and is less expensive, plays only digital games that users download from the PlayStation Store.  *Id.*  Games can be developed by console manufacturers (first-party games) or by outside developers (third-party games).  *See id.* ¶ 29.

### B.   The PlayStation Store And Videogame Distribution

Sony's PlayStation Store, which launched in 2006, offers digital games, apps, and other downloadable content for use on the PlayStation.  *Id.* ¶¶ 4–5, 35–37.  When a user purchases from the PlayStation Store, Sony collects payment from the user and instantly delivers the digital game or other content to the user's console.  *Id.* ¶ 36.  Plaintiffs allege that the PlayStation Store is the only place where users can purchase digital games compatible with the PlayStation.  *Id.* ¶¶ 39, 41.

---

[2] For the purposes of this Motion only, this brief accepts the Complaint's factual allegations as true and, accordingly any statements of fact in this brief are based on those allegations (which Sony does not concede).  Unless noted, internal quotation marks, brackets, and citations are omitted.  Like the Complaint, this brief refers to downloadable games as "digital games" and games stored on a physical disk as "physical games."

1    Microsoft and Nintendo have their own dedicated stores that function similarly to the

2    PlayStation Store. *Id.* ¶¶ 35–36. Plaintiffs allege that Microsoft and Nintendo use an "agency" or

3    "commission" purchasing model, while Sony uses a "wholesale" model. *Id.* ¶ 37. Under the

4    commission model, game publishers set the price of a game on Xbox or Switch, with the game-store

5    operator receiving a 30% commission on each sale. *Id.* By contrast, under the wholesale model,

6    Sony and the publisher/developer agree upon a wholesale price and then Sony sets the retail price

7    that it will charge consumers on the PlayStation Store. *Id.* The Complaint characterizes this

8    wholesale model as Sony "forc[ing] publishers to cede control over the final retail price." *Id.* ¶ 39.

9    Sony has operated the PlayStation Store under this model for many years. *See id.* ¶ 37 n.18 (citing

10   a wholesale agreement from 2017).

11   Before April 2019, one way that Sony marketed games was by offering download codes that

12   consumers could use to download games from the PlayStation Store to third-party retailers, like

13   Amazon or Wal-Mart, who would in turn sell them to consumers. *See id.* ¶¶ 40–41. In April 2019,

14   Sony discontinued this offering and *publicly confirmed* that it would no longer distribute game-

15   specific, full-game download codes through third-party retailers. *Id.* ¶ 41.[3] Microsoft and Nintendo

16   continue to offer full-game download codes through third-party retailers for their platforms. *Id.*

17   ¶ 40.

18   Plaintiffs further allege that Sony's business strategies have been extremely successful: sales

19   of PlayStation consoles and total downloads of digital PlayStation games "sharply increased" to

20   unprecedented levels between 2018 and 2021. *Id.* ¶¶ 2, 4, 48. At the same time, the Complaint

21   _____

22   [3] According to a source cited in the Complaint, Sony stated that it would stop offering full-game, game-specific download codes through third-party retailers, but would continue to offer retailers

23   certain other download codes that consumers could use to purchase games and content, *e.g.*, a code worth $50 that consumers could use to buy any product on the PlayStation Store. Compl. ¶ 41 &

24   n.24 (citing N. Statt, *Sony confirms it will stop letting GameStop and other retailers sell PS4 download codes*, THE VERGE (Mar. 25, 2019),

25   https://www.theverge.com/2019/3/25/18281538/sony-playstation-4-gamestop-stop-selling-game-download-codes-retailers). Both Sony's statement and the "leaked" GameStop memo quoted in this

26   article are incorporated by reference in the Complaint and therefore may be considered on a motion to dismiss. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018). This brief uses

27   "download code" to refer only to the full-game, Sony download codes that are the subject of the

28   allegations.

suggests that competition among the major videogame consoles remains vigorous, as Sony, Microsoft, and Nintendo each have a "roughly equal market share." *Id.* ¶ 50.

**C.     Plaintiffs And Their Claims**

Each Plaintiff owns a PS5 Digital Edition, purchased digital games from the PlayStation Store, and downloaded them to his console during the putative Class Period. *Id.* ¶¶ 1, 14–16. As the PS5 Digital Edition was not released until November 12, 2020, *id.* ¶ 2, Plaintiffs purchased their consoles at least eighteen months *after* Sony stopped selling download codes through third-party retailers (and many years after Sony first adopted a wholesale model), *see id.* ¶¶ 37 n.18, 41.

Plaintiffs bring claims under Section 2 of the Sherman Act, alleging monopolization and attempted monopolization, derivative claims under California's Unfair Competition Law ("UCL"), and a claim for unjust enrichment. *Id.* ¶¶ 85–112. Plaintiffs claim Sony has unlawfully monopolized a "market" for digital PlayStation games by (1) discontinuing these download-code offerings to third-party retailers and (2) choosing a wholesale game purchasing model. *See id.* ¶ 86. Plaintiffs claim this conduct has resulted in "supracompetitive prices for digital PlayStation games." *Id.* ¶ 87. Plaintiffs seek to represent a putative class of all persons who purchased digital videogame content directly from the PlayStation Store since April 1, 2019. *Id.* ¶ 71. They seek damages and an order "preliminarily and permanently enjoining Sony from continuing the unlawful conduct alleged." *Id.* at 29. In other words, they ask this Court to fundamentally change the way Sony operates its platform.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To state a monopolization claim, a plaintiff must show that (1) the defendant has monopoly power in a properly defined antitrust market, (2) acquired or maintained through anticompetitive conduct, which (3) caused an antitrust injury. *Qualcomm*, 969 F.3d at 990. For attempted monopolization, a plaintiff must show (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc.*

1    *v. McQuillan*, 506 U.S. 447, 456 (1993).  Here, Plaintiffs fail to allege facts plausibly supporting

2    the elements of these claims.

3          First, Plaintiffs rest their case on a single-brand market: a claimed market for "digital

4    PlayStation games."  Compl. ¶ 12.  Single-brand markets are highly disfavored because they almost

5    always ignore the reality of competition from *other* brands.  Here, Plaintiffs' proposed market

6    ignores competition from the other major console-based platforms, to say nothing of the other

7    platforms (*e.g.*, PCs, mobile, and streaming services).  To the extent Plaintiffs attempt to rely on a

8    single-brand "aftermarket" theory, this fails because they have not alleged facts showing they were

9    unknowingly subject to allegedly anticompetitive conditions after being "locked in" to their

10    PlayStations.  The fact that third-party retailers (like Amazon or Best Buy) do not sell these full-

11    game download codes for PlayStation games has long been knowable to anyone with an internet

12    connection (or who visited one of their stores).  Moreover, the Complaint acknowledges that Sony

13    publicly confirmed it would stop providing its download codes to third-party retailers at least

14    eighteen months before Plaintiffs purchased their PlayStations.  *See id.* ¶ 41 n.24 (Sony confirmed

15    discontinuation of these code sales in March 2019); *id.* ¶ 2 (PS5 launched in November 2020); *id.*

16    ¶¶ 14–16 (Plaintiffs purchased PS5s).  Thus, Plaintiffs fail to plead facts plausibly supporting their

17    proposed market, much less monopoly or near-monopoly power.

18          Second, Plaintiffs fail to plead anticompetive conduct.  Sony has no duty to perpetually

19    offer third-party retailers these game download codes for use on the PlayStation Store and had every

20    right to discontinue those sales consistent with its chosen business model.  Antitrust law does not

21    forbid Sony from eliminating a middleman in favor of dealing directly with consumers.  Nor is there

22    anything wrong with Sony choosing a wholesale model, as many businesses do.

23          Finally, Plaintiffs do not plausibly plead facts showing harm to competition.  To the contrary,

24    the Complaint alleges that demand for PlayStation consoles has exceeded supply; overall sales of

25    videogames generally, and PlayStation games in particular, have sharply increased; and Microsoft

26    and Nintendo continue to be vigorous competitors, each with "roughly equal market share" to Sony.

27    *Id.* ¶¶ 2, 23, 30, 50.  Further, Plaintiffs' claim of "supracompetitive" pricing lacks any plausible

28

factual basis: the Complaint does not allege that Sony's prices for digital games exceed competitors' prices or rose after Sony stopped offering these download codes to third-party retailers in 2019.  Nor does the Complaint allege that the decision to stop offering them somehow enhanced Sony's alleged market power.  For these reasons, the Complaint should be dismissed.

## I.   PLAINTIFFS FAIL TO ALLEGE FACTS SHOWING THAT SONY POSSESSES MONOPOLY OR NEAR-MONOPOLY POWER IN A PLAUSIBLE RELEVANT MARKET.

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition." *Qualcomm*, 969 F.3d at 992.  The defined product market must include all economic substitutes for the relevant product—*i.e.,* those that are interchangeable in use or those with a sufficient cross-elasticity of demand. *Hicks*, 897 F.3d at 1120.  This ensures that the defined market includes the firms "who have actual or potential ability to deprive each other of significant levels of business." *Id.*  Plaintiffs' sole alleged "market" fails this test.

### A.  Plaintiffs' Allegations Render Their Single-Brand Market Implausible.

Plaintiffs assert that the relevant market is the sale of products marketed for use with a single brand: digital games for the PlayStation console.  Compl. ¶ 49.  In other words, Plaintiffs' theory is that Sony has no relevant competitors. *See id.* ¶ 55 ("Sony has a 100% market share in the relevant market.").  Plaintiffs' theory is implausible because it ignores the platform competition apparent on the face of the Complaint, as well as the overwhelming precedent rejecting identical theories as insufficient to state a claim.

"Single-brand markets are, at a minimum, extremely rare" and courts have consistently rejected such market definitions. *Reilly,* 2022 WL 74162, at *5 ("It is an understatement to say that single-brand markets are disfavored." (*quoting In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F.Supp.3d 324, 343 (E.D.N.Y. 2019) (rejecting alleged single-brand card payment market))).  That is because single-brand markets ignore the reality of *interbrand* competition and effectively assume no competition exists. *See Reilly*, 2022 WL 74162, at *6, *10 (dismissing complaint and finding single-brand market implausible as alternative products existed).  "Even where brand loyalty is intense," courts have not hesitated to reject single-brand markets if

1  alternatives exist.  *Id.* at *5; *PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418

2  (5th Cir. 2010); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).  Thus,

3  courts regularly dismiss complaints like this one that are premised on a single-brand market

4  definition.[4]

5      Here, the Complaint shows that the scope of effective competition cannot be limited to a

6  proposed single-brand market comprised *only* of digital *PlayStation* games.  The Complaint alleges

7  that Sony competes with Microsoft and Nintendo, with each having "roughly equal market share."

8  Compl. ¶ 50.  Videogames are also played on several other "different electronic platforms,"

9  including "smartphones and tablets," "personal computers," and "specialized handheld devices."

10  *Id.* ¶ 24.  And many major game titles are available across platforms.  *See id.* ¶ 40 & figs. 1, 2; *id.* ¶

11  58 Table 1; *Epic Games,* 2021 WL 4128925, at *6 (*e.g.,* Epic's Fortnite available on multiple

12  platforms).  Plaintiffs offer no plausible factual basis for the Court to turn a blind eye to this

13  competition and limit any "market" for videogames to just those sold through Sony.

14      Indeed, the Complaint's allegations show that competition exists *at the platform level.*

15  Consumers know when purchasing a console that they can use only games that are compatible with

16  that console. Compl. ¶ 26.  Thus, Plaintiffs (and the sources they cite) recognize that a user's gaming

17  options influence her choice of console.  *Id.* ¶¶ 26, 29 & n.10.  For example, if a user wants to play

18  a "Mario" game, she will need to purchase a gaming console from Nintendo.  *Id.* ¶ 29 n.10.  If a

19  console manufacturer does not ensure that desirable gaming options are available on its platform

20  and are competitive in terms of quality, price, and other metrics, it will lose not only game sales but

21  console and other platform-related sales.

22

23  [4] *E.g.*, *Coronavirus Reporter*, 2021 WL 5936910, at *10–13; *Oracle Am., Inc. v. CedarCrestone,*

24  *Inc.*, 938 F. Supp. 2d 895, 904, 908 (N.D. Cal. 2013); *AFMS, LLC v. United Parcel Serv. Co.*, No.
   10-cv-05830, 2011 WL 13128436, at *20–21 (C.D. Cal. Nov. 23, 2011); *N. Penn Towns, LP v.*

25  *Concert Golf Partners, LLC*, No. 19-cv-4540-KSM, 2021 WL 3562849, at *23–24 (E.D. Pa. Aug.
   12, 2021); *Success Sys., Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 70–71 (D. Conn. 2020); *see hiQ*

26  *Labs*, 485 F. Supp.3d at 1148–49; *PSKS,* 615 F.3d at 414, 417–19 (affirming dismissal of single-
   brand market antitrust claim as there was "no structural barrier to the interchangeability between"

27  defendant's branded products and other products).

28

1    Further, the Complaint alleges that Sony uses the popularity of the PlayStation console "to

2    build PlayStation into a multinational and multifaceted digital entertainment brand" encompassing,

3    *inter alia*, the PlayStation Store, *id.* ¶ 3, and that the "bulk" of the profits for the PlayStation platform

4    comes not from console sales, but from the sale of games and other content over the PlayStation

5    Store and Network, *id.* ¶ 4.  Far from supporting a games-only market, these allegations suggest the

6    opposite: that competition takes place at the platform level, with manufacturers innovating and

7    pricing their products aggressively to attract users to the platform.  At the competitive platform

8    level, Plaintiffs plead no facts plausibly suggesting a lack of substitutability or cross-elasticity of

9    demand between PlayStation consoles and compatible games and other consoles and games.  That

10   is fatal.  *See Hicks*, 897 F.3d at 1120.

11    In a series of recent monopolization cases, courts within the Ninth Circuit have rejected

12   Plaintiffs' exact theory (*i.e.*, that a "market" can be limited to the sale of games, apps, or other

13   content on a single technology platform) as made-for-litigation, inconsistent with accepted market-

14   definition principles, and economically unsound.  *See, e.g.*, *Reilly*, 2022 WL 74162, at *5–6;

15   *Coronavirus Reporter*, 2021 WL 5936910, at *7–8; *Epic Games, Inc.*, 2021 WL 4128925, at *82,

16   86–91; *Pistacchio*, 2021 WL 949422, at *2–3; *see also hiQ Labs*, 485 F. Supp. 3d at 1149; *In re

17   ATM Fee Antitrust Litig.*, No. 04-cv-2676 (CRB), 2010 WL 2557519, at *8–9 (N.D. Cal. June 21,

18   2010).  In these cases, courts refused to ignore competition *among* different platforms that offer

19   gaming or other functionality.  For example, in *Reilly*, Judge Chen rejected as implausible a single-

20   brand market limited to "Apple's distribution of iOS apps" because of, *inter alia*, alternative avenues

21   for app distribution.  2022 WL 74162, at *6.  And, in *Epic Games*, Judge Gonzalez Rogers rejected

22   Epic's attempt to define a market limited to "Apple's own internal operating systems related to the

23   App Store" and, instead, held that the market included all "digital mobile gaming transactions" that

24   occur on Apple's iOS, Google's Android, and potentially other platforms.  2021 WL 4128925, at

25   *1, 90–93.  Similarly, in *Streamcast Networks, Inc. v. Skype Techs., S.A.*, the court dismissed claims

26   that relied on an alleged single-brand services market based on the branded "FastTrack" peer-to-

27   peer file-sharing platform because, despite its unique attributes, other peer-to-peer technologies

28

1  permitted "users to accomplish the same basic task."  547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007)

2  (collecting cases).[5]

3      In short, the facts alleged in the Complaint reflect the reality of robust competition *between*

4  platforms to sell and monetize their platforms.  Limiting the relevant market to the sale of digital

5  games compatible with PlayStation consoles would ignore the commercial reality reflected by this

6  platform competition.  As described below, Plaintiffs' attempt to salvage their Complaint with an

7  aftermarket theory also fails.

8  **B. Plaintiffs' Allegations Render Their Aftermarket Theory Implausible.**

9      Plaintiffs' apparent assertion of an "aftermarket" theory does not make their single-brand

10  market claim any more viable.  Plaintiffs assert that "each console creates a separate aftermarket for

11  games that can be played on it," meaning there are separate "markets" for games sold on Sony's

12  PlayStation, games sold on Microsoft's Xbox, and games sold on Nintendo's Switch.  Compl. ¶ 51.

13  Not only is this illogical, but Plaintiffs' theory would open the door for a separate, single-brand

14  "aftermarket" every time one product had an interdependency with a complementary product from

15  the same supplier.  Not surprisingly, this "aftermarket" theory contravenes overwhelming authority,

16  including the recent platform cases discussed above.

17      To show a valid single-brand aftermarket, a plaintiff must show (1) the alleged aftermarket

18  is "wholly derivative from and dependent on the primary market," (2) the challenged conduct relates

19  only to the aftermarket, not the primary market, (3) the defendant's market power in the aftermarket

20  "flows from its relationship with its consumers" and not from "contractual provisions that it obtains

21  in the [primary] market," and (4) competition in the primary market does not suffice "to discipline

22  anticompetitive practices in the aftermarket."  *Coronavirus Reporter*, 2021 WL 5936910, at *10

23  (quoting *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1050, 1049–50 (9th Cir. 2008)).  To

24

25  [5] *See also, e.g., Shaw v. Rolex Watch, USA, Inc.*, 673 F. Supp. 674, 679 (S.D.N.Y. 1987) (dismissing
   single-brand antitrust claim and explaining that "[t]his Court does not need protracted discovery to

26  state with confidence that Rolex watches are reasonably interchangeable with other high quality
   timepieces"); *Am. Sales Co., v. AstraZeneca AB*, No. 10-cv-60662 (PKC), 2011 WL 1465786, at *3

27  (S.D.N.Y. Apr. 14, 2011) (dismissing antitrust claim based on single-brand of a pharmaceutical for

28  failure to plead facts negating cross-elasticity of demand).

satisfy this fourth element, a plaintiff must show that "the restriction in the aftermarket [was not] sufficiently disclosed to consumers in advance to enable them to bind themselves to the restriction knowingly and voluntarily." *Id.*[6]  The Ninth Circuit has only found a valid single-brand aftermarket where the defendants' conduct, coupled with market imperfections, has "prevented consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *See AFMS, LLC*, 2011 WL 13128436, at *5 (quoting *Newcal*, 513 F.3d at 1050).  Plaintiffs offer no plausible basis for this Court to find the rare single-brand aftermarket here.

First, Plaintiffs do not plead facts plausibly showing that sales of consoles and games are properly considered as separate markets or that the challenged conduct relates only to the alleged aftermarket, and not the alleged primary market.  *Wolfire* is instructive.  In *Wolfire*, the plaintiff claimed tying and other antitrust violations against a game-platform provider, alleging separate markets for the platform and game transactions on that platform.  2021 WL 5415305, at *2–3.  The court rejected this contention, explaining that the plaintiff alleged that games developed for a particular platform cannot be played on another platform and that revenue from game and add-on sales supported the platform.  *Id.*  Under these circumstances, the court found, the defendant's game store and its platform should be considered a "single product" within "the integrated game platform and transaction market" and dismissed the complaint.  *Id.*; *see also Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 694–95 (9th Cir. 1998), *amended*, 164 F.3d 1243 (9th Cir. 1999) (finding a single product where any purchaser would know that the purchase of one product would eventually entail the purchase of a second); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[C]ourts should combine different products or services into a single market when that combination reflects commercial realities.").

---

[6] The economic principle underlying the inquiry into consumer awareness is that, if consumers are aware of the alleged limitations in the aftermarket, they can avoid them by making a different purchasing decision in the initial market.  Therefore, competition in the initial market disciplines competition in the aftermarket.  *See Newcal*, 513 F.3d at 1050.  As the leading antitrust treatise explains, the purpose of the single-brand aftermarket theory is not to protect "those too foolish to protect themselves via information that is either readily available or customarily obtained by reasonable buyers."  Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1740d3.

Here too, the Complaint alleges that PlayStation games must be developed to be compatible with the PlayStation platform and, although PlayStation consoles are not free like the *Wolfire* defendant's PC-based platform, the Complaint alleges that the bulk of the revenue to support the PlayStation platform comes from games and related sales.  Compl. ¶ 4.  Moreover, as described immediately above, many other allegations in the Complaint support the conclusion that consoles, games, and other functionality are all part of platform-level competition.  *See* Part I.A.  Thus, Plaintiffs have not shown that there is a separate antitrust market for digital PlayStation games.  *See Wolfire*, 2021 WL 5415305, at *2–3.  Moreover, even if one accepts the allegation of separate markets, Plaintiffs have not met the second factor of the *Newcal* test—that the challenged conduct relates only to the aftermarket, not the primary market.  As discussed above, the facts alleged in the Complaint show that the availability of compatible games is a key factor in competition in the primary market.

Second, Plaintiffs have failed to allege facts rebutting "the economic presumption that defendant's consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to purchase in the foremarket."  *Coronavirus Reporter*, 2021 WL 5936910, at *10 (quoting *Newcal*, 513 F.3d at 1050).  Without such facts, there is no plausible basis to find that competition in an initial console "market" is insufficient to discipline any anticompetitive conduct in any game "aftermarket" and the fourth *Newcal* factor is not met.  *See, e.g.*, *Newcal*, 513 F.3d at 1050; *Coronavirus Reporter*, 2021 WL 5936910, at *10.  In *Oracle America*, for example, the court dismissed the complaint, rejecting a proposed single-brand aftermarket because the plaintiff had not alleged that the defendant had "changed its policy in order to lock-in customers, that it misrepresented [the challenged restraint], or that [the restraint] was otherwise not generally known."  938 F. Supp. 2d at 907; *see Coronavirus Reporter*, 2021 WL 5936910, at *11 (aftermarket theory applies to "consumers who are unknowingly captured and held prisoner through a primary market").  So too here.

Plaintiffs do nothing to rebut this presumption of knowledge.  To the contrary, the Complaint shows the opposite: that these codes were unavailable from third-party retailers and that this was

1    *publicly known*.   Facts about the availability of games are easily available to every potential

2    purchaser via the Internet or any third-party retailer's website/app or store.   *See id.* ¶ 40 figs. 1–3

3    (screenshots of retailers' public websites showing availability of download codes by console, *e.g.,*

4    Xbox Series X, Switch).   Any purchasers could have easily determined that these codes were not

5    available for the PlayStation by checking the websites of Amazon, Target, or other third-party

6    retailers or simply by visiting a retailer and seeing what was on the shelves.   This alone is fatal to

7    Plaintiffs' market allegation.   *See Epic Games*, 2021 WL 4128925, at *90 (rejecting single-brand

8    market because the plaintiff could not show "that consumers are *unaware* that the App Store is the

9    sole means of digital distribution on the iOS platform"); *Blizzard Ent. Inc. v. Ceiling Fan Software*

10   *LLC*, 941 F. Supp. 2d 1227, 1235–36 (C.D. Cal. 2013) (dismissing claim based on single-brand

11   market because plaintiff did not identify anything that would have "prevented users from

12   discovering the restrictions at the outset").

13         The Complaint confirms the public nature of Sony's decision to no longer offer game-

14   specific download codes to the retailers.   The Complaint states that, in March 2019, an employee of

15   the retailer GameStop publicly "leaked" a memo discussing that Sony was going to stop offering

16   download codes through third-party retailers, and Sony *publicly confirmed* that this memo was

17   accurate.   *Id.* ¶ 41 & n.24; *see* note 3 *supra* (quoting in part Sony's statement).   More broadly, the

18   Complaint alleges that consumers are well-aware that the PlayStation platform operates as a "walled

19   garden."   *See* Compl. ¶¶ 5, 39.   Finally, *Plaintiffs* cannot claim *they* relied on the availability of

20   download codes in purchasing their PS5 Digital Edition consoles.   *See id.* ¶¶ 14–16.   These consoles

21   were not even available until November 2020, eighteen months *after* Sony publicly confirmed the

22   policy change.   *Id.* ¶¶ 7, 30, 102.[7]

23         Plaintiffs' assertion that Sony did not take *additional* steps to inform consumers about

24   discontinuing this category of download codes in April 2019 fundamentally confuses the legal

25   standard in aftermarket "lock-in" cases.   As discussed above, consumers are *presumed* to know of

26

27   ───────────────────────────
     [7] As for Sony's wholesale game-purchasing model, there was no policy change at all.   The
28   Complaint indicates this model has been in effect since at least March 2017, Compl. ¶ 6 n.6, which
     pre-dates the proposed class period by over two years, *id.* ¶ 71.

1   limitations in the aftermarket—a presumption that has particular force when the limitation is obvious

2   to anyone with an internet connection or who can visit a retail store.  Here, Plaintiffs do not allege

3   Sony did anything to "hide the ball."  Instead, their admission that Sony publicly confirmed that

4   these codes would no longer be available at third-party retailers, and that the relevant information

5   as to the sources of game downloads was widely available online and elsewhere, does not rebut, but

6   buttresses this presumption.

7        Finally, the logic of Plaintiffs' theory is that anytime a company changes the way its products

8   are distributed, absent a publicity campaign related to that change, a single-brand "aftermarket" is

9   created and the company in a competitive business is transformed into a monopolist.  That makes

10  no sense and is not the law.  Companies routinely reorganize the way their products are distributed.

11  *See, e.g., Bushie*, 460 F.2d at 119; *Naify v. McClatchy Newspapers*, 599 F.2d 335, 337 (9th Cir.

12  1979); *Port Dock*, 507 F.3d at 124.  Antitrust law does not force companies to maintain static

13  business models indefinitely.  *Knutson v. Daily Rev., Inc.*, 383 F. Supp. 1346, 1360–61 (N.D. Cal.

14  1974), *modified*, 401 F. Supp. 1374 (N.D. Cal. 1975), *and aff'd in part, rev'd in part on other*

15  *grounds*, 548 F.2d 795, 800 (9th Cir. 1976) (rejecting notion that a company is "forever bound to

16  use the same system of distribution when sound business considerations suggest that a different

17  method be used" and holding that a company "can lawfully terminate an independent distributor

18  and thereafter sell exclusively through its own outlets").

19       In sum, the challenged conduct alleged in this case took place in full public view before

20  Plaintiffs bought their PS5s.  There are no alleged facts plausibly suggesting that any consumer was

21  unaware of any limitations on PlayStation game purchases—least of all the Plaintiffs who purchased

22  consoles with only digital-gaming capability at least eighteen months after Sony discontinued these

23  download codes.  On these allegations, Plaintiffs have not shown that competition in the console

24  market is incapable of disciplining any anticompetitive conduct in the alleged game aftermarket.

25  Thus, Plaintiffs' aftermarket "lock-in" theory does not apply.

26  **C.  Plaintiffs Do Not Allege That Sony Has Monopoly Power In Any Relevant Market.**

27       Plaintiffs do not allege that Sony possesses monopoly power (or near monopoly power) in

28  any market other than the alleged single-brand market for digital PlayStation games, and they

expressly disclaim any attempt to claim such power as to consoles.  Compl. ¶ 52.  Because Plaintiffs'

alleged market for "digital PlayStation games" fails, so too does their claim that Sony has monopoly

power in such a "market."  *See, e.g.*, *Qualcomm*, 969 F.3d at 992 (explaining that without a relevant

market definition, "there is no way to measure the defendant's ability to lessen or destroy

competition").  Nor do Plaintiffs allege direct evidence of monopoly or near monopoly power.  *See*

*Am. Express*, 138 S. Ct. at 2284.  To the contrary, as discussed below, the Complaint shows

Plaintiffs' allegations of "supracompetitive" pricing are implausible.

## II.   PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT SONY ENGAGED IN ANTICOMPETITIVE CONDUCT.

Even assuming Plaintiffs have properly defined a relevant market and alleged monopoly

power (and they have not, as explained above), the two forms of conduct Plaintiffs challenge—

Sony's decision to stop offering third-party retailers download codes and its use of a wholesale

model to distribute games—are not anticompetitive as a matter of law.

### A.   Sony's Decision to Stop Offering Full-Game Download Codes to Third-Party Retailers Is Not Anticompetitive.

Antitrust law does not restrict "the long recognized right" of a company, even a monopolist,

"freely to exercise [its] own independent discretion as to the parties with whom [it] will deal."

*Qualcomm*, 969 F.3d at 983, 993 (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko,*

*LLP*, 540 U.S. 398, 409 (2004)).  "The one, limited exception" to this rule—from *Aspen Skiing Co.*

*v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)—is "at or near the outer boundary of Section

2 liability," *Qualcomm*, 969 F.3d at 993–94 (citing *Trinko*, 540 U.S. at 409).  This exception "should

be applied only in rare circumstances."  *Qualcomm*, 969 F.3d at 994.  Those rare circumstances do

not include the commonplace situation presented here—a supplier restricting supply to an

intermediary from the distribution chain to deal directly with consumers.  Thus, even if Sony were

a monopolist, which it is not, it would not have an antitrust duty to deal with third-party retailers

and could not be held liable under the Sherman Act for refusing to continue to offer these download-

code products for its PlayStation Store.

As the Ninth Circuit explained in *Qualcomm*, to pursue a Section 2 claim predicated on a

refusal-to-deal theory, a plaintiff must show at least three factors: (1) the defendant unilaterally

terminated a voluntary and profitable course of dealing, (2) the "only conceivable rationale" for this termination was to sacrifice short-term benefits to obtain higher profits in the long run from the exclusion of competition, and (3) "the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers."  969 F.3d at 993–95.  None of these factors are present here.

First, Plaintiffs do not allege facts showing that selling full-game download codes through third parties was profitable at all, and certainly do not allege that such sales were *more* profitable than selling games directly to consumers without an intermediary.  *See, e.g.*, *MetroNet Servs. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) (finding *Aspen Skiing* did not apply where the defendant changed a prior course of dealing based on profitability concerns); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (affirming dismissal of refusal-to-deal theory where the plaintiff did not allege that the arrangement was profitable).

Second, far from suggesting that Sony sacrificed short-term benefits to profit in the long-term from the exclusion of competition, Plaintiffs allege that Sony's decision to stop the download-code program was *more profitable for Sony in both the short- and long-term*.  Specifically, according to Plaintiffs' allegations, eliminating the third-party download codes enabled Sony to both immediately and in the future capture revenue from its PlayStation Store sales directly without the unnecessary involvement of third-party intermediaries.  Compl. ¶¶ 45–46 (alleging that Sony takes the "retail markup for itself" and "sets the price to maximize its own profits").

This is by itself enough to reject the *Aspen Skiing* exception.  *Qualcomm*, 969 F.3d at 994 ("Because Qualcomm's purpose was greater profits in both the short and long terms, the second required element of the *Aspen Skiing* exception is not present.").[8]  Antitrust law recognizes that, when a supplier—even an undisputed monopolist—reorganizes its distribution system, it is

---

[8] Plaintiffs do not allege any facts suggesting that Sony lost a single sale by changing its distribution system.  To the contrary, the Complaint claims that the PlayStation platform generally, and downloads from the PlayStation Store specifically, became even more popular with consumers in the period after the policy change.  *See, e.g.*, Compl. ¶¶ 2, 4–5 (alleging that digital game sales through PlayStation Store downloads increased as a percentage of all PlayStation games sales from 43% in 2018 and to 62% in 2020).  This increase in Sony's sales of digital games disproves any suggestion that this change sacrificed short-term profits.

presumed to be for valid business reasons, such as more effective distribution. *See, e.g.*, *Port Dock*, 507 F.3d at 124 (affirming dismissal and noting "when a monopolist has acquired its monopoly at one level of a product market, its vertical expansion into another level of the same product market will ordinarily be for the purpose of increasing its efficiency, which is a prototypical valid business purpose"); *Bushie*, 460 F.2d at 119 ("It is well settled that a manufacturer may discontinue dealing with a particular distributor for business reasons which are sufficient to the manufacturer."); *Pac. Bell Tel. Co. v. linkLine Commn'cs, Inc.*, 555 U.S. 438, 449 (2009) (explaining that there was no cognizable claim where a monopolist supplier who also competes at the retail level refuses to cooperate with its retail competitors, leaving them unable to compete).  In short, suppliers are free to decide how their product should be distributed; there is no "duty to deal" in such circumstances. *See*, *e.g.*, *Port Dock*, 507 F.3d at 125–26 (rejecting *Aspen Skiing*  argument and holding that "a complaint pleading that a defendant expanded vertically and as a result, decided to discontinue doing business with its erstwhile trading partners at the next level down, does not plead an actionable refusal to deal"); *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-cv-4903 (JMF), 2020 WL 58247, at *3–4 (S.D.N.Y. Jan. 6, 2020) (rejecting *Aspen Skiing* argument where a vertically-integrated supplier cut off a supply input to its downstream competitor).

Third, Plaintiffs do not allege that Sony continued to offer download codes to some retailers, while "singling out" others. *See Qualcomm*, 969 F.3d at 995.  In *Aspen Skiing*, the monopolist ski resort continued to sell ski-lift tickets to every other buyer yet refused to sell ski-lift tickets to its only competitor, *even when the competitor offered to buy at full retail price*.  472 U.S. at 593–94; *see Qualcomm*, 969 F.3d at 995.  Here, Plaintiffs do not allege that Sony singled out any particular retailer or refused to sell any retailer games at its retail price.  Instead, according to the Complaint, Sony stopped offering these full-game download codes for third-party retailers in favor of direct dealing with consumers.  As in *Qualcomm*, where the defendant's decision to license its technology only to end-user OEMs and to refuse to license to other firms such as parts manufacturers and rival

1    chip manufacturers was found lawful under the Sherman Act, Sony's decision does not meet the

2    third *Aspen Skiing* factor.  *Qualcomm*, 969 F.3d at 995.[9]

3          Finding no duty to deal here not only comports with settled antitrust law, but also with long-

4    standing antitrust policy.  Skepticism of compelled duties to deal is rooted in the well-founded

5    economic policy that requiring even a monopolist to "share the source of [its] advantage" with others

6    threatens to "lessen the incentive for the monopolist" to "invest in those economically beneficial

7    facilities" in the first place.  *Trinko*, 540 U.S. at 407–08; *see also Novell, Inc. v. Microsoft Corp.*,

8    731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.) ("Forcing firms to help one another would also

9    risk reducing the incentive both sides have to innovate, invest, and expand—again results

10   inconsistent with the goals of antitrust.").  A court order forcing Sony to offer these download-code

11   products to third-party retailers not only undermines Sony's incentive to invest in and innovate its

12   platform, but disincentivizes *other* platforms that could be subject to the same obligations if

13   successful.

14         "Administrability considerations are also at play here.  If forced sharing were the order of

15   the day, courts would have to pick and choose the applicable terms and conditions."  *Novell*, 731

16   F.3d at 1073.  But antitrust law does not make judges "central planners."  *Trinko*, 540 U.S. at 407–

17   08.  As the Supreme Court has explained, "[e]nforced sharing" impermissibly "requires antitrust

18   courts to" "identify[] the proper price, quantity, and other terms of dealing."  *Id.* at 408; *see also*

19   *linkLine*, 555 U.S. at 1121 ("Courts are ill suited to . . . identify[] the proper price, quantity, and

20   other terms of dealing.").  These administrability concerns strongly disfavor any duty-to-deal claim

21   here.

22

23

24

---

25   [9] Although Plaintiffs do not use the antitrust term "essential facility" because they could not come
     close to alleging facts that support that legally uncertain claim, that is essentially the theory they are
26   pursuing: despite the admitted competition the PlayStation platform faces, because Sony has an
     alleged "monopoly" on its own console and its own store, it should be forced to continue offering
27   products it no longer wishes to offer and must allow others to set the prices for products on its
     PlayStation Store.
28

**B. Sony's Use Of A Wholesale Model To Sell Digital Games Is Not Anticompetitive.**

Plaintiffs' challenge to Sony's use of a wholesale model is even further divorced from basic antitrust principles. Plaintiffs complain that Sony's use of this model requires developers to "cede total control over the retail price [of digital PlayStation games] to Sony" instead of allowing developers to set the retail price. Compl. ¶ 37. But what Plaintiffs describe as "total control" is simply a wholesale model of the type that is ubiquitous throughout the economy: (1) the retailer (Sony) and the wholesaler (game publisher) agree on a wholesale price that the retailer will pay the wholesaler for the product (videogames); (2) the retailer sets the retail price, which typically includes a margin over the wholesale price; and (3) the retailer sells the product to consumers.[10] Antitrust law does not forbid this common distribution method.

As far as Sony is aware, no court has ever found a firm's unilateral decision to use a wholesale model to sell software, games, apps, or any other product to be anticompetitive. Companies must choose among varying modes of distribution, including a wholesale model or commission model (sometimes called an "agency" model), based on their respective benefits and costs. A company may independently choose which distribution channel best fits its objectives without running afoul of the Sherman Act. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343 n.13 (1990) ("If an exclusive dealership is the most efficient means of distribution, the public is not served by forcing the manufacturer to abandon this method and resort to self-distribution or competing distributors."). Indeed, the thousands of supermarkets and other retailers that operate on a wholesale model would no doubt be surprised to learn that, according to Plaintiffs, controlling the prices they charge in their stores subjects them to a potential monopolization claim.

Despite the Complaint's contrary suggestion, *see* Compl. ¶ 37, the fact that Sony chooses to use a different distribution model than competitors like Microsoft and Nintendo provides no support for the claim that it is anticompetitive. To the contrary, courts recognize that diversity of business models is an important feature of competition. *See Qualcomm*, 969 F.3d at 996 (rejecting antitrust

---

[10] *See generally United States v. Apple,* 791 F.3d 290, 303 (2d Cir. 2015) (discussing differences in wholesale and agency models of distribution); Lu, L., *A Comparison of the Wholesale Model and the Agency Model in Differentiated Markets*, 51 Rev. Ind. Organ. 151, 152 (2017).

challenge to business model that limited licenses to OEM-level users); *Epic Games*, 2021 WL 4128925, at *102 ("[C]entralized app distribution and the 'walled garden' approach differentiates Apple from Google [and] ultimately increases consumer choice . . . ."). After all, the "primary purpose" of antitrust is to protect "*interbrand* competition"—*i.e.,* competition among various brands like Sony's PlayStation, Microsoft's Xbox, and Nintendo's Switch. *Am. Express*, 138 S. Ct. at 2290 (emphasis added); *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997). Forcing Sony to use the same business model as its competitors would defeat, not support, that primary purpose.

Plaintiffs' only theory as to how Sony's wholesale model could be anticompetitive—that it eliminates competition between developers to set lower retail prices—is wrong. Wholesale suppliers in all kinds of industries compete on price even though the retailer sets the ultimate consumer price. *See* Compl. ¶ 39. There is no reason to believe that developers do not set competitive prices both at the wholesale level (to Sony) and at the retail level (on the commission-based Microsoft and Nintendo stores). If accepted, Plaintiffs' theory would transform every retailer using a wholesale model into a potential wrongdoer, effectively forcing the industry to switch to a uniform agency distribution model instead. Forcing such uniformity would not benefit consumers. Indeed, in *United States v. Apple*, the DOJ charged, and the Second Circuit found, that an agreement among book publishers and Apple to collectively switch from a wholesale to an agency model in order to raise consumer prices was an unlawful antitrust conspiracy. 791 F.3d at 297–98. It would be perverse, to say the least, if this Court ordered Sony to use the same agency model as its competitors under the theory that antitrust law *required* it.[11]

## III.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN ANTICOMPETITIVE EFFECT OR ANTITRUST INJURY.

"To be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'—that is, it must harm the competitive *process* and thereby harm consumers." *Qualcomm*, 969 F.3d at 990. Anticompetitive effects can include a market wide reduction in output or market wide price increases. *See Am. Express*, 138 S. Ct. at 2284; *see also Rebel Oil Inc. v. Atl. Richfield*

---

[11] Plaintiffs have also failed to allege facts establishing the "specific intent to monopolize" element of their attempted-monopolization claim. *See Spectrum Sports,* 506 U.S. at 459. As discussed, the facts pled show merely that Sony discontinued one form of download codes to one sales channel.

*Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("A predator has sufficient market power [to charge supracompetitive prices] when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices.").   In addition to anticompetitive effects, a plaintiff must establish "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977).   Here, Plaintiffs have not plausibly pled anticompetitive effects or antitrust injury.

### A. Plaintiffs Have Not Alleged Facts Demonstrating The Challenged Conduct Caused Supracompetitive Prices Or Other Effects.

*1.   Plaintiffs Allege No Facts Showing That Sony Charges Supracompetitive Prices.*

To plead anticompetitive effects, Plaintiffs primarily rely on their repeated, unsupported allegation that Sony's prices are "supracompetitive"—*i.e.,* higher than they would be if the challenged conduct did not exist.  *See, e.g.*, Compl. ¶¶ 8, 75.  That is facially implausible.

First, and critically, Plaintiffs do not allege that prices of digital games offered on Microsoft's and Nintendo's online game stores are lower than PlayStation Store prices.  This is telling because, as Plaintiffs allege, both Microsoft and Nintendo continue to offer download codes through third-party retailers. *Id.* ¶ 39.  If Sony's decision to halt sale of these download codes was causing "supracompetitive" prices, one would expect to see Sony's digital-game prices exceeding those of its competitors who do not engage in the challenged conduct.  But, if anything, the Complaint suggests the opposite: the game prices that Plaintiffs cherry-picked to highlight in the Complaint show that, in those instances at least, prices for digital games on the Microsoft Store are *higher* than PlayStation Store prices, and Nintendo eShop prices are the same.  *Compare* Compl. ¶ 40 (noting two popular digital games for Xbox cost $69.99 each and a popular digital game for Switch costs $59.99), *with* ¶ 58, Table 1 (indicating that PlayStation Store games range from $19.99–$59.99).[12]

---

[12] Putting aside conclusory adjectives, Compl. ¶ 10 (alleging Sony's margins are "outsized"), Plaintiffs do not allege a single fact that suggests what Sony margins over wholesale are or that Sony's margins exceed its competitors' commissions.  Indeed, Plaintiffs vaguely suggest Sony's margins are the same as Microsoft and Nintendo for commission-based sales.  Compl. ¶ 37 & n.20

1    Second, Plaintiffs fail to plead any facts that suggest that the alleged anticompetitive conduct

2    caused Sony's margins or its prices for digital games to rise above competitive levels.   Without

3    factual allegations on this point, the claim that the alleged conduct caused supracompetitive pricing

4    fails.   *See Somers v. Apple, Inc.,* 729 F.3d 953, 963–64 (9th Cir. 2013) (affirming dismissal of

5    monopolization complaint against Apple based on alleged "supracompetitive" pricing because the

6    price for music downloads had remained the same before, during, and after the alleged monopoly).

7    In *Wolfire*, for example, the court dismissed a claim that a game platform used its monopoly power

8    to charge a supracompetitive fee to use the platform because, *inter alia*, the fee had "remained the

9    same throughout, even during periods of intense competition in the marketplace."   2021 WL

10   5415305, at *3; *see also In re German Auto. Mfrs. Antitrust Litig.*, No. 20-17139, 2021 WL

11   4958987, at *1 (9th Cir. Oct. 26, 2021) ("[The] overcharge theory is implausible because the

12   [plaintiffs] have not alleged any facts suggesting that the price of Defendants' vehicles increased

13   while the alleged steel conspiracy was in effect or decreased after it ended.").   Here, the Complaint

14   does not suggest any change in Sony's prices either.

15   Finally, Plaintiffs' primary basis for claiming that Sony charged them "supracompetitive"

16   prices for digital games—that digital games are allegedly sometimes priced higher than physical

17   games, Compl. ¶¶ 57–59, 75—is fundamentally flawed.   First, Plaintiffs attempt to extrapolate

18   general conclusions from a few cherry-picked examples of physical game prices, which due to

19   inventory levels, changes in consumer demand, the availability of used games, and other issues can

20   vary widely over the life cycle of a game.   Second, even assuming that prices for physical games

21   are generally lower, this says nothing about whether digital-game prices are higher *because of the*

22   *challenged conduct*, as opposed to some other factor.   For example, downloading digital games from

23   the PlayStation Store is considerably more convenient for most consumers than traveling to a

---

24   (citing Tom Marks, *Report: Steam's 30% Cut Is Actually the Industry Standard*, IGN (Jan. 13,

25   2020),        https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-
     standard); *see Am. Express*, 138 S. Ct. at 2288 ("The plaintiffs did not offer any evidence that the

26   price of credit-card transactions was higher than the price one would expect to find in a competitive

27   market" and they "failed to offer any reliable measure of Amex's transaction price or profit
     margins.").

28

physical store, *id.* ¶¶ 5, 34–35, a characteristic that leads to stronger demand.  Plaintiffs' willful avoidance of demand and other confounding factors in alleging supracompetitive pricing demonstrates that this conclusion is entitled to no weight.  *See In re Term Commodities Cotton Futures Litig.,* No. 12-cv-5126, 2013 WL 9815198, at *17 (S.D.N.Y. Dec. 20, 2013) (defining an "artificial price" for a commodity as one that "that does not reflect basic forces of supply and demand"); *Wolfire*, 2021 WL 5415305, at *3 (granting motion to dismiss because, *inter alia*, plaintiff had not shown supracompetitive pricing or that the challenged fee was not "commensurate with the [platform's] value to game publishers").

> 2.     *Plaintiffs' Allegations Of Other Alleged Anticompetitive Harms Are Speculative, Conclusory, And Contradicted By The Complaint.*

Plaintiffs suggest competitive harm occurred because Sony's alleged conduct *could* reduce incentives for some developers to make PlayStation games, which could reduce game output and Plaintiffs' choices.  *See* Compl. ¶ 61.  This allegation is speculative, conclusory, and contradicted by other allegations in the Complaint.  *See In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 997 (N.D. Cal. 2010) ("Conclusory allegations of anticompetitive effect are insufficient without supporting facts as to how competition in the [relevant market] has actually been reduced or harmed.").  For example, Plaintiffs admit that sales of PlayStation games rapidly increased since April 2019, Compl. ¶ 30, and they do not identify a single game that would have been on the PlayStation Store but for the alleged conduct.  The allegation that the PS5 "is expected to become the best-selling video game console of all time," *id.* ¶ 2, further belies any notion that the PlayStation Store offers inadequate game options or that somehow the output of games has been restrained. Where (as here) output is growing, a court may not infer harm to competition absent facts showing that the market would have grown more.  *Am. Express*, 138 S. Ct. at 2288–89.  Plaintiffs plead no such facts.

**B.   Unilateral Termination of A Distribution Channel Does Not Cause Antitrust Injury.**

Even if they were properly alleged (and they are not), higher prices or reduced consumer choice are not enough in themselves to establish *antitrust* injury.  As the Ninth Circuit recently held:

1
2
3
4

> Allegations that conduct has the effect of reducing consumers' choices or increasing prices to consumers do not sufficiently allege an injury to competition because both effects are fully consistent with a free, competitive market. Instead, in order to prove a violation of the Sherman Act, the plaintiff must show that diminished consumer choices and increased prices are the result of a less competitive market due to either artificial restraints or predatory and exclusionary conduct.

5      *Qualcomm*, 969 F.3d at 990 (alterations omitted).  Here, any impact on price or consumer choice is

6      a result of Sony's lawful conduct and, thus, cannot be antitrust injury.  *See, e.g.*, *NYNEX Corp. v.*

7      *Discon, Inc.*, 525 U.S. 128, 136–37, 140 (1998) (even if a monopolist's termination of a distributor

8      led to higher prices, this was not antitrust injury because the termination did not create or enhance

9      market power: the "consumer injury naturally flow[s] not so much from a less competitive market

10     [], as from the exercise of market power that is *lawfully* in the hands of a monopolist").  In other

11     words, a supplier's ability to terminate its retailers or distributors does not depend on market power

12     but rather its lawful ability to choose how to sell its products.  *Port Dock*, 507 F.3d at 124.

13          In fact, Plaintiffs concede that Sony already possesses "exclusive control over the design,

14     features and operating software for PlayStation consoles, and over the necessary software for

15     delivering digital content to PlayStation consoles."  Compl. ¶ 42.  The Complaint does not allege,

16     nor could it, that this control is the result of anything other than Sony's procompetitive, lawful

17     efforts to develop these valuable hardware and software assets for its PlayStation platform.  Thus,

18     whatever power Sony possesses to set prices or to choose distributors to market the delivery of

19     digital content on its platform is based on these lawfully developed assets, not on anticompetitive

20     conduct.  *See, e.g.*, *NYNEX*, 525 U.S. at 136–37.  Even if the assertion that Sony charged higher

21     prices for digital games after it stopped offering download codes to third-party retailers were true—

22     and the Complaint shows it is not—this does not demonstrate antitrust injury because the alleged

23     injury would flow not from unlawful conduct but from Sony's lawful ability to monetize its assets.

24     *Qualcomm*, 969 F.3d at 1003 (even for a monopolist, "profit-seeking behavior alone is insufficient

25     to establish antitrust liability"); *Rambus Inc. v. FTC,* 522 F.3d 456, 464 (D.C. Cir. 2008) (if a

26     practice "raises the price secured by the seller but does so without harming competition, it is beyond

27     the antitrust laws' reach"); *Port Dock*, 507 F.3d at 124.

28

1    Plaintiffs have failed to plausibly plead an anticompetitive effect or antitrust injury, so their

2    Complaint must be dismissed.

3    **IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL.**

4    Plaintiffs' claim under California's UCL is wholly derivative of their Sherman Act claims.

5    Compl. ¶ 101 *et seq.*  Because Plaintiffs' Sherman Act claims must be dismissed, their UCL claim

6    must be dismissed as well.  *City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 692

7    (9th Cir. 2015) ("An independent claim under California's UCL is therefore barred so long as [the

8    defendant's] activities are lawful under the antitrust laws.").[13]

9    <u>**CONCLUSION**</u>

10   For the foregoing reasons, Sony respectfully requests that the Court dismiss the Complaint

11   with prejudice.

---

[13] Plaintiffs also bring an unjust-enrichment claim, based entirely on paying supposedly supracompetitive prices for games.  This claim must be dismissed as Plaintiffs have not alleged facts plausibly showing that Sony's conduct was wrongful.  *See Cont'l Cas. Co. v. Enodis Corp.*, 417 F. App'x 668, 670 (9th Cir. 2011) (holding that an unjust-enrichment claim requires the plaintiff to show that the defendant's retention of a benefit was "unjust").

Dated: February 18, 2022                          Respectfully submitted,

                                                  /s/ John F. Cove, Jr.
                                                  John F. Cove, Jr. (SBN 212213)
                                                  Patrick D. Robbins (SBN 152288)
                                                  535 Mission Street, 25th Floor
                                                  San Francisco, CA 94105
                                                  Telephone: 415.616.1100
                                                  john.cove@shearman.com
                                                  probbins@shearman.com

                                                  Ryan A. Shores (*pro hac vice*)
                                                  Brian C. Hauser (*pro hac vice*)
                                                  401 9th Street, NW, Suite 800
                                                  Washington, DC 20004
                                                  Telephone: 202.508.8058
                                                  ryan.shores@shearman.com
                                                  brian.hauser@shearman.com

                                                  SHEARMAN & STERLING, LLP

                                                  *Attorneys for Defendant*
                                                  *Sony Interactive Entertainment LLC*