UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGUSTIN CACCURI,<br><br>    Plaintiff,<br><br>    v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC,<br><br>    Defendant. | Case No. 21-cv-03361-RS<br><br>**ORDER GRANTING MOTION TO DISMISS** |
| ADRIAN CENDEJAS,<br><br>    Plaintiff,<br><br>    v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC, et al.,<br><br>    Defendant. | Case No. 21-cv-03447-RS |
| ALLEN NEUMARK,<br><br>    Plaintiff,<br><br>    v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC, et al.,<br><br>    Defendant. | Case No. 21-cv-05031-RS |

## I. Introduction

Defendant Sony Interactive Entertainment LLC ("Sony") moves to dismiss the Consolidated Class Action Complaint for these three related antitrust putative class actions pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs Agustin Caccuri, Adrian Cendejas, and Allen Neumark aver that Sony engaged in monopolistic and anticompetitive conduct in the sale of digital PlayStation games on its PlayStation Store, averring violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. The motion to dismiss is granted because Plaintiffs have failed to allege adequately anticompetitive conduct under the Sherman Act, and the other claims are derivative of the Sherman Act claims.

## II. Factual Background[1]

In May and June 2021, these three putative class actions were filed in the Northern District of California. On June 4, 2021 the *Cendejas* action was related to the *Caccuri* action, and on July 27, 2021, the *Neumark* action was also related to the *Caccuri* action. On December 3, 2021, Michael M. Buchman of Motley Rice LLC was appointed Interim Lead Counsel for all three related actions. Plaintiffs filed a Consolidated Class Action Complaint on December 20, 2021. In the Consolidated Class Action Complaint, Plaintiffs aver five claims for relief: (1) monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. 4; (2) attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. 4; (3) declaratory and injunctive relief under Section 2 of the Sherman Act, 15 U.S.C. § 2 and Sections 2 and 16 of the Clayton Act, 15 U.S.C. § 26; (4) damages under the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (5) unjust enrichment.

Sony manufactures, markets, and sells the PlayStation, one of the most popular home video game systems. Sony launched its most recent model, the PlayStation 5, in November 2020,

---

[1] As facts in a complaint are taken as true when evaluating a Rule 12(b)(6) motion to dismiss, *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005), the facts recited in this background section are from the Complaint unless otherwise noted.

1 and by September 2021 it had sold over 13 million units. In addition to producing the physical
2 game console, the PlayStation franchise has many other arms: the PlayStation Store (an online
3 digital video game store), the PlayStation Network (an online multiplayer gaming service),
4 PlayStation Now (a subscription-based video game streaming service), and PlayStation Studios
5 (the video game development arm). Most relevant for this litigation is the PlayStation Store, which
6 launched in 2006 and allows users to purchase digital copies of PlayStation games and download
7 them directly onto the console, rather than having to buy physical disks and insert them into the
8 console's disk drive. Sony sells two versions of the PlayStation 5: the $499 Base Model allows
9 users to purchase either physical disks or digital versions of games and the $399 Digital Edition is
10 only compatible with digital games downloaded from the PlayStation Store.

11 On the PlayStation Store, game developers cannot set prices; instead, the prices are set by
12 Sony. Further, the prices for a digital version of a game on the PlayStation Store may vary from
13 the prices for a physical copy of the game available through any number of retailers. Until April
14 2019, game developers could sell download codes for digital PlayStation games through the same
15 online and brick-and-mortar retailers of the physical games. When this practice was active, the
16 prices for download codes could vary from the prices in the PlayStation Store. When Sony
17 eliminated the download code option, that meant the price in the PlayStation Store was the only
18 possible price for acquiring a digital copy of a PlayStation-compatible game.

19 Although Sony's PlayStation is highly popular, it is not the only video game console on
20 the market. Major competitors include the Xbox from Microsoft and the Switch from Nintendo.
21 While some major video games have versions produced for each of the three consoles, a purchased
22 video game is only compatible with one specific console. For example, a consumer who owns
23 both a PlayStation and Xbox and wants to play the "NBA 2K22" game would need to purchase
24 two versions of the game, one compatible with PlayStation and one compatible with Xbox. The
25 different console manufacturers have different practices concerning the production and sale of
26 games for their consoles. While 85% of game sales for the Switch console are for games
27 developed by Nintendo that are exclusive to its console, only 17% of game sales for PlayStation

are games developed by Sony. Microsoft and Nintendo also operate their own virtual stores to download games directly to consoles. The Microsoft and Nintendo online stores, however, allow developers to set the retail price for the game.

### III. Legal Background

#### A. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must contain a short and plain statement of the claim showing the pleader is entitled to relief. Fed. R. Civ. P. 8(a). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party*." Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

#### B. Federal Antitrust Law

"To establish liability under [section 2 of the Sherman Act], a plaintiff must show: '(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (quoting *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

### IV. Discussion

Sony argues that the Complaint should be dismissed because (1) Plaintiffs have failed to

allege monopoly power or a dangerous probability of achieving monopoly power in a properly-defined relevant antitrust market; (2) Plaintiffs have failed to allege anticompetitive conduct; (3) Plaintiffs have failed to allege anticompetitive effects or antitrust injury; and (4) Plaintiffs have failed to allege facts supporting its derivative claims. As explained below, Plaintiffs have failed to plead one of the elements required to establish anticompetitive conduct. Each of Sony's arguments, however, are addressed in turn.

### A. Monopoly Power

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition." *Qualcomm*, 969 F.3d at 992. The relevant market "must encompass the product at issue as well as all economic substitutes for the product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008)). "Economic substitutes have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product. Including economic substitutes ensures that the relevant product market encompasses 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Id.* (citations omitted).

Plaintiffs define the relevant product market in this case as "the market for downloadable, digitally-delivered video game content that is compatible with a PlayStation console ("digital PlayStation games")." Complaint ¶ 49. The Complaint also avers that "[d]ue to the high cost of consoles, the differentiation among them, and the lack of cross-compatibility, each console creates a separate aftermarket for games that can be played on it." *Id.* at ¶ 51. Defendant argues that Plaintiff's single-brand market is implausible, because competition occurs at the platform level, such as between Sony and Nintendo, "with manufacturers innovating and pricing their products aggressively to attract users to the platform." Motion to Dismiss, p.9. Defendant also argues Plaintiffs fail to satisfy the requirements for pleading an aftermarket.

Addressing first the single-brand market issue, limiting a market definition to a single brand is disfavored. *See Reilly v. Apple Inc.*, No. 21-CV-04601-EMC, 2022 WL 74162, at *5 (N.D. Cal. Jan. 7, 2022) ("It is an understatement to say that single-brand markets are disfavored.

From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets[.]" (internal quotation marks and citation omitted)); Herbert J. Hovenkamp, Markets in IP & Antitrust, 100 Geo. L.J. 2133, 2137 (2012) ("[A]ntitrust law has found that a single firm's brand constitutes a relevant market in only a few situations."). This general disfavoring, however, does not mean single-brand market theories are never viable. For example, in *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992), which concerned service and parts for Kodak equipment, the Supreme Court noted that "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers[,]" and allowed the lawsuit to proceed on its single-market theory. *Id.* at 482 (citation omitted). Similarly here, the market definition does not fail at the pleading stage for only concerning a single brand.

Next, Plaintiff's single brand aftermarket theory is viable at this stage in the proceedings. The Ninth Circuit has identified four considerations when assessing whether a Plaintiff has pled a cognizable aftermarket: (1) whether "the aftermarket here is wholly derivative from and dependent on the primary market"; (2) that "allegations of illegal restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial market"; (3) if the defendant "does not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market" but rather "market power [which] allegedly flows from its relationship with its consumers"; and (4) "market imperfections . . . prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket" such that "[c]ompetition in the initial market [] does not necessarily suffice to discipline anticompetitive practices in the aftermarket." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1049-51 (9th Cir. 2008). When assessing the Complaint through the lens of these considerations, Plaintiffs have adequately alleged a cognizable aftermarket.

Sony only challenges the second and fourth *Newcal* factors. Addressing the second *Newcal* factor, Plaintiffs have adequately pled that the allegations of illegal restraints and monopolization relate only to the aftermarket for Playstation-compatible digital games, not the initial market for video game consoles. As stated by Plaintiffs, "the initial purchase of a PlayStation gaming console

is a condition precedent to playing a PlayStation game[,]" and thus purchasing a digital game. Opposition to Motion to Dismiss, p.8. Unlike the Steam gaming platform and Steam Store at issue in *Wolfire Games, LLC v. Valve Corp.*, 2021 WL 5415305 (W.D. Wash. Nov. 19, 2021), upon which Sony heavily relies, the cost of the game is not the only cost to start playing. *Wolfire* concerned a personal computer ("PC") gaming platform and online digital game store. In *Wolfire*, the Steam platform was free to users and only the games cost money. Here, the platform and the games are separate purchases. Unlike for PlayStation users, a Steam user could switch to a game on a different platform upon seeing a price differential between the Steam Store and another online digital game store. Here, a PlayStation user wishing to find a lower price for a digital game would have to look at the games for an entirely different console, necessitating another console purchase in the hundreds of dollars. Thus in this case, "allegations of illegal restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial market." *Newcal*, 513 F.3d at 1050.

Next, competition in the console market does not "suffice to discipline anticompetitive practices in the aftermarket." *Id.* at 1051. Switching to another console to gain a cheaper price for a single game would require purchasing a separate console, negating any lower price. Further, switching from one console to another requires more than just an expenditure in price; it requires the user to acclimate itself to a new system, and to rebuild the skills a user had developed for use on a different platform. Plaintiffs also allege that consumers were unaware of the restricted nature of the aftermarket, as Sony discontinued the practice of allowing the sale of download codes through other retailers. Although the policy change happened well before the Plaintiffs in this case purchased their PlayStation 5s, it is a factual question whether the disclosure of this change was done in a public manner known to users. Further, consumers may not have known that Sony set the price for each game—and thus users were subjecting themselves to whatever prices Sony set— rather than allowing game developers to set their own prices. In short, Plaintiffs have offered "factual allegations to rebut the economic presumption that [PlayStation] consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market" to purchase a PlayStation console rather than another console. *Id.*

**B. Anticompetitive Conduct**

"[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). That right, however, is not absolute, and "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Id.* The Supreme Court articulated this exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). The Supreme Court identified three relevant circumstances for creating antitrust liability: (1) "the unilateral termination of a voluntary and profitable course of dealing"; (2) "a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition"; and (3) that the refusal to deal involves "products that were already sold in a retail market to other customers." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004). Sony challenges the existence of each of these circumstances. For the reasons explained below, Plaintiffs have failed to satisfy the requirements for the *Aspen Skiing* exception.

First, Plaintiffs provide conclusory statements that Sony voluntarily terminated a profitable practice, but do not provide sufficient factual detail. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). From the Complaint, it is unclear how Sony generated a revenue stream from the sale of download codes by third party retailers. The Complaint avers that "Sony [] charges a Platform Royalty Fee on each game sold by retailers for use on its gaming consoles, including PlayStation 5" and that "Sony's Platform Royalty Fee for physical games sold at external retailers is 11.5%[,]" but does not state whether a royalty fee also applied to download code sales. Complaint ¶ 44. For games sold on the PlayStation Store, the Complaint avers that Sony takes a 30% cut of the price. *Id.* at ¶ 37. Although it seems almost certain that Sony gained some revenue through download codes, and Plaintiffs need not at this stage *prove* that the practice was profitable, Plaintiffs must at a minimum describe the process through which Sony earned money from the practice. The Court cannot assume the practice was profitable when Plaintiffs have failed to plead how Sony received

any money through the practice.[2]

Sony's arguments that it merely made a change in distribution methods, however, is rejected at this stage. Although "[i]t is well settled that a manufacturer may discontinue dealing with a particular distributor for business reasons which are sufficient to the manufacturer[,]" *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972) (internal quotation marks and citation omitted), Sony acted as both a distributor and a retailer. For the purposes of reviewing a motion to dismiss, it is proper to view Sony in both roles, including their role as a competitor in the sale of games.

The second and third elements fail due to Plaintiffs' shortcomings as to the first element. As for the second element, pleading "a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," *MetroNet*, 383 F.3d at 1132, requires pleading that Sony received revenue—and thus benefits—from the scheme. As for the third element, the structure is also relevant for assessing whether Sony "refused to provide to their competitors products that were already sold in a retail market to other customers." *Id.* at 1133. If Sony was selling download codes to third-party retailers, which those retailers then sold to consumers, it appears that practice could be analogous to the situation in *Aspen Skiing*, where the ski resort refused to sell ski passes to a competitor that the ski resort was selling directly to consumers. 472 U.S. at 593. Without knowing how Sony earned revenue through the practice, however, it is difficult to analogize to *Aspen Skiing*. In short, Plaintiffs have failed to plead anticompetitive conduct necessary for their Sherman Act claims.

C. **Anticompetitive Effects or Antitrust Injury**

"[T]o be condemned as exclusionary, a monopolist's act must have an anticompetitive effect —that is, it must harm the competitive process and thereby harm consumers." *Qualcomm*,

---

[2] Plaintiffs argue they are entitled to a presumption under *Trinko* that Sony's business practice was profitable. *See Trinko*, 540 U.S. at 409 ("The unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end."). Plaintiff cites no case or other authority supporting their argument that the mere use of the word "presumably" in this opinion creates a burden-shifting presumption of profitability. No presumption, therefore, is applied in ruling on this motion.

969 F.3d at 990 (internal quotation marks and citation omitted). Direct evidence of anticompetitive effects may include "reduced output, increased prices, or decreased quality in the relevant market[.]" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). Plaintiffs must also plead antitrust injury, defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Plaintiffs have pled an anticompetitive effect because, at a minimum, they have pled increased prices. Plaintiffs plead that numerous games are more expensive in digital versions than in physical versions, despite additional costs present for physical versions like the production of the materials and shipping. Although as Defendant points out there may be other reasons for the increased prices, and physical versions of the game may not be the appropriate benchmark, Plaintiffs have at this stage pled increased prices. Plaintiffs have also pled an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. "[M]aintain[ing] supracompetitive prices" is a cognizable antitrust injury, and Plaintiffs argue that Sony's actions were designed to maintain supracompetitive prices. *See F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 157 (2013),

### D. California UCL Claim and Unjust Enrichment

Plaintiffs' UCL claim is derivative of their Sherman Act claims, and because the Sherman Act claims are not adequately pled, the UCL claim must be dismissed. *See City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015) ("An independent claim under California's UCL is therefore barred so long as [the defendant's] activities are lawful under the antitrust laws."). The claim for unjust enrichment fails for the same reason.

### V. Conclusion

For all the foregoing reasons, the motion to dismiss is granted because Plaintiffs have failed to allege adequately anticompetitive conduct under the Sherman Act, and the other claims are derivative of the Sherman Act claims. Although it is unclear at this time if the deficiencies may be cured, Plaintiff is granted leave to amend. Any amended Complaint must be filed within 30 days of the filing of this Order.

**IT IS SO ORDERED**.

Dated: July 15, 2022

_____
RICHARD SEEBORG
Chief United States District Judge