Michael M. Buchman (admitted *pro hac vice*)
mbuchman@motleyrice.com
**MOTLEY RICE LLC**
800 Third Avenue, Suite 2401
New York, NY 10022
Telephone: (212) 577-0050

*Interim Lead Counsel for Plaintiffs*

Andrew C. Finch (SBN: 195012)
afinch@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3417
Facsimile: (212) 492-0417

Meredith R. Dearborn (SBN: 268312)
mdearborn@paulweiss.com
Shawn M. Estrada (SBN: 322852)
sestrada@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, California 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101

*Attorneys for Defendant Sony Interactive
Entertainment LLC*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AGUSTIN CACCURI et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC,<br><br>Defendant. | Lead Case No. 3:21-CV-03361-AMO<br><br>**STIPULATION AND ~~[PROPOSED]~~ ORDER AMENDING CLASS DEFINTION**<br><br>Courtroom: 10, 19th Floor<br>Judge: Honorable Araceli Martínez-Olguín |

1    Pursuant to Federal Rule of Civil Procedure 15(a)(2) and Civil Local Rule 10-1, and in

2    accordance with this Court's Procedural Guidance for Class Action Settlements, the parties

3    (Defendant Sony Interactive Entertainment LLC and Plaintiffs Augustin Caccuri, Adrian

4    Cendejas, and Allen Neumark ("Plaintiffs")) hereby stipulate as follows:

5    WHEREAS, Plaintiffs filed a Consolidated Class Action Complaint on December 20,

6    2021, ECF No. 40;

7    WHEREAS, Plaintiffs filed the operative Consolidated Amended Class Action Complaint

8    on August 15, 2022, ECF No. 61;

9    WHEREAS, the class definition from the operative Consolidated Amended Class Action

10    Complaint reads as follows:

11    All persons in the United States, exclusive of Sony and its employees, agents and
      affiliates, and the Court and its employees, who purchased any digital video game
12    content directly from the PlayStation Store at any time from April 1, 2019 through
      the present
13
      WHEREAS, extensive discovery and arm's length settlement negotiations have led the
14
    parties to amend the class definition to better address the alleged harm suffered by the class
15
    members;
16
      THEREFORE, IT IS STIPULATED AND AGREED that the class definition from the
17
    operative Consolidated Amended Class Action Complaint shall hereby be amended and Plaintiffs
18
    shall file a Second Consolidated Amended Class Complaint (*See* Exhibit A) with the following
19
    class definition:
20
      all persons in the United States who purchased through the PlayStation Store one
21    or more video games for which a game specific voucher ("GSV") was available at
      retail prior to April 1, 2019, for which a total of at least 200 GSV redemptions
22    were made prior to April 1, 2019, and for which the post-discount price increased
      by at least fifty cents from: (a) the period between January 1, 2017 and March 31,
23    2019, as compared to (b) the period between April 1, 2019 and December 31,
      2023.  The class period shall be April 1, 2019 to December 31, 2023.
24

25

26    Dated:  December 11, 2024        By:  */s/ Michael M. Buchman*

27                                          Michael M. Buchman (admitted *pro hac vice*)
                                            mbuchman@motleyrice.com
28                                          **MOTLEY RICE LLC**

800 Third Avenue, Suite 2401
New York, NY 10022
Telephone: (212) 577-0050

*Interim Lead Counsel for Plaintiffs*

Dated:  December 11, 2024        By:    /s/ Andrew C. Finch
                                        Andrew C. Finch (SBN: 195012)
                                        afinch@paulweiss.com
                                        **PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP**
                                        1285 Avenue of the Americas
                                        New York, NY 10019-6064
                                        Telephone: (212) 373-3417
                                        Facsimile: (212) 492-0417

                                        Meredith R. Dearborn (SBN: 268312)
                                        mdearborn@paulweiss.com
                                        **PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP**
                                        535 Mission Street, 24th Floor
                                        San Francisco, California 94105
                                        Telephone: (628) 432-5100
                                        Facsimile:  (628) 232-3101

                                        Patrick T. Hein (SBN 254431)
                                        patrick.hein@aoshearman.com
                                        **ALLEN OVERY SHEARMAN STERLING
                                        US LLP**
                                        140 New Montgomery Street, 10th Floor
                                        San Francisco, CA 94105-2997
                                        Telephone: (415) 616-1100
                                        Facsimile:  (415) 616-1199

                                        Brian C. Hauser (admitted *pro hac vice*)
                                        brian.hauser@aoshearman.com
                                        Matt Modell (admitted *pro hac vice*)
                                        matt.modell@aoshearman.com
                                        **ALLEN OVERY SHEARMAN STERLING
                                        US LLP**
                                        401 9th Street, NW, Suite 800
                                        Washington, DC 20004
                                        Telephone: (202) 508-8000
                                        Facsimile:  (202) 508-8100

                                        *Attorneys for Defendant Sony Interactive
                                        Entertainment LLC*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTESTATION**

I, Michael M. Buchman am the ECF user whose identification and password are being used to file this document. I attest under penalty of perjury that concurrence in this filing has been obtained from counsel listed above.

 _/s/ Michael M. Buchman_____
Michael M. Buchman

**PURSUANT TO STIPULATION, IT IS SO ORDERED**.  Plaintiff shall file the Second Consolidated Amended Class Complaint within 3 days of this order.

Dated:  December 13 , 2024

Hon. Araceli Martínez-Olguín
UNITED STATES DISTRICT JUDGE

Michael M. Buchman (admitted *pro hac vice*)
~~Jacob O. Onile-Ere (admitted *pro hac vice*)~~
~~Johnny Shaw (admitted *pro hac vice*)~~
**MOTLEY RICE LLC**
~~800~~777 Third Avenue, ~~27th Floor~~Suite 2401
New York, NY 100~~22~~17
Tel: (212) 577-0050
mbuchman@motleyrice.com
~~mclerkin@motleyrice.com~~
~~jonileere@motleyrice.com~~

*Interim Lead Counsel for the Proposed Class*

*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTIRCT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AGUSTIN CACCURI, ADRIAN CENDEJAS and ALLEN NEUMARK, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC,<br><br>        Defendant. | Case Nos. 21-cv-03361-RS<br>        21-cv-03447-RS<br>        21-cv-05031-RS<br><br><br>**<u>SECOND</u> CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

1    Plaintiffs Agustin Caccuri, Adrian Cendejas, and Allen Neumark, on behalf of

2  themselves and all others similarly situated, bring this Consolidated Amended Class Action

3  Complaint against Sony Interactive Entertainment LLC for violation of federal antitrust and state

4  unfair competition laws. Based upon personal knowledge, information and belief, and the

5  investigation of counsel, Plaintiffs allege as follows:

6                                **I.    INTRODUCTION**

7    1.    This is an antitrust and unfair competition class action seeking damages and

8  injunctive relief for violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the

9  California Business and Professions Code § 17200, against Sony Interactive Entertainment LLC

10  ("Sony" or "Defendant"). Plaintiffs bring this action on behalf of themselves and all other

11  similarly situated Class members who purchased digital video games on Sony's PlayStation

12  Store (the "Class") between April 1, 2019 and the present (the "Class Period").

13    2.    Sony manufactures, markets, and sells the PlayStation, one of the most popular

14  home video game systems in the world. Sony's most recent model, the PlayStation 5, is expected

15  to become the best-selling video game console of all time. PlayStation 5 launched on November

16  12, 2020, and by September 3, 2021 Sony sold 13.4 million units,[1] making it the fastest-selling

17  console of all time. Despite record sales numbers, Sony has been unable to supply anywhere

18  close to enough units to meet consumer demand.[2] Sales are predicted to surpass 200 million units

19  within the next five years.[3]

20

21

22  [1] *See* Sony Corporation, Supplemental Information for the Consolidated Financial Results for the Second Quarter Ended September 30, 2021 (Oct. 28, 2021), https://www.sony.com/en/SonyInfo/

23  IR/library/presen/er/pdf/21q2_supplement.pdf.

24  [2] *See* N.F. Mendoza, *PlayStation rakes in $2.6 billion in PS5 sales*, TechRepublic (Feb. 25, 2021), https://www.techrepublic.com/article/playstation-rakes-in-2-6-billion-in-ps5-sales/.

25  [3] Aernout van de Velde, *PS5 Sales to Exceed 200 to 300 Million Units in 5 to 6 Years, Analyst Says; Could Terminate the Long-Running Console War*, WCCF Tech (Oct. 17, 2020),

26  https://wccftech.com/ps5-sales-200-300-million-700-console-war/; Lionel Sujay Vailshery, *Forecast unit sales of the PlayStation 5 worldwide from 2020 to 2024 (*Apr 12, 2021),

27  https://www.statista.com/statistics/1124784/unit-sales-ps5-worldwide/.

28                                          1

3.      Sony has used the console's popularity to build PlayStation into a multinational and multifaceted digital entertainment brand which includes an online store for purchasing and downloading digital video games directly to the console (the PlayStation Store), a unified online multiplayer gaming and digital media delivery service (the PlayStation Network), a subscription-based digital video game streaming service (PlayStation Now), and Sony's video game development arm (PlayStation Studios).

4.      The bulk of the profits Sony derives from the PlayStation franchise come not from sales of its consoles, but from the digital video games and other digital content sold through the PlayStation Store and the PlayStation Network, which produced over $17 billion in revenues for Sony in the fiscal year ending March 31, 2021.[4]

5.      The PlayStation Store launched in 2006 alongside the PlayStation 3 console, allowing users to purchase digital copies of PlayStation games and download them directly to the console as an alternative to buying physical disks and inserting them into the console's disk drive. Since the launch of the original PlayStation in 1994, the games had been available only on disks. Now users can access the PlayStation Store from their console, purchase games, and download them directly to their console through the PlayStation Network. In 2020, digital downloads made up 62% of sales for PlayStation games, compared to only 43% in 2018.[5]

6.      Recognizing this trend, Sony seized the opportunity to take control of the retail market for games—an area where it had previously exerted little power. Sony does not allow other applications that enable consumers to purchase or otherwise download and play video games to run on PlayStation consoles. To make games available on the PlayStation Store—the only way to sell digital copies—publishers must agree to cede control over the final price to

---

[4] *See* Sony Corporation, Financial Statements and Consolidated Financial Results for the Fiscal Year Ended March 31, 2021 (Apr. 28, 2021), available at https://www.sony.com/en/SonyInfo /IR/library/presen/er/pdf/20q4_sony.pdf. Dollar figure based on the following exchange rate from April 28, 2021: 1 JPY = 0.0092 USD.

[5] Mustafa Mahmoud, *62% of all full PlayStation game sales were digital in 2020*, Kitguru (Mar. 12, 202), https://www.kitguru.net/gaming/mustafa-mahmoud/62-of-all-full-playstation-game-sales-were-digital-in-2020/.

Sony.[6] This forecloses price competition among publishers. Finally, Sony eliminated the last vestiges of price competition when it stopped allowing outside retailers to sell digital download codes that could be redeemed on the PlayStation Store.

7.     Until recently, consumers could purchase download codes for digital PlayStation games from the same online and brick-and-mortar retailers who sell physical games such as Amazon, GameStop, Best Buy, and Wal-Mart. The codes could be redeemed on the PlayStation Store for digital copies of PlayStation games. But on April 1, 2019, Sony eliminated retailers' ability to sell download codes for digital PlayStation games. Because delivering digital content to PlayStation consoles requires access to Sony's PlayStation Network, the new policy established the PlayStation Store as the only source from which consumers can purchase digital PlayStation games, and the only source to which video game publishers can sell digital PlayStation games. Because Sony also requires publishers who sell digital games on the PlayStation Store to relinquish full control over the retail price, the policy swiftly and effectively foreclosed any and all price competition in the retail market for digital PlayStation games.

8.     Sony's restrictions established a monopoly over the sale of digital PlayStation games to consumers. Sony's monopoly allows it to charge supracompetitive prices for digital PlayStation games, which are significantly higher than their physical counterparts sold in a competitive retail market, and significantly higher than they would be in a competitive retail market for digital games.

9.     A comparison of prices for the most popular digital games on the PlayStation Store with prices for the same games available on disk from an array of retailers suggests prices on the PlayStation store are, on average, about 75% percent higher than those for games on disk,

---

[6] PlayStation Global Developer & Publisher Agreement ¶ 15.2.2 (effective Mar. 23, 2017) ("Each SIE Company has the sole and exclusive right to set the retail price to Users for Digitally Delivered Products sold or otherwise made available for purchase on or through [PlayStation Network]."), *available at* https://www.sec.gov/Archives/edgar/data/946581/0001628280170 05833/ex10-48.htm.

and in some cases closer to 175% higher.[7] There is no legitimate reason digital games should be more expensive than their physical counterparts. In fact, given the costs saved on packaging and distribution, prices for digital games in a truly competitive market would likely be lower than they are for games on disk.

10. Sony's ability to maintain supracompetitive prices on the PlayStation Store while consumers continue to switch from disks to digital games in ever increasing numbers, along with Sony's outsized margins on digital games, demonstrate that prices for digital games on the PlayStation store are not responsive to changes in prices for PlayStation games on disk.

11. Consumers face major costs to switch between PlayStation and one of the other consoles. For example, video games available on the PlayStation 4 can be played on the PlayStation 5, but cannot be played on any Xbox or any Nintendo console. Consumers that have built up a library of PlayStation 4 games worth hundreds or thousands of dollars would lose all that value by switching. Furthermore, PlayStation users are accustomed to the PlayStation controllers and gameplay, and may have developed social networks within the PlayStation ecosystem that they would lose if they switched to a new console. Finally, certain games are available only on PlayStation.

12. The relevant product market in this case is the market for downloadable, digitally-delivered video game content that is compatible with a PlayStation console ("digital PlayStation games").

13. As a direct and proximate result of Sony's unlawful acquisition and maintenance of a monopoly over the sale of digital PlayStation games, Plaintiffs and Class members have paid and will continue to pay significantly more for digital games than they would have absent Sony's monopoly. Plaintiffs seek damages for themselves and Class members equal to the amount they have already overpaid, treble damages, and injunctive relief to put an end to the overcharges they will continue to pay as long as Sony is allowed to keep its unlawful monopoly.

---

[7] *See* ¶¶ 64-69 and Figure 6, *infra*.

## II.    THE PARTIES

14.    Plaintiff Agustin Caccuri is an individual residing in Santa Monica, California. Mr. Caccurri owns a PlayStation 5 Digital Edition console, has purchased digital video games on the PlayStation Store and downloaded them to his console during the Class Period, and plans to purchase and download more digital games from the PlayStation Store in the future.

15.    Plaintiff Adrian Cendejas is an individual residing in California. Mr. Cendejas owns a PlayStation 5 Digital Edition console, has purchased digital video games on the PlayStation Store and downloaded them to his console during the Class Period, and plans to purchase and download more digital games from the PlayStation Store in the future.

16.    Plaintiff Allen Neumark is an individual residing in Miami, Florida. Mr. Neumark owns a PlayStation 5 Digital Edition console, has purchased digital video games on the PlayStation Store and downloaded them to his console during the Class Period, and plans to purchase and download more digital games from the PlayStation Store in the future.

17.    Defendant Sony Interactive Entertainment LLC ("Sony") is a corporation organized and existing under the laws of California, with its headquarters and principal place of business at 2207 Bridgepointe Parkway, San Mateo, California. It is a wholly-owned subsidiary of the Japanese consumer electronics and media conglomerate Sony Corporation, and is the sole owner of the PlayStation digital entertainment brand.

## III.    JURISDICTION AND VENUE

18.    This action arises, in part, under section 2 of the Sherman Act, 15 U.S.C. § 2. The Court has federal question jurisdiction pursuant to the Clayton Antitrust Act, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

19.    The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a different state than the Defendant.

20.    The Court has personal jurisdiction over Sony because Sony is headquartered in California. The Court also has jurisdiction pursuant to Cal. Code Civ. P. § 410.10, as a result of

SECOND CONSOLIDATED AMENDED CLASS ACTION
COMPLAINT

1    Sony's substantial, continuous and systematic contacts with the State, and because Sony has

2    purposely availed itself of the benefits and privileges of conducting business activities within the

3    State.

4         21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Class

5    members purchased digital video games from Sony in this District, Sony has its principal place

6    of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs'

7    claims occurred here, and Sony is a corporation subject to personal jurisdiction in this District

8    and, therefore, resides here for venue purposes.

9                         **IV.    INTRADISTRICT ASSIGNMENT**

10        22.    Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly

11   assigned to the San Francisco division because a substantial part of the events and omissions

12   which give rise to the claim emanated from California and from San Mateo County in particular.

13                         **V.    FACTUAL ALLEGATIONS**

14        **A.    Industry Background**

15        23.    The video game market has grown substantially in recent years. Revenues in the

16   video game industry reached $180 billion worldwide in 2020, exceeding those from movies and

17   from the major North American sports leagues combined.[8]

18        24.    Video games are played on one of several different electronic platforms,

19   including: (i) smartphones and tablets; (ii) personal computers; (iii) video game consoles; and

20   (iv) specialized handheld devices. This case concerns video games consoles, specifically the

21   market for downloadable, digitally-delivered video game content that is compatible with a

22   PlayStation console ("digital PlayStation games").

23        25.    Video game consoles are specialized home computer systems that connect to a

24   television and output a video signal to display videos games. Each game console includes

25

26   [8] Jordan Williams, *Video game industry bigger than sports, movies combined: report*, The Hill
     (Dec. 23, 2020), https://thehill.com/blogs/in-the-know/in-the-know/531479-video-game-
27   industry-bigger-than-sports-movies-combined-report.

28                              6

1    specially designed handheld controllers that allow users to interact with games, serving a similar

2    function to that of a keyboard and mouse on a personal computer. For the past two decades, three

3    companies have dominated the market for video game consoles: Sony, which manufactures the

4    PlayStation console; Microsoft, manufacturer of the Xbox; and Nintendo. All three companies

5    periodically release new models of their consoles, with updated hardware and software and new

6    design features.

7        26.    Games are not cross-compatible on different consoles, so once a consumer

8    purchases a console, he or she must purchase games that are designed for that particular console.

9    The consoles are substantially differentiated, with distinctively designed controllers and other

10   factors that lead to a different experience for the player, even where the same games are

11   available on more than one console. Consumers, therefore, tend to prefer one console over the

12   others, and are far more likely to continue buying the new models of one console than to switch

13   to a different console entirely.

14       27.    The historical supply chain for video games involves: (i) developers, who design

15   and execute the creation of games and produce the software; (ii) publishers, who handle funding,

16   marketing, and distribution to retailers; and (iii) retailers, who sell games to the console-owning

17   public.[9]

18       28.    The relationship between developers and publishers is akin to that between book

19   authors and publishing houses. The author produces a manuscript and then relies on a publishing

20   house to print and market the books, and deliver them to bookstores. Similar to the way that

21   publishing houses often offer advances to authors who agree to write manuscripts for them,

22   video game publishers also provide funding to developers.

23       29.    The three major video game console manufacturers also develop and publish

24   games for their consoles in-house, called "first-party games" which are often available

25

26   [9] *See Intro to the Industry: The difference between game developers and publishers,* Gaming
     Street (Sept. 18, 2019), https://gamingstreet.com/intro-to-the-industry-the-difference-between-
27   game-developers-and-publishers/.

28
                                        7

1  exclusively on that company's console. Nintendo relies heavily on first-party games, which make

2  up about 85% of game sales for its Switch console.[10] Most PlayStation games, on the other hand,

3  are developed and published by third-parties, with about 17% of game sales being developed by

4  Sony in 2020.[11]

5      **B.    The Sony PlayStation**

6      30.    The original PlayStation launched in 1994, and the console was immediately

7  popular among consumers. In less than a decade, it became the first video game system to ship

8  100 million units. Sony has released four updated versions of its console to date. The most

9  recent—the PlayStation 5—launched on November 12, 2020. As of September 3, 2021, Sony

10  had sold 13.4 million units[12] making it the fastest-selling console of all time.[13] Sony has

11  nevertheless been unable to meet demand for the console. Upon release, PlayStation 5 consoles

12  were almost immediately sold out at every retailer. Today, it is still very difficult for consumers

13  to get their hands on a PlayStation 5 gaming console, with inventory restocks at major retailers

14  and on Sony's website selling out almost instantaneously.[14] PlayStation 5 sales are expected to

15  eventually surpass 200 million units.[15]

16  _____

17  [10] Ben Gilbert, *Nintendo's recent success highlights a critical risk to the gaming giant's business*, Bus. Insider (Feb. 4, 2019), https://www.businessinsider.com/nintendo-reliance-on-first-party-games-huge-risk-to-business-2019-2.

18
19  [11] Sony Corporation, Supplemental Information for the Consolidated Financial Results for the Fourth Quarter Ended March 31, 2021 at 9 (Apr. 28, 2021), sony.com/en/SonyInfo/IR/library/presen/er/pdf/20q4_supplement.pdf

20  [12] *See* Sony Corporation, Supplemental Information for the Consolidated Financial Results for
21  the Second Quarter Ended September 30, 2021 (Oct. 28, 2021), https://www.sony.com/en/SonyInfo/
22  IR/library/presen/er/pdf/21q2_supplement.pdf.

23  [13] *See* Jeff Yeung, *The PlayStation 5 Overtakes Nintendo Switch as Best-Selling Console*, HypeBeast (Oct 19, 2021), https://hypebeast.com/2021/10/sony-playstation-5-nintendo-switch-best-selling-console-september-2021.

24
25  [14] *See* Kevin Webb, *Sony's PlayStation 5 remains hard to find months after its launch*, Bus. Insider (Apr. 14, 2021), https://www.businessinsider.com/where-to-buy-ps5.

26  [15] *See* Aernout van de Velde, *PS5 Sales to Exceed 200 to 300 Million Units in 5 to 6 Years,*
27  *Analyst Says; Could Terminate the Long-Running Console War*, WCCF Tech (Oct. 17, 2020), https://wccftech.com/ps5-sales-200-300-million-700-console-war/.

28

31.     The PlayStation 5 is available in two versions, the Base Model which is available for $499 retail, and the Digital Edition which is $100 less expensive at $399 retail. The Base Model includes the previously-standard optical disk drive, allowing users to choose whether to purchase physical disk copies of games, available from retailers such as those mentioned above, or to buy digital copies and download directly to their console. The less expensive Digital Edition does not include a disk drive, so users can only purchase games in digital format from Sony's PlayStation Store at Sony's monopoly prices. Sony failed to provide notice to purchasers of the Digital Edition that they would be restricted to one source for purchasing games. Sony also failed to provide notice to purchasers of the PlayStation 4 and the PlayStation 5 Base Model who prefer to buy digital games that they would be limited to one source. And Sony failed to provide notice to any PlayStation owners that they would be paying monopoly prices for digital video games.

**C.      The Rise of Digital Video Games**

32.     Games for early video game consoles took the form of ROM cartridges—read-only memory chips containing the game software which were housed inside a plastic casing. The cartridges were inserted into slots on the console. ROM cartridges allowed the user to rapidly load and access the game software and were more durable than other alternatives available at the time. Game manufacturers enjoyed the advantage of the relative security of software in cartridge form, which was difficult for users to copy. ROM cartridges were expensive to manufacture, however, and offered limited storage capacity relative to optical disks. As video games became more complex, requiring more software code, manufacturers began to shift to optical disks, which offered greater storage capacity and were cheaper to manufacture.

33.     By the early 2000s, video game cartridges were largely replaced by optical disks (i.e., DVDs). Like cartridges before them, optical disks could be purchased or rented from a variety of online and brick-and-mortar retailers, including many that bought and sold used copies. They could also be traded and shared amongst friends. Technology continued to progress rapidly, however, and advances in internet bandwidth and home computing power introduced the

9

possibility of downloadable and streaming video games. As video on demand and music

streaming services began to replace DVDs and CDs, the video game industry followed suit.

Console manufacturers added the capability for their consoles to connect to the internet and

introduced virtual stores where digital video games could be purchased and downloaded without

the need for a physical disk.

34.    Digital downloads offered a new level of convenience. Consumers no longer had

to go to a brick and mortar store to purchase a disk or wait for one to arrive in the mail. Now,

video games could be purchased and played instantly with the click of a button or by entering a

code into the console. Theoretically, digital downloads should also be less expensive. There is

virtually no marginal cost to an additional download, unlike discs which had to be manufactured,

loaded with media, packaged and transported to retail stores.

35.    Sony, Microsoft, and Nintendo each operate their own virtual store where

consumers can buy and download digital games directly on their console. Sales of digital games

for the three major consoles exceeded sales of their physical counterparts for the first time in

2020,[16] and are projected to reach 80 percent of the market by 2025.[17] The trend is likely to

continue, with video game disks following the path taken by DVDs and CDs towards the history

books.

36.    All three digital stores operate in a similar fashion: game publishers provide the

game software to the digital store, which then makes the games available for purchase. The store

collects payment and facilitates digital delivery to users' consoles. For their services maintaining

the platform and the necessary infrastructure for delivering digital content, Sony, Microsoft, and

---

[16] *See* Dylan Warman, *For the First Time, Digital Game Sales Outnumber Physical Sales*, ScreenRant (Aug. 12, 2020), https://screenrant.com/digital-game-sales-consoles-outnumber-physical-first-time/

[17] Leo Lewis, Kana Inagaki and Patrick McGee, *Sony gears up for ultimate round of gaming wars with Microsoft*, Financial Times (Sept. 17, 2020), https://www.ft.com/content/0086ab89-06fb-4721-9e69-046f129d6f22

Nintendo take a portion of every sale on their respective stores, remitting the balance to the publishers.

37.     Sony's PlayStation Store differs from both Microsoft and Nintendo's digital stores, however, in that game developers must cede total control over the retail price to Sony.[18] Microsoft and Nintendo, on the other hand, allow developers who sell games through their platforms to set the retail price, and then take 30% of that price on each sale for platform fees.[19] Sony follows a similar revenue sharing model with some publishers, and is reported to take the same 30% cut.[20] With other publishers, however, Sony maintains agreements whereby it pays the publisher an agreed upon "wholesale price" for each game sold, with the full retail markup going to Sony.[21]

38.     To use the PlayStation Store, a user must create a master account. A log of all previously purchased items, known as "Download List," records each PlayStation Store account's complete download activity. Each master account is associated with an online virtual "wallet" to which funds can be added. This wallet is then debited when a purchase is made from the store. Money can be added to the wallet through different systems of payment, including credit cards, debit cards, PayPal transfers and prepaid gift cards, but the wallet does not accept cash. Consumers must use the PlayStation wallet to purchase digital games through the PlayStation Store.

---

[18] *See* PlayStation Global Developer & Publisher Agreement ¶ 15.2.2 (effective Mar. 23, 2017) ("Each SIE Company has the sole and exclusive right to set the retail price to Users for Digitally Delivered Products sold or otherwise made available for purchase on or through [PlayStation Network]."), *available at* https://www.sec.gov/Archives/edgar/data/946581/00016282801700 5833/ex10-48.htm.

[19] *See Frequently Asked Questions,* Nintendo Developer Portal, https://developer.nintendo .com/faq (last visited Apr. 28, 2021); Microsoft Store App Developer Agreement, Version 8.6 (effective July 10, 2020), *available at* https://query.prod.cms.rt.microsoft.com/cms/api/am/ binary/RE4o4bH

[20] *See* Tom Marks, Report: *Steam's 30% Cut Is Actually the Industry Standard*, IGN (Jan. 13, 2020), https://www.ign.com/articles/2019/10/07/report-steams-30-cut-is-actually-the-industry-standard.

[21] PlayStation Global Developer & Publisher Agreement ¶ 15.2.1.

1      **D.**    **Sony Eliminates Retail Competition for Digital PlayStation Games**

2      39.    The shift from optical disks to digital video games upended the competitive

3 landscape. All three major console manufacturers have adopted a "walled garden" model for

4 accessing digital games, meaning they do not allow users to install software on their consoles

5 outside of the platform's official store. This creates a closed platform where the console

6 manufacturer controls and supervises user access to all the software that runs on the platform—

7 i.e., consumers cannot access other digital stores from their consoles.[22] While this model

8 naturally concentrates market power in the console manufacturer, price competition for digital

9 games still occurs in two principal ways. *First*, where publishers maintain some control over the

10 retail price, they compete with one another to gain market share by offering a lower price to

11 consumers. *Second*, where download codes are available from outside retailers, the retailers

12 compete amongst themselves and with the in-console stores to offer the best price. Both types of

13 price competition exist in the aftermarkets for Xbox and Nintendo games, but Sony has taken

14 unique steps to foreclose both. Sony forces publishers to cede control over the final retail price in

15 order to make their games available on the PlayStation Store, thereby eliminating the first type of

16 price competition. This sets Sony apart not only from Xbox and Nintendo, but from similar

17 "walled gardens" in other technology markets, such as the Apple App Store.[23]

18      40.    Sony also forbids outside retailers from selling digital download codes,

19 foreclosing the second form of price competition. For Xbox and Nintendo games, consumers can

20 buy download codes from the same retailers who sell games on disks, which they then use to

21 download the games directly to their consoles. These outside retailers often offer digital

22 download codes at lower prices than are available on the in-console store, or offer other

23 incentives and perks to attract consumers. For example, as of this writing, the price of NBA

24 2K22 for Xbox series X/S on the Microsoft store is $69.99. A digital download code for the

25

26 [22] *Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *2, 52 (N.D. Cal. Sept. 10, 2021).

27 [23] *Id.* at 22.

28

1  same game is available from Amazon for $35.00. Madden NFL 22 also costs $69.99 on the
2  Microsoft store—but a download code is available from GameStop for $34.99. Super Mario
3  Party for Nintendo Switch costs $59.99 on the Nintendo eShop, but a download code is only
4  $49.50 on Amazon.

Figure 1: December 14, 2021 Screenshot of Amazon.com



13

Figure 2: December 14, 2021 Screenshot of GameStop.com



Figure 3: December 14, 2021 Screenshot of Amazon.com



41. Until April 1, 2019, consumers could purchase download codes for digital PlayStation games from the same array of retailers that also sold physical games. This allowed PlayStation users to purchase a digital copy of a video game from their preferred retailer at the retailer's chosen price. At brick-and-mortar stores, these codes came on printed cards that were activated at the point of sale. Users could also purchase codes from retailers' websites and receive them instantly without the need for any physical game product.

Figure 4: Digital Game Download Card



42. The financial relationship between Sony and retailers such as Amazon, Best Buy, Game Stop and Walmart concerning digital game sales was financially lucrative to Sony and the retailers. As a result, Sony treated its relationships with the retailers of its digital games as mutually beneficial. Sony actively promoted sales of its digital games through *both* the PlayStation Store and at "participating retailers" which evidences that Sony, for years, viewed participating retailers as a strong economic source of profitable revenue. Sony promoted sales

15

through retailers by directing customers to purchase digital games from retailers because it benefited Sony financially and/or contractually.[24]

43.     Sony employed multiple pricing structures in order to generate revenue through third-party sales of digital PlayStation games. For games developed in-house by PlayStation Studios, Sony generally provided download codes to retailers to sell on consignment, with the retailer taking a commission on each sale and remitting the remainder of the retail price to Sony.[25] Sony also sold download codes for third-party games back to the publisher in bulk and allowed the publishers to deal with retailers directly.[26]

44.     Sales of digital PlayStation games from third-party retailers were substantial. As of 2016, GameStop was selling about a billion dollars per year in digital content.[27] Sony is GameStop's second largest vendor, with Sony products accounting for eighteen percent of new

---

[24] *See, e.g.,* Press Release, Sony Corp., PlayStation 4 Sales Surpass 60.4 Million Units Worldwide (June 13, 2017), https://www.sie.com/en/corporate/release/2017/170613.html; Press Release, Sony Corp., PlayStation 4 Sales Surpass 70.6 Million Units Worldwide (Dec. 7, 2017), https://www.sie.com/en/corporate/release/2017/171207.html; Press Release, Sony Corp., Sony Interactive Entertainment America Unveils Extraordinary Gaming Experiences for PlayStation 4 And PlayStation VR at E3 2016 (June 14, 2016), Press Release, Sony Corp., PlayStation 4 Sells 5.9 Million Units Worldwide During the 2017 Holiday Season (Jan. 9, 2018), https://www.sie.com/en/corporate/release/2018/180109.html.

[25] *See* Letter from GameStop COO/CFO Robert A. Lloyd to SEC (June 25, 2018), https://www.sec.gov/Archives/edgar/data/0001326380/000132638018000077/filename1.htm (We sell a variety of digital products which generally allow consumers to purchase full game downloads, downloadable content or point of sale activated cards redeemable for digital content. . . . When purchasing these products from us, consumers pay a retail price and we earn a commission based on a percentage of the retail sale as negotiated with the product publisher. We recognize these commissions as revenue at the time of sale of these digital products.").

[26] *See* Sony Interactive Ent't, PlayStation Global Developer and Publisher Agreement § 9.2.4 (Mar. 23, 2017), https://www.sec.gov/Archives/edgar/data/946581/000162828017005833/ex10-48.htm).

[27] Interview by Deloitte with Robert Lloyd, CFO, GameStop Corp. (Apr. 4, 2016), https://www.wsj.com/articles/for-gamestop-cfo-robert-lloyd-complexity-is-part-of-the-game-1459742593?reflink=desktopwebshare_permalink.

16

1  product sales in 2019 .[28] GameStop is just one of several major retailers who previously sold
2  digital PlayStation games.

3      45.    On or about April 1, 2019, which is also the start of Sony's fiscal year, Sony
4  implemented a new policy preventing retailers from selling digital download codes. This policy
5  was only revealed to the public when an employee of GameStop leaked a confidential memo
6  Sony sent to inform GameStop of the policy change. Sony later confirmed the authenticity of the
7  memo, but took no other steps to make PlayStation owners and potential purchasers aware of the
8  restriction.[29] Since access to Sony's PlayStation Network is required to enable digital delivery of
9  PlayStation games, the result of this scheme is that consumers can purchase digital games only
10  through the PlayStation Store or not at all. For owners of the PlayStation 5 Digital Edition, that
11  means the only place they are able to purchase any video games for their console is through the
12  PlayStation Store.

13      46.    Sony's financial performance with retail partners *was not* the impetus for Sony's
14  decision to refrain from selling digital games through retailers. The relationships Sony had with
15  these retailers were strong, and lucrative for Sony and its retail partners. Sony's financial
16  relationship with GameStop and Best Buy was particularly lucrative up until the policy change in
17  2019. Sony benefited from the marketing and customer service provided by retailers. Customers
18  who shop at retailers such as GameStop bought more games overall, and more accessories, than
19  those who shop on the PlayStation Store.[30]  To be sure, even after the new policy was
20  implemented Sony continued to sell cash/gift cards through these same digital game retailers so
21  that consumers could use the gift cards to buy the games and other digital products through the

---

[28] GameStop Corp., 2019 Annual Report (SEC Form 10-K) at 3 (Mar. 27, 2020),
https://news.gamestop.com/static-files/9d2139e1-31c7-498f-ad95-63db1e6d085a.

[29] *See* Nick Statt, *Sony confirms it will stop letting GameStop and other retailers sell PS4
download codes*, The Verge (Mar. 25, 2019), https://www.theverge.com/2019/3/25/18281538/
sony-playstation-4-gamestop-stop-selling-game-download-codes-retailers.

[30] GameStop Corp., Q2 2019 Earnings Call Transcript at 5 (Sep. 10, 2019).

retailers.[31]  This enabled Sony to retain the benefit of retailers' customers while avoiding competition with the retailers on digital game pricing.

47.    By implementing this new policy, Sony elected to sacrifice short-term sales and profits in order to shift *all* digital game sales to the PlayStation Store where prices for digital games were generally higher. The following Sony Interactive Entertainment Business Data and Sales Report demonstrates that for Fiscal Year 2019 when it first implemented the new policy eliminating retailers as competitors in digital game sales, Sony sustained a substantial loss of Software Unit Sales and corresponding revenue in digital games.

<u>Figure 5</u> [32]

**Worldwide PlayStation®4 Software Unit Sales (Sell-in / Unit: millions)**

|  | Q1<br>(April - June) | Q2<br>(July - September) | Q3<br>(October – December) | Q4<br>(January - March) | FY<br>(April - March) |
|---|---|---|---|---|---|
| FY2016 | 39.9 | 54.0 | 85.5 | 54.9 | 234.2 |
| FY2017 | 45.9 | 76.1 | 92.8 | 59.4 | 274.2 |
| FY2018 | 47.7 | 82.3 | 95.6 | 62.3 | 292.7 |
| FY2019 | 50.5 | 71.6 | 88.7 | 65.3 | 276.1 |
| FY2020 | 91.4 | 81.8 | N/A | N/A | N/A |

48.    Sony faced decreased revenue in its first year of implementation of eliminating third-party digital game sales. Sony's total game software sales for the first quarter of implementation, the quarter beginning on April 1, 2019, which was a year before Covid, were the third lowest of any quarter between 2016 and 2020.  Game software sales for the full 2019

---

[31] Chrissy Montelli, *How to gift games on a PS4 by sharing a PlayStation Store Cash Card, since you can't gift games directly,* Business Insider (Dec. 5, 2019), https://www.businessinsider.com/how-to-gift-games-on-ps4.

[32] Sony Interactive Ent't, *Business and Sales Data,* https://www.sie.com/en/corporate/data.html (last visited July 12, 2022).

1    fiscal year were also down from 2018.[33] By 2020, however, Sony was taking advantage of its

2    monopoly profits, posting $17.32 billion for the fiscal year in sales of digital games and

3    associated content.[34]

4    49.    Sony, at all relevant times, retained exclusive control over the design, features and

5    operating software for PlayStation consoles, and over the necessary software for delivering

6    digital content to PlayStation consoles. The digital PlayStation games sold by Sony to consumers

7    through the PlayStation Store after the change in policy were largely the same game titles as

8    those that were previously sold through retailers.

9    50.    Sony specifically intended to and did eliminate price competition from other

10   digital video game retailers. Sony entrenched its monopoly by eliminating retailers, temporarily

11   sacrificing short-term sales and profits in order to control the Sony digital game market

12   exclusively through the PlayStation Store.  As a result, Sony has an unlawful monopoly over the

13   market for digital PlayStation games, from which it derives supracompetitive profits.

14   51.    Before the April 2019 policy change, publishers could sell both physical

15   PlayStation games and digital games, via download codes, through a variety of retailers.

16   Retailers profit from markups on the final purchase price, but price competition among them puts

17   downward pressure on retail price markups. Sony also charges a Platform Royalty Fee on each

18   game sold by retailers for use on its gaming consoles, including PlayStation 5. On information

19   and belief, Sony's Platform Royalty Fee for physical and digital games sold at external retailers

20   is 11.5%.

21   52.    By foreclosing retail competition for digital PlayStation games, Sony effectively

22   takes the retail markup for itself in addition to its royalty fee. Consumers, limited to a single

23

24   [33] *See* Sony Corporation, 2019 Annual Report (SEC Form 20-F) at 31, 24 (June 26, 2020),
     https://www.sony.com/en/SonyInfo/IR/library/FY2019_20F_PDF.pdf.

25   [34] Sony Corporation, Financial Statements and Consolidated Financial Results for the Fiscal
26   Year Ended March 31, 2021 (Apr. 28, 2021), available at https://www.sony.com/en/SonyInfo
     /IR/library/presen/er/pdf/20q4_sony.pdf. Dollar figure based on the following exchange rate
27   from April 28, 2021: 1 JPY = 0.0092 USD.

28

1  source for purchasing any digital PlayStation content, are forced to pay a higher price for digital

2  PlayStation games than they would in a free and unrestrained competitive retail market.

3      53.    Additionally, by taking complete control over retail prices for digital PlayStation

4  games, Sony foreclosed price competition among video game publishers to a significant degree

5  because they can no longer execute a strategy of offering lower retail prices to gain a higher

6  share of sales. Instead, Sony sets the price to maximize its own profits, and Sony's interests in

7  choosing a retail price strategy conflict with the interests of video game publishers. Because

8  Sony is responsible for all the marginal costs associated with each sale, it is incentivized to set

9  the price higher to obtain a greater margin on each sale. Publishers, who incur no additional costs

10  with each additional game sold, would maximize their profits at a lower price point but greater

11  sales volume, relative to Sony. As one source from an independent game publisher recently put

12  it: "[h]aving a limited ability to discount our titles, and get featured through sales really hurts our

13  revenue."[35]

14      54.    Sony owns, possesses or controls 100% of the PlayStation Store, maintains and

15  operates the PlayStation Store with Sony employees or agents, and controls all of the sales,

16  revenue collections and other business operations.

17      55.    The revenue Sony generates through sales of digital video games has been

18  increasing sharply since it established its monopoly on digital PlayStation games, and will

19  continue to rise as more users shift to digital games. In 2019, Sony made $12.48 billion through

20  sales of digital PlayStation games and associated content.[36] For the fiscal year ending March 31,

21  2021, that number was $17.32 billion.[37]

---

[35] *See, e.g.,* Liam Croft, *Report: How PlayStation Is Failing Indie Developers*, Push Square (July 2, 2021), https://www.pushsquare.com/news/2021/07/report_how_playstation_is_failing_indie_developers.

1

### VI.    MONOPOLY POWER IN THE RELEVANT MARKET

2        56.    The relevant product market in this case is the market for downloadable, digitally-

3    delivered video game content that is compatible with a PlayStation console ("digital PlayStation

4    games"). The relevant geographic market is the United States, its territories, possessions, and the

5    Commonwealth of Puerto Rico.

6        57.    As discussed above, the market for video game consoles is dominated by three

7    companies of roughly equal market share: Sony (PlayStation); Microsoft (Xbox); and Nintendo.

8    The price for the consoles is generally between $300 and $600. Games are not cross-compatible

9    on different consoles, so once a consumer purchases a console, he or she must purchase games

10   that are designed for that particular console.

11       58.    Due to the high cost of consoles, the differentiation among them, and the lack of

12   cross-compatibility, each console creates a separate aftermarket for games that can be played on

13   it. Games that cannot be played on the same console are not substitutable. The costs of switching

14   to a new console include not only the cost of the console along with its controllers and

15   accessories, but the value of the consumer's entire game collection, which may have taken years

16   and cost thousands of dollars to accumulate. Switching console brands also requires learning

17   how to use a new controller and adapting to the differences in game play. A small but significant,

18   non-transitory increase to the price of games for one console will not, therefore, cause a

19   consumer to switch to one of the other consoles.

20       59.    The aftermarket for digital PlayStation games is wholly derivative from and

21   dependent on the primary market for video game consoles. The monopolization alleged herein

22   relates only to the aftermarket for digital PlayStation games, not to the primary console market.

23   Sony's market power in the aftermarket flows from its relationship with consumers—

24   specifically, its control over access to virtual stores through its consoles—and not from

25   contractual provisions that it obtains in the initial market. Competition in the console market

26   does not suffice to discipline anticompetitive practices in the aftermarket for digital PlayStation

27   games.

28

60.    Prices for digital games on the PlayStation Store are not responsive to changes in prices for physical games available from other retailers, and physical games are not substitutes for digital games. A small but significant, non-transitory increase in price for digital PlayStation games will not cause a significant number of consumers to switch to buying physical copies of PlayStation games instead.

61.    Historically, there was vigorous price competition among retailers and among publishers within the console-specific game markets. Retailers tried to offer the best prices to consumers and thereby gain a higher share of the market while maintaining profits. Publishers had an incentive to lower their wholesale prices so retailers could offer a better price in turn, resulting in pricing and sales volumes that maximized profits for both publishers and retailers.

62.    By prohibiting sale of digital PlayStation games except through the PlayStation Store, Sony established a complete monopoly in the market for digital PlayStation games. Sony has a 100% market share in the relevant market, and complete control over retail prices in the relevant market.

63.    Sony did not provide notice of its April 1, 2019 policy change to consumers. As a result, purchasers of PlayStations largely did not have knowledge that they could now only purchase digital games from one source. Those who purchased their consoles before April 1, 2019 similarly did not expect their ability to buy digital games from their preferred retailer would be eliminated.

## VII.    ANTICOMPETITIVE EFFECTS

64.    Sony's acquisition and maintenance of a monopoly in the market for digital PlayStation games causes consumers to pay more for their digital PlayStation games than they would have in a competitive market.

65.    Evidence of the anticompetitive price effect is already manifesting itself as demonstrated by the current price differences for PlayStation video games across different retailers. Table 1, below, reflects the prices of the first ten games listed on the PlayStation

Store's "Best-Seller" list[36] as of May 4, 2021, along with the prices of the same games on disk from four prominent retailers. As shown, Sony's prices on the PlayStation Store are between 12% and 171% higher for these games than the average prices for each across the other four retailers.

Figure 6

| Game | PS Store | Wal-Mart | GameStop | Best Buy | Amazon | Non-PS Store Average | Price Δ on PS Store |
|---|---|---|---|---|---|---|---|
| Madden NFL 21 | $59.99 | $19.98 | $27.99 | $19.99 | $29.16 | $24.28 | +147% |
| Ghost of Tsushima | $59.99 | $56.50 | $37.99 | $59.99 | $59.99 | $53.62 | +12% |
| NBA 2K21 | $59.99 | $29.72 | $18.99 | $19.99 | $19.99 | $22.17 | +171% |
| Watch Dogs Legion | $59.99 | $36.49 | $49.99 | $59.99 | $30.00 | $44.12 | +36% |
| Marvel's Avengers | $39.99 | $29.00 | $22.99 | $24.99 | $24.99 | $25.49 | +57% |
| MLB The Show 20 | $19.99 | $9.99 | $8.99 | $19.99 | $16.97 | $13.99 | +43% |
| Resident Evil 3 | $59.99 | $27.99 | $34.99 | $39.99 | $25.50 | $32.12 | +87% |
| NHL 21 | $59.99 | $28.89 | $29.99 | $19.99 | $25.00 | $25.97 | +131% |
| | | | | | | **Average Price Δ on PS Store:** | **+74%** |

66.    The market for video games on disk provides a helpful benchmark for what prices would look like in a competitive market for digital games. There is no legitimate reason digital games should be more expensive than their physical counterparts. In fact, given the costs saved on packaging and distribution, prices for games in a truly competitive market for digital games would likely be lower than they are for games on disk. The only plausible explanation for the stark price differences is Sony's monopoly power in the market for digital PlayStation games. As video game disks go the way of CDs and DVDs before them, Sony has positioned itself to gain an ever-increasing share of, and eventually, a monopoly in the market for *all* PlayStation games.

67.    Sony made approximately $17 billion in revenue from the sale of digital PlayStation games in the fiscal year ending March 31, 2021.[37] If the average price difference of

---

[36] *See PlayStation Store*: *Best Sellers,* Sony Interactive Entm't, https://store.playstation.com/en-us/category/877e5ce2-4afc-4694-9f69-4758e34e58cd/1 (last visited May 4, 2021).

[37] *See* Sony Corporation, Financial Statements and Consolidated Financial Results for the Fiscal Year Ended March 31, 2021 (Apr. 28, 2021), available at https://www.sony.com/en/SonyInfo

23

+74% indicated by the above data is representative of the broader market, then overcharges resulting from Sony's monopoly could be in the range of $7 billion *per year* as long as Sony's monopoly continues.

68.    The lack of a truly competitive environment has also led to reduced output and supply of PlayStation video games because publishers are barred from selling these games at prices below Sony's chosen retail price. Control over prices, including the opportunity to offer discounts and promotions, is a key tool that smaller, independent publishers use to sell their games. Sources from such publishers have described how difficult it is to gain traction on the PlayStation Store in the face of Sony's restriction.[38] This lowers the incentive for publishers to expend the resources necessary to make their games available on the PlayStation Store. In this way, Sony's unlawful monopoly restricts output of new digital PlayStation games.

69.    The existence of supracompetitive pricing, reduced consumer choice among market alternatives, and reduced output demonstrate that Sony's monopolistic conduct has injured competition generally in the market for digital PlayStation games, precisely the type of harm the antitrust laws were intended to prevent.

## VIII.    ANTITRUST INJURY

70.    Plaintiffs and Class members have been injured by Sony's anticompetitive conduct because they have been deprived the choice of purchasing digital games at lower prices from competing retailers and paid more for digital PlayStation games than they would have paid in a competitive market.

71.    Plaintiffs and Class members have also been injured because Sony's unlawful monopolization of the relevant market extinguished Plaintiffs and Class members' freedom of

---

/IR/library/presen/er/pdf/20q4_sony.pdf. Dollar figure based on the following exchange rate from April 28, 2021: 1 JPY = 0.0092 USD.

[38] *See* Liam Croft, *Report: How PlayStation Is Failing Indie Developers*, Push Square (July 2, 2021), https://www.pushsquare.com/news/2021/07/report_how_playstation_is_failing_ indie_developers.

choosing between video games sold through the PlayStation Store and lower cost alternatives that would have been available had Sony not monopolized the market.

72.    Plaintiffs and Class members have also been injured by reduced output resulting from Sony's monopolization of the relevant market by being deprived of the opportunity to purchase and play digital PlayStation games that would have been available but for Sony's anticompetitive policies.

### IX.    EFFECT ON INTERSTATE COMMERCE

73.    During the relevant time period, Sony produced, marketed, sold, and delivered digital PlayStation games across state lines in an uninterrupted flow of interstate commerce.

74.    During the relevant time period, Plaintiffs and Class members purchased digital PlayStation games, other digital content, and related services from Sony and/or its agents. As a result of Sony's illegal and anticompetitive conduct, Plaintiffs and Class members were compelled to pay, and did pay, artificially inflated prices for one or more of the aforementioned products and services.

75.    During the relevant time period, Sony employed various instrumentalities of interstate commerce to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce.

76.    Defendant's conduct was within the flow of and was intended to have and did have a direct, substantial, and foreseeable effect on interstate commerce.

77.    Sony's conduct has also had substantial intrastate effects in that, among other things, consumers paid overcharges in each state. Sony's conduct materially deprived the consuming public—including of purchasers in each state—of any choice to purchase more affordable digital PlayStation games from retailers other than Sony. The absence of competition for PlayStation 5 games has, and continues to, directly and substantially affect and disrupt commerce within each state.

X.    CLASS ACTION ALLEGATIONS

78.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

as a class action under Federal Rules of Civil Procedure 23(a), (b)(2) and (3), seeking damages

and injunctive relief on behalf of the following Class:

> All persons in the United States, exclusive of Sony and its employees, agents and affiliates, and the Court and its employees, who purchased any digital video game content directly from the PlayStation Store at any time from April 1, 2019 through the present. All persons in the United States who purchased through the PlayStation Store one or more video games for which a game specific code voucher ("GSV") was available at retail prior to April 1, 2019, for which a total of at least 200 GSV redemptions were made prior to April 1, 2019, and for which the post-discount price increased by at least fifty cents from: (a) the period between January 1, 2017 and March 31, 2019; as compared to (b) the period between April 1, 2019 and December 31, 2023. The class period shall be April 1, 2019 to December 31, 2023. Excluded from the Settlement Class are: (1) Defendant and its counsel, officers, directors, management, employees, parents, subsidiaries and affiliates; and (2) the Court and its employees.

79.    Plaintiffs and the Class seek damages for the overcharges they have paid since

Sony monopolized the relevant market, and permanent injunctive relief to prevent or remedy the

unlawful conduct alleged herein and thereby ensure competition in the relevant market.

80.    Members of the Class are so numerous and geographically dispersed that joinder

of all members is impracticable. Upon information and belief, there are at least ten million Class

members, who reside in and have purchased digital PlayStation games in every state and territory

throughout the United States. Moreover, given the costs of complex antitrust litigation, it would

be uneconomic for many class members to bring individual claims and join them together. The

Class is readily identifiable from information and records in the possession of Defendant.

81.    Plaintiffs are members of the Class they seek to represent, and their claims arise

from the same factual and legal bases as those of the Class; they assert the same legal theories as

do all Class members.

82.    Plaintiffs' claims are typical of the claims of Class members. Plaintiffs' claims

arise out of the same course of anticompetitive conduct that gives rise to the claims of the other

26

Class members. Plaintiffs and all members of the Class were damaged by the same wrongful conduct: Sony's monopolization of the retail market for digital PlayStation games. Plaintiffs and all members of the Class paid supracompetitive prices for digital PlayStation games and were deprived of the benefits of retail competition as a result of Sony's unlawful monopoly.

83.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other members of the Class.

84.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of antitrust class actions.

85.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. Overcharge damages with respect the Class as a whole are appropriate because Sony acted on grounds generally applicable to the entirety of the Class. Such generally applicable conduct is inherent in Sony's unlawful creation and maintenance of a monopoly in the market for digital PlayStation games. Questions of law and fact common to the Class include, but are not limited to:

a)  Whether Sony unlawfully created, maintained and continues to maintain monopoly power in the relevant market;

b)  Whether Sony's unlawful monopoly has caused and continues to cause anticompetitive effects in the relevant market;

c)  Whether procompetitive justifications exist, and if they do, whether there were less restrictive means of achieving them;

d)  Whether Sony's unlawful monopoly has substantially affected intrastate and/or interstate commerce;

e)  Whether Sony's unlawful monopoly caused antitrust injury through overcharges to the business or property of Plaintiffs and the members of the Class;

f)  Whether Sony's marketing, sales and business practices with regard to PlayStation consoles and digital games constitutes unlawful, unfair, unconscionable or misleading conduct;

g)  Whether injunctive relief is warranted to restore competition in the relevant market; and

h)  The quantum of overcharges paid by the Class in the aggregate.

27

86.     The common questions of law and fact are identical for each and every member of the Class.

87.     Plaintiffs will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent themselves and those similarly situated.

88.     The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and cause needless expenditure of judicial resources.

89.     Plaintiffs are typical of the Class in that their claims, like those of the Class, are based on the same anticompetitive business practices and the same legal theories.

90.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

91.     Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XI.     CLAIMS FOR RELIEF

### FIRST CLAIM

**Monopolization Under Section 2 of The Sherman Act, 15 U.S.C. § 2
and Section 4 of the Clayton Act, 15 U.S.C. 4**

92.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

93.     Sony has willfully and unlawfully acquired, maintained, and continues to maintain monopoly power in the market for digital PlayStation video games. Specifically, Sony

28

1   has unlawfully acquired monopoly power by: (i) establishing the PlayStation Store as the

2   exclusive distributor of digital PlayStation games; and (ii) maintaining complete control over

3   retail prices on the PlayStation Store.

4       94.     Sony's unlawful acquisition of monopoly power has reduced competition in the

5   relevant market resulting in decreased output and supracompetitive prices for digital PlayStation

6   games.

7       95.     There is and was no legitimate, non-pretextual, procompetitive business

8   justification for Sony's conduct that outweighs its harmful effect.

9       96.     Plaintiffs and Class members have been injured by Sony's unlawful

10  monopolization because they have been: (a) deprived of lower cost alternatives for digital

11  PlayStation games; (b) forced to pay supracompetitive prices for those games; and/or (c)

12  subjected to a lower of those games. Plaintiffs and Class members paid more for digital

13  PlayStation games than they otherwise would have absent Sony's unlawful monopolization of

14  the digital PlayStation game market.

15      97.     Plaintiffs and Class members have suffered economic injury to their property as a

16  direct and proximate result of Sony's monopolization of the relevant market in violation of 15

17  U.S.C. § 2, and are, therefore, entitled to treble damages, costs, and attorneys' fees in amounts to

18  be proven at trial.

19      98.     Plaintiffs and Class members have suffered economic injury to their property as a

20  direct and proximate result of Sony's unlawful monopolization, and Sony is, therefore, liable for

21  treble damages, costs, and attorneys' fees in amounts to be proven at trial.

22                              **SECOND CLAIM**

23
    **Attempted Monopolization Under Section 2 of The Sherman Act, 15 U.S.C. § 2**
24          **and Section 4 of the Clayton Act, 15 U.S.C. 4**

25      99.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if

26  fully set forth herein.

27

28                                  29

100.    Sony has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the market digital PlayStation games. Specifically, Sony has unlawfully attempted to acquire monopoly power by: (i) establishing the PlayStation Store as the exclusive distributor of digital PlayStation games; and (ii) maintaining complete control over retail prices on the PlayStation Store.

101.    Sony's attempted acquisition of monopoly power has reduced competition in the relevant market resulting in decreased output and supracompetitive prices for digital PlayStation games.

102.    There is and was no legitimate, non-pretextual, procompetitive business justification for Sony's conduct that outweighs its harmful effect.

103.    Plaintiffs have been injured by Sony's unlawful attempted monopolization because they have been: (a) deprived of lower cost alternatives for digital PlayStation games; (b) forced to pay supracompetitive prices for those games; and (c) subjected to a lower output of those games. Plaintiff and Class members paid more for digital PlayStation games than they otherwise would have absent Sony's unlawful monopolization of the digital PlayStation game market.

104.    Plaintiffs and Class members have suffered economic injury to their property as a direct and proximate result of Sony's attempted monopolization of the relevant market in violation of 15 U.S.C. § 2, and are, therefore, entitled to treble damages, costs, and attorneys' fees in amounts to be proved at trial.

### THIRD CLAIM

**Declaratory and Injunctive Relief Under Section 2 of The Sherman Act, 15 U.S.C. § 2 and Sections 2 and 16 of the Clayton Act, 15 U.S.C. § 26**

105.    Plaintiffs reallege and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

106.    Sony's unlawful creation and maintenance of a monopoly in the digital PlayStation game market violates Section 2 of the Sherman Act, 15 U.S.C § 2. Its unlawful

30

1    conduct is continuing and will continue unless it is permanently enjoined. The anticompetitive

2    effects of Sony's unlawful conduct in the relevant market are continuing and will continue absent

3    an injunction.

4        107.    Plaintiffs and the Class have been injured in their business or property by reason

5    of Sony's antitrust violations alleged in this Count. These injuries will continue until Sony's

6    anticompetitive conduct ceases and competition is restored.

7                                    **FOURTH CLAIM**

8                    **Damages Under the California Unfair Competition Law**
                     **Cal. Bus. & Prof. Code §§ 17200, *et seq.***
9

10       108.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if

11   fully set forth herein.

12       109.    Sony fails to disclose to consumers in its marketing, advertising or at the point of

13   sale that digital edition games can only be purchased on the PlayStation Store. Consumers who

14   purchase games have historically been accustomed to shopping for games and comparing prices

15   or other features offered from different retailers. Sony's departure from this traditional

16   environment to an exclusive online store where games are available at significantly higher prices

17   should have been disclosed to consumers prior to purchasing a PlayStation console, especially

18   those consumers who purchase the Play Station 5 Digital Edition console who were effectively

19   "locked-in" to purchasing digital games from the PlayStation Store.

20       110.    This video game aftermarket restriction is unfair, immoral, unethical,

21   unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does

22   not outweigh the gravity of the harm to its victims.

23       111.    Purchasers of the PlayStation console before and after Sony's elimination of retail

24   competition for digital PlayStation games did not have notice that digital games would only be

25   available from the PlayStation store or that they would be paying significantly higher prices for

26   digital games.

27

28

112. On average, Sony charges significantly more for digital PlayStation games than other retailers charge for the same games on disk. Given the costs saved on manufacturing, packaging, and distributing video game disks, there is no legitimate business reason for this discrepancy. The unreasonably high margins Sony obtains on digital PlayStation game sales is evidence of its unfair business practices.

113. Sony's monopolizing conduct violates the public policy of preserving fair business competition as declared by specific constitutional, statutory or regulatory provisions, including the Sherman Act and the Cartwright Act.

114. Sony's monopolizing conduct is also unfair because the consumer injury is substantial, is not outweighed by benefits to consumers or competition, and is not one consumers could reasonably have avoided.

## FIFTH CLAIM

### Unjust Enrichment

115. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

116. As a result of Sony's monopolization of the digital PlayStation video game market, Sony has been unjustly enriched at the expense of Plaintiffs and Class members, who purchased digital PlayStation games from the PlayStation Store when they otherwise might not have, or spent more to purchase digital PlayStation games than they otherwise would have absent Sony's wrongful acts described herein.

117. It would be inequitable for Sony to retain the profits, benefits, and other compensation obtained from its wrongful conduct.

118. As a result, Plaintiffs seeks, on behalf of themselves and other Class Members, restitution from Sony and an Order disgorging all of Sony's inequitably-obtained revenue, profits, benefits, or other compensation.

119. Because the Court has broad discretion to find Sony was unjustly enriched, and because the Court has broad discretion to award appropriate relief, and because Sony may have

32

been unjustly enriched in an amount different than the amount Plaintiffs and Class Members were damaged, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Sony's challenged behavior.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, pray for judgment against Sony as to each and every claim made herein and for the following relief:

A.    An Order determining that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and directing that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appointing the Plaintiffs as the named representatives of the Class;

C.    Injunctive relief ensuring free and unrestrained competition in the market for digital PlayStation games, and preliminarily and permanently enjoining Sony from continuing the unlawful conduct alleged herein, and from engaging in similar or related conduct in the future;

D.    Monetary relief consisting of treble damages in an amount to be determined at trial; pre- and post-judgment interest; and costs, expenses, and reasonable attorneys' fees; and

G.    Any other and further relief the case may require and the Court may deem just and proper under the circumstances.

## XIII.    JURY DEMAND

120.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated: ~~November 27, 2024~~December 11[1], 2024                Respectfully submitted,

*/s/ Michael M. Buchman*

Michael M. Buchman (admitted *pro hac vice*)

~~Jacob O. Onile-Ere (admitted *pro hac vice*)~~

~~Johnny Shaw (admitted *pro hac vice*)~~

**MOTLEY RICE LLC**
800~~777~~ Third Avenue, ~~27th Floor~~Suite 2401
New York, NY 1002~~17~~2

33

**Formatted:** Indent: Left: 0"

Tel: (212) 577-0050
mbuchman@motleyrice.com
~~jonileere@motleyrice.com~~
~~jshaw@motleyrice.com~~

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

Jeff S. Westerman (State Bar No. 94559)
**ZIMMERMAN REED**
6420 Wilshire Blvd.
Suite 1080
Los Angeles, CA 90048
Tel: (310) 752-9385
jeff.westerman@zimmreed.com

*Counsel for Plaintiff Augustin Caccuri*

Joseph R. Saveri (State Bar No. 130064)
Ronnie S. Spiegel (WSBA No. 33721)*
Elissa A. Buchanan (State Bar No. 249996)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Tel: (415) 500-6800
jsaveri@saverilawfirm.com
abuchanan@saverilawfirm.com

*Counsel for Plaintiff Adrian Cendejas*

* Located in Washington State

Blake Hunter Yagman (admitted *pro hac vice*)
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel.: (929) 709-1493
byagman@leedsbrownlaw.com

Peggy J. Wedgworth (admitted *pro hac vice*)
Elizabeth McKenna (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel: (212) 868-1229

34

pwedgworth@milberg.com
emckenna@milberg.com
*Counsel for Plaintiff Allen Neumark* Jeff S. Westerman (State Bar No. 94559)
**WESTERMAN LAW CORP.**
16133 Ventura Blvd., Suite 685
Encino, CA 91436
Tel: (310) 698-7450
jwesterman@jswlegal.com

*Counsel for Plaintiff Augustin Caccuri*

Peggy J. Wedgworth (admitted *pro hac vice*)
Elizabeth McKenna (admitted *pro hac vice*)
Blake Yagman (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel: (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com
byagman@milberg.com

*Counsel for Plaintiff Allen Neumark*

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Katharine Malone (State Bar No. 290884)
Christopher K.L. Young (State Bar No. 318371)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Tel: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
kmalone@saverilawfirm.com
eyoung@saverilawfirm.com
areddy@saverilawfirm.com

*Counsel for Plaintiff Adrian Cendejas*

35