[Submitting Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AGUSTIN CACCURI et al., on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC,<br><br>*Defendant*. | Case No. 3:21-cv-03361-AMO<br><br>**PROPOSED CLASS PLAINTIFFS' NOTICE OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT, APPROVAL OF THE FORM AND MANNER OF NOTICE TO THE CLASS, APPROVAL OF PLAN OF ALLOCATION, TO SCHEDULE A FAIRNESS HEARING FOR FINAL APPROVAL AND CERTIFICATION OF A SETTLEMENT CLASS**<br><br>**MOTION HEARING**<br><br>Date:        November 13, 2025<br>Time:        2:00 p.m.<br>Courtroom:   10, 19th Floor<br>Location: San Francisco Courthouse<br><br>Honorable Araceli Martínez-Olguín |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

I.  STATEMENT OF ISSUES TO BE DECIDED ................................................................. 2

II. THE MOTION FOR PRELIMINARY APPROVAL OF THE PROPOSED
    SETTLEMENT ................................................................................................................... 2

    A.  Introduction ................................................................................................................ 2

    B.  Procedural History ..................................................................................................... 4

        1.  The Litigation ................................................................................................... 4

        2.  Discovery ........................................................................................................... 5

        3.  Settlement Negotiations .................................................................................. 7

    C.  The Proposed Settlement is the Result of Arm's Length Negotiations ........................ 8

        1.  Strength of the Plaintiffs' Case ..................................................................... 9

        2.  The Risk Expense and Complexity ............................................................. 10

        3.  The Risk of Maintaining the Class Action Status Through Trial ............. 11

        4.  The Settlement Amount ................................................................................. 11

        5.  The Extent of Discovery Completed ........................................................... 12

        6.  The Experience and Views of Counsel ....................................................... 12

        7.  The Presence of Governmental Participation ............................................ 13

        8.  The Reaction of the Class Members to the Proposed Settlement ............. 13

    D.  Whether The Settlement's PSN Credits Are "Coupons" Under Ninth Circuit
        Law ............................................................................................................................. 14

    E.  The Settlement Is Fair, Reasonable and Adequate/Procedural Guidance ................. 19

        1.  Identity of the Settlement Class – Procedural Guidance 1(a) ................... 19

        2.  Release of Claims – Procedural Guidance 1(b) .......................................... 23

        3.  Class Recovery – Procedural Guidance 1(c) .............................................. 24

        4.  Cases Affected by the Settlement - Procedural Guidance 1(d) ................. 24

        5.  Allocation Plan - Procedural Guidance 1(e) .............................................. 24

        6.  Submission of Claim Form - Procedural Guidance 1(f) ............................ 25

        7.  Reversions - Procedural Guidance 1(g) ...................................................... 25

        8.  Settlement Administration – Procedural Guidance 2 ................................ 25

        9.  Notice – Procedural Guidance 3 .................................................................. 26

        10. Opt-Outs – Procedural Guidance 4 ............................................................. 27

        11. Objections – Procedural Guidance 5 ........................................................... 28

12.  Attorneys' Fees and Costs – Procedural Guidance 6 ...................................... 28

13.  Service Awards – Procedural Guidance 7 ........................................................ 28

14.  *Cy Pres* – Procedural Guidance 8.................................................................... 29

15.  Timeline – Procedural Guidance 9 .................................................................. 29

16.  CAFA – Procedural Guidance 10 .................................................................... 29

17.  Comparable Outcomes – Procedural Guidance 11 ......................................... 29

F.  The Court Should Preliminarily Approve the Proposed Settlement ........................... 30

1.  Procedural Considerations ............................................................................... 31

a.  Adequate Representation of the Class ................................................... 31

2.  Substantive Considerations ............................................................................. 32

a.  Strength of Class Plaintiffs' Case and Risks of Continued Litigation ................................................................................................. 32

b.  The Settlement Provides Adequate Relief to the Settlement Class ........ 33

c.  Attorney Fees and Service Awards ....................................................... 33

d.  Equitable Treatment of Settlement Class Members .............................. 34

G.  The Plan of Allocation is Fair, Reasonable, and Adequate ........................................ 34

H.  The Proposed Form and Manner of Notice Should be Approved ............................... 35

I.  The Court Should Approve A.B. Data, Ltd. as Notice and Settlement Administrator ................................................................................................................ 36

J.  The Court Should Adopt a Schedule for Final Approval of the Proposed Settlement ................................................................................................................... 36

III.  The Proposed Settlement Class Should be Preliminarily Certified ..................................... 36

A.  Legal Standard .......................................................................................................... 36

1.  The Proposed Class Satisfies Fed. R. Civ. P. 23. ............................................ 37

a.  The Proposed Settlement Class Satisfies Rule 23(a)'s Requirements. ......................................................................................... 37

2.  The Settlement Class Satisfies Rule 23(b)(3)'s Requirements ........................ 40

a.  Predominance ........................................................................................ 40

b.  Superiority ............................................................................................. 41

IV.  CONCLUSION ...................................................................................................................... 42

ATTESTATION ............................................................................................................................. 44

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) .................................................................................................. 40, 41

4

*Boston Retirement System v. Uber Technologies, Inc.,*
  2022 WL 2954937 (N.D. Cal. 2022) ................................................................................ 40

5

*Castillo v. Bank of America, NA,* 980 F.3d 723 (9th Cir. 2020) ........................................ 39

6

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir. 1992) ................................... 30

7

*Garner v. State Farm. Mut. Auto. Ins. Co.,* 2010 WL 1687832 (N.D. Cal. Apr. 22,
  2010) .............................................................................................................................. 32

8

*Giusti-Bravo v. U.S. Veterans Admin.,*
  853 F. Supp. 34 (D.P.R. 1993) ................................................................................. 33, 34

9

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998) .................................... 31, 39

10

*Haralson v. U.S. Aviation Servs. Corp.,* 383 F. Supp. 3d 959 (N.D. Cal. 2019) ............ 31

11

*Hendricks v. Ference,* 754 F. App'x 510 (9th Cir. 2018) .................................... 15, 16

12

*Holwill v. AbbVie Inc. et al.,* No. 1:18-cv-06790 (N.D. Ill.) ...................................... 26

13

*In re Abbott Labs. Norvir Antitrust Litig.,* No. 04-cv-1511 (N.D. Cal., Aug. 27,
  2008) (ECF No. 612) ................................................................................................. 37

14

*In re Aggrenox Antitrust Litig.,* No. 14-MD-2516 (D. Conn, Mar 6, 2018) ................ 37

15

*In re Buspirone Antitrust Litig.,* No. 01-md-01413 (S.D.N.Y. April 21, 2003) ........... 37

16

*In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508 (E.D. Mich. 2003) .................... 37

17

*In re Children's Ibuprofen Oral Suspension Antitrust Litig.,* No. 04-mc-535
  (D.D.C. Dec. 11, 2006) .............................................................................................. 37

18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  2006 WL 1530166 (N.D. Cal. June 5, 2006) ............................................................. 39

19

*In re Glumetza Antitrust Litig.,* 336 F.R.D. 468 (N.D. Cal. 2020) ........................... 41

20

*In re High-Tech Emp. Antitrust Litigation.,* No. 11-cv-02509, 2015 WL 12991307
  (N.D. Cal. Mar. 3, 2015) ........................................................................................... 30

21

*In re High-Tech Employee Antitrust Litig.,* 985 F. Supp. 2d 1167 (N.D. Cal. 2013)
  (citing *Dukes,* 564 U.S. at 349) ............................................................................... 38

22

*In re Hyundai & Kia Fuel Econ. Litig.,* 926 F.3d 539 (9th Cir. 2019) .............. 37, 40, 41

23

*In re Imprelis Herbicide Mktg. Sales Pracs. & Prods.,* 296 F.R.D. 351 (E.D. P.
  2013) ............................................................................................................................ 34

24

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.,* No. 19-MD-
  02913-WHO, 2022 WL 2343268 (N.D. Cal. June 28, 2022) ................................ 38

25

*In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369 (D.D.C. 2002) ......... 37

26

*In re Lyft Securities Litig.,* 2023 WL 5068504 (N.D. Cal. Aug. 7, 2023) .................. 33

27

28

*In re Online DVD Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir 2015)..............................14, 17

*In re Outer Banks Power Outage Litig.*, 2018 WL 2050141 (E.D.N.C May 2, 2018) ........................................................................................................................35

*In re Qualcomm Inc. Sec. Litig.*, No. 3-17-00121 (S.D. Cal.) ....................................................26

*In re Remeron End Payor Antitrust Litig.*, Nos. 02-2007, 04-5126, 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sep. 13, 2005) ....................................................................37

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 14-md-02503-DJC, 2017 WL 4621777 (D. Mass. 2017)..................................................................38, 41

*In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155379 (E.D. Tenn. May 17, 2013) ........................................................................................................................34

*In re Suboxone Antitrust Litigation*, No. 13-md-02445 (E.D. Pa.) .............................................26

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ..................................31

*In re Tricor Indirect Purchaser Litig.*, No. 05-cv-360 (D. Del. May 8, 2009) ..........................37

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)................................................................................................37

*In re Xyrem (Sodium Oxybate) Antitrust Litigation*, No. 20-md-02966 (N.D. Cal.) .................26

*In re Zetia Antitrust Litigation*, No. 18-md-2836 (E.D. Va.)......................................................26

*Just Film, Inc. v. Buono,* 847 F.3d 1108 (9th Cir. 2017) .............................................................41

*McKnight v. Hinojosa*, 54 F. 4th 1069 (9th Cir. 2022) ...........................................14, 15, 16, 18

*Nat'l Rural Telecomm. Coop. v. DIRECTV*, 221 F.R.D. 523 (C.D. Cal. 2004)............................9

*Neil Leventhal et al. v. Bayside Cemetery et al*, New York County Index No. 100530/2011E ...................................................................................................26

*Nichols v. Smithkline Beecham Corp.*, No. 00-cv-6222, 2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005)........................................................................37

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982)..................................32

*Rael v. Children's Place, Inc.*, 2021 WL 1226475 (S.D. Cal. Mar. 30, 2021).....................17, 18

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)................................................................................................8

*Rolland v. Celluci*, 191 F.R.D. 3 (D. Mass. 2000) ......................................................................34

*Ryan-House v. GlaxoSmithKline PLC*, No. 02-cv-442 (E.D. Va. July 28, 2004).......................37

*Ryan-House v. GlaxoSmithKline PLC,* No. 02-cv-442, 2005 U.S. Dist. LEXIS 33711 (E.D. Va. Jan. 10, 2005)........................................................................37

*Smith v. Kaiser Found. Hosps.*, No. 18CV780-KSC, 2020 WL 5064282 (S.D. Cal. Aug. 26, 2020) ...............................................................................................31

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ................................................................................................40

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349 (D.D.C.

2007) ...............................................................................................................37

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..................................38, 39, 40

**OTHER AUTHORITIES**

2 *Newberg on Class Actions*, § 11.28, 11-59 ..............................................................40

*Newberg on Class Actions* § 11.25 (4th ed. 2002).....................................................31

4 A. Conte & H. Newberg on Class Actions at § 11.24 (4th ed. 2002) .........................9

5 *Moore's Federal Practice*, §23.85[2][e] (Matthew Bender 3d ed.).............................9

*Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) ...............................................................................................35

*Manual for Complex Litigation* §§ 21.312, 21.633 (4th ed. 2004) ............................35

*Manual for Complex Litigation, Third* § 30.42 (1995) .................................................9

**RULES**

Fed. R. Civ. P. 23(a)(1)-(4) ...........................................................................................4

Fed. R. Civ. P. 23(a)(3) ...............................................................................................39

Fed. R. Civ. P. 23(b)(3)(D) ..........................................................................................41

Fed. R. Civ. P. 23(e)(1) ..........................................................................................37, 41

Fed. R. Civ. P. 23(e)(2) .........................................................................................34, 36

Fed. R. Civ. P. 23(e)(2)(A)-(B) ....................................................................................30

Fed. R. Civ. P. 23(e)(2)(C)-(D) ....................................................................................31

Fed. R. Civ. P. 23(e)(2)(C)(iv) .....................................................................................34

**NOTICE OF UNOPPOSED MOTION AND MOTION FOR PRELIMINARY APPROVAL**

**PLEASE TAKE NOTICE THAT** on November 13, 2025 or a date and time convenient for The Honorable Araceli Martínez-Olguín of the United States District Court for the Northern District of California, San Francisco Division, located in Courtroom 10, 19th Floor at 450 Golden Gate Avenue, San Francisco, California 94102, Class Representative Plaintiff Adrian Cendejas, by and through his undersigned counsel of record, will and hereby does move for entry of an Order as follows:

    (1)    preliminarily approving the Class Action Settlement with Defendant Sony Interactive Entertainment LLC ("SIE" or "Defendant") (the "proposed Settlement")[1];

    (2)    approving the proposed Notice Plan and proposed Long and Short Form Notices to the Class;

    (3)    preliminarily approving the proposed Plan of Allocation;

    (4)    designating Adrian Cendejas as Class Representative for the proposed Settlement Class;

    (5)    appointing A.B. Data, Ltd. ("A.B. Data") to serve as Notice and Settlement Administrator;

    (6)    setting a schedule for Final Approval of the proposed Settlement and related proceedings regarding attorneys' fees, costs, expenses and service awards;

    (7)    certifying a Settlement Class for the following proposed Class:

All persons in the United States who purchased through the PlayStation Store one or more video games for which a game specific voucher ("GSV") was available at retail prior to April 1, 2019, for which a total of at least 200 GSV redemptions were made prior to April 1, 2019, and for which the post-discount price increased by at least fifty cents from: (a) the period between January 1, 2017 and March 31, 2019; as compared to (b) the period between April 1, 2019 and December 31, 2023. The class period shall be April 1, 2019 to December 31, 2023 ("Class Period").  Excluded from the Settlement Class are: (1) Defendant and its counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; and (2) the Court and its employees; and

    (8)    granting such other and further relief as the Court may deem just and appropriate.

---

[1] Capitalized terms in this Motion incorporate the defined terms from the proposed Revised Settlement Agreement.

1    Copies of the [Proposed] Order Granting Preliminary Approval of Class Action

2  Settlement and [Proposed] Order Granting Final Approval of Class Action Settlement are

3  separately submitted with this Motion. *See* Exhibits A and B to the Declaration of Michael M.

4  Buchman dated August 18, 2025 ("Buchman Decl.").

5    Proposed Class Plaintiff's Motion is based on Federal Rule of Civil Procedure 23, the

6  Northern District's Procedural Guidance for Class Action Settlement ("Procedural Guidance"),

7  this Notice of Unopposed Motion, the supporting Memorandum of Points and Authorities, the

8  Declaration of Michael M. Buchman dated August 18, 2025, and the pleadings and papers on file

9  in *Caccuri et al., v. Sony Interactive Entertainment LLC*, Case No. 3:21-cv-03361-AMO (the

10  "litigation"), as well as any other matter this Court may consider.

11  **MEMORANDUM OF POINTS AND AUTHORITIES**

12  **I.    STATEMENT OF ISSUES TO BE DECIDED**

13    Whether the Court should preliminarily approve the proposed Settlement, authorize

14  notice to the Settlement Class and preliminarily certify a Settlement Class.

15  **II.   THE MOTION FOR PRELIMINARY APPROVAL OF THE PROPOSED
        SETTLEMENT**

16  

17    **A.    Introduction**

18    Plaintiff Adrian Cendejas,[2] on behalf of himself and the proposed Settlement Class,

19  respectfully seeks preliminary approval of the proposed Settlement with Defendant SIE in this

20  litigation.  This proposed Settlement provides for a Settlement amount totaling $7,850,000

21  ("Settlement Amount"), in the form of cash-value PlayStation Network ("PSN") account credits

22  to be electronically distributed directly to Settlement Class members' PSN accounts. The

23  Settlement Class members with active PSN accounts will not need to submit claim forms to

24  receive a benefit under the proposed Settlement. SIE is able to identify the proposed Settlement

25  _____

[2] "Plaintiff" as referenced in this document refers to the proposed Class Representative Plaintiff
26  Adrian Cendejas. "Plaintiffs" as referenced in this document refers to Messrs. Agustin Caccuri,
Adrian Cendejas and Alan Neumark. The reason for this distinction is because only Plaintiff
27  Adrian Cendejas has a qualifying purchase under the proposed Class Definition. Plaintiffs
Agustin Caccuri and Allen Neumark do not have qualifying purchases under the proposed Class
28  Definition. This distinction is explained below.

Class members through their PSN accounts and directly deposit an account credit. There are approximately 4,407,533 eligible Class member PSN accounts. Class members who made qualifying purchases, but whose PSN accounts have been deactivated will be able to contact the case 877 number, the case specific email address, and/or the case specific mailing address and provide qualifying information, such as PSN account information and relevant purchases as well as a current address, in order to receive monies, via U.S. mail, equal in value to the PSN account credits to which they may be entitled under the proposed Settlement. Thus, the proposed Settlement involves a cash-value PSN account credit or cash to certain Class members.

The proposed Settlement was reached with the assistance of mediator Mr. Christopher Hockett who was designated by the Court to conduct an Ordered Early Neutral Evaluation ("ENE") conference. Mr. Hockett is a widely recognized and experienced antitrust litigator, former Chair of the ABA Antitrust Section, and now a lecturer at Berkeley Law School. He conducted the ENE. He was later engaged to serve as the mediator by the parties after significant discovery and motion practice. Once engaged, Mr. Hockett facilitated arm's length negotiations among experienced antitrust class action counsel. With Mr. Hockett's assistance, the parties were able to reach agreement and enter into the Revised Settlement Agreement. *See* Buchman Decl., Exhibit C.

In exchange for the Settlement Amount, Plaintiff and the proposed Settlement Class agree to release all claims against SIE that arise out of or relate to the alleged conduct in this litigation. The people who may have been encompassed in the original class definition who are not included in the settlement class definition are not providing releases and will maintain their ability to pursue their claims if they so desire. As demonstrated below, the proposed Settlement is in the best interests of proposed Settlement Class members as defined in the Second Consolidated Amended Class Action Complaint and meets the criteria for approval under Federal Rule of Civil Procedure 23(e). Plaintiff, therefore, respectfully requests the proposed Class be certified for settlement purposes. The Settlement Class includes approximately 4.4 million eligible PSN accounts, with some Class members potentially having multiple eligible

accounts. The Class Representative Plaintiff's claims are typical of those of all proposed

Settlement Class members and present numerous common questions of fact and law. Plaintiff

more than adequately represents the interests of all proposed Settlement Class members. The

Fed. R. Civ. P. 23(a)(1)-(4) requirements are, therefore, satisfied. The common issues presented

in this case predominate over any questions that may affect individual Settlement Class

members.  A class action is superior to other methods of adjudication and, therefore, the Fed. R.

Civ. P. 23(b)(3) requirements are satisfied. Accordingly, Plaintiff respectfully requests that the

Court enter an Order: (i) preliminarily approving the proposed Settlement; (ii) approving the

form and manner of Notice to the Settlement Class; (iii) preliminarily approving the Plan of

Allocation to the Class; (iv) preliminarily certifying a Rule 23 Settlement Class and designating

Adrian Cendejas as Class Representative for the Settlement Class; (v) appointing A.B. Data, Ltd.

("A.B. Data") to serve as Notice and  Settlement Administrator; (vi) setting a schedule for notice

and Final Approval of the proposed Settlement; and (vii) granting such other and further relief as

the Court may deem just and appropriate under the circumstances.

     **B.**     **Procedural History**

          **1.**     **The Litigation**

     Plaintiff alleges that he purchased digital videogames from the PlayStation Store. Second

Consolidated Amended Class Action Complaint ("SCACAC") ¶¶ 14–16. ECF No. 190.  That

Complaint further alleges as follows: from the time of the PlayStation Store's launch in 2006

until April 2019, SIE allowed Amazon, Best Buy, GameStop, Target, Wal-Mart and other third-

party retailers to sell PlayStation game-specific vouchers ("GSVs"). *Id*. ¶¶ 41–42.  In April

2019, SIE eliminated the sale of GSVs through all U.S. third-party retailers. Consumers were

still able to purchase cash/gift cards from these retailers for redemption of any digital games

through the PlayStation Store as well as purchasing games directly on the PlayStation Store. The

SCACAC alleges that sales after April 1, 2019 were made at supracompetitive prices.  *Id*. ¶¶ 45,

50. SIE denies the allegations in the SCACAC.

     On February 18, 2022, SIE moved to dismiss the Consolidated Class Action Complaint

pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 45. Chief Judge Seeborg granted, in part, the

motion on the grounds that, although Plaintiffs had "adequately alleged a cognizable aftermarket," Plaintiffs failed to adequately allege anticompetitive conduct under the Sherman Act. ECF No. 60 at 2. The Court granted Plaintiffs leave to replead. *Id*. at 10. On August 15, 2022, Plaintiffs filed a Consolidated Amended Class Action Complaint. ECF No. 61. SIE again moved to dismiss. ECF No. 67. On February 7, 2023, the Court denied the motion on the grounds that Plaintiffs sufficiently pled the *Qualcomm* factors, including the requirement that Defendant's "only conceivable or rational purpose" was to exclude competition. ECF No. 80. Plaintiff has filed the SCACAC to revise the Class definition to conform with the Class defined in the Revised Settlement Agreement. ECF No. 190.

### 2. Discovery

Discovery began following the Court's denial of SIE's second motion to dismiss. Plaintiffs served a first set of requests for the production of documents, approximately 35 requests, on April 28, 2023, to which SIE served objections and responses on May 30, 2023. On January 30, 2024, after an extensive meet and confer process, SIE served amended objections and responses to Plaintiffs' first set of requests for production, reflecting certain compromises reached by the parties. On February 6, 2024, Plaintiffs served a subpoena on third party The Value Engineers, Inc., a market research consulting firm retained by SIE. On February 14, 2024, Plaintiffs served subpoenas on Amazon.com, Inc., Best Buy Co., Inc, GameStop Corp., Target Corporation, and Walmart Inc., to obtain transactional data and other documents. These retailers sold GSVs prior to the April 1, 2019 implementation of the decision to eliminate the sale of GSVs at retail. SIE similarly served third-party subpoenas on the same retailers, as well as certain other third parties whose productions were produced to Plaintiffs. In total, SIE produced over 100,000 documents and voluminous transaction data, which Plaintiffs reviewed prior to conducting settlement discussions. In addition, approximately 6,500 documents were produced from third parties Amazon.com, Inc., Best Buy Co., Inc, GameStop Corp., Target Corporation, and Walmart Inc., and The Value Engineers, Inc.

SIE served a first set of requests for the production of documents on Plaintiffs on December 6, 2023, to which Plaintiffs responded on January 19, 2024. In total, Plaintiffs produced 2,164 documents to SIE. A review of the data produced by SIE and third-party retailers established that retailers were charging the manufacturer's suggested retail prices or prices higher than those being charged by SIE. The data produced in the litigation indicates that certain consumers may have been injured concerning a small number of digital games sold prior to and after April 1, 2019. But the indication from Plaintiffs' economic expert, with the benefit of SIE and third-party productions, was that the damages and breadth of injury as the operative complaint stood, were significantly smaller than initially anticipated concerning digital games sold by SIE during the Class Period. *See* Procedural Guidance 1(c). Moreover, Plaintiffs' expert conveyed that proving economic injury and resulting damages would be very challenging in this case. *Id.*

Following the review of the documents and data produced in the litigation, Plaintiffs began preparing for depositions and working with their expert concerning class certification. Plaintiffs noticed thirteen Fed. R. Civ. P. 30(b)(1) depositions as well as a Fed. R. Civ. P. 30(b)(6) deposition of SIE. Plaintiffs were fully prepared to take each scheduled SIE deposition of SIE's current and former executives. Plaintiffs' counsel was also ready to defend the depositions of the three Plaintiffs.  Plaintiffs also initiated a Joint Brief to the Court to obtain specified depositions and documents, only some of which the Court permitted.

On November 16, 2023, SIE preemptively filed a motion to deny class certification based primarily on issues relating to contract terms for arbitration and waiver of the right to bring a class action. The motion was fully briefed and argued on May 1, 2024. *See* ECF Nos. 124, 134, 136, 167. The motion was denied, in part, on May 24, 2024, but the Court left open the very significant issues of whether the class action waiver provision would impact certification of a class and whether the class would be narrowed to exclude consumers who were under a prior SIE Terms of Service Agreement given a change in the 2020 Terms of Service. ECF No. 167.

### 3. Settlement Negotiations

In August 2024, the parties agreed to privately engage Mr. Hockett, who served as the Court-appointed early neutral evaluator, to explore potential resolution. After a number of separate and joint mediation sessions over a three-week period, and with supervision and input from Mr. Hockett in numerous private calls, the parties reached the proposed Settlement on September 15, 2024. *See* Buchman Decl.**,** Exhibit D, Declaration of Christopher B. Hockett dated August 6, 2025 ("Hockett Decl.,") ¶¶ 5-8. This proposed Settlement was reached as a result of hard-fought and highly adversarial litigation, and arm's length negotiation with Mr. Hockett as intermediary, and only after two motions to dismiss and a motion to preemptively deny class certification were briefed, argued, and resolved and significant discovery was obtained from SIE and third parties. During discovery, the parties produced and reviewed over one hundred thousand documents and substantial amounts of SIE transaction and pricing data. The parties similarly served and responded to requests for production and had a discovery dispute regarding the time frame of discovery and number of witnesses to be deposed resolved by the Court. Additionally, the parties were prepared to take numerous depositions and Plaintiffs had input from their economic expert. Plaintiffs were thus well-versed in the strengths and weaknesses of the case and were well-positioned to assess and balance the risks and rewards of continuing to litigate.

There were a number of issues which made this case difficult and potentially problematic for Plaintiffs. *See* Procedural Guidance 1(c). *First*, the number of games sold at retail was much smaller than originally contemplated making the games in question here a small subset of the digital games sold by SIE through the PlayStation Store. *Id. Second*, the smaller set of games meant that the class size would be much smaller than initially contemplated. *Id. Third*, retailers were selling a number of digital games at the same price as SIE or even at higher prices making the universe of actionable games and *quantum* of damage even smaller, which made it more difficult to prove that SIE engaged in the underlying conduct. *Id. Fourth*, establishing and proving damages would be challenging according to Plaintiffs' economic expert. *Id. Fifth*, the class action waiver issue remained outstanding under the Court's ruling on SIE's denial of the

preemptive class certification motion. That issue created significant uncertainty about class size, let alone certification at all, going forward. *Id. Sixth*, SIE repeatedly argued in court filings that the "only rationale or conceivable purpose" test under *Qualcomm* would be applied to its decision to stop selling at retail. *Id.* This is a developing area of the law, the contours of which were argued throughout this proceeding, and which raised additional risk and uncertainty. The existence of these issues, individually and collectively, created considerable uncertainty about obtaining any relief for the Class at trial, let alone on appeal, and support the view that resolution of this action at this time is in the best interests of the Class. *Id.*

Plaintiff has entered into the proposed Settlement on behalf of himself and the proposed Settlement Class. Pursuant to paragraphs 21 and 33 of the Revised Settlement Agreement, Defendant makes no admissions as to the merits of the allegations in the Action and reserves its rights accordingly. However, in recognition that further litigation could be burdensome, expensive, and distracting, Defendant has determined that it is desirable for it to resolve this matter. The proposed Settlement Class is defined as:

> all persons in the United States who purchased through the PlayStation Store one or more video games for which a game specific voucher ("GSV") was available at retail prior to April 1, 2019, for which a total of at least 200 GSV redemptions were made prior to April 1, 2019, and for which the post-discount price increased by at least fifty cents from: (a) the period between January 1, 2017 and March 31, 2019; as compared to (b) the period between April 1, 2019 and December 31, 2023. The class period shall be April 1, 2019 to December 31, 2023.

*See* Buchman Decl., Exhibit C, Revised Settlement Agreement at 3-4.

The following persons or entities are excluded from the Settlement Class:

> a) Defendant and its counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; and
>
> b) the Court and its employees.

**C.     The Proposed Settlement is the Result of Arm's Length Negotiations**

The Proposed Settlement before this Court was the result of hard-fought, arm's length negotiation. The Ninth Circuit "put[s] a good deal of stock in the product of an arm's length, non-collusive, negotiated resolution" when approving a class action settlement. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Class settlements are presumed fair when

they are reached "following sufficient discovery and genuine arm's length negotiation[.]" *See Nat'l Rural Telecomm. Coop. v. DIRECTV*, 221 F.R.D. 523, 528 (C.D. Cal. 2004); 4 A. Conte & H. Newberg, *Newberg on Class Actions* at § 11.24 (4th ed. 2002). "The extent of discovery [also] may be relevant in determining the adequacy of the parties' knowledge of the case." *DIRECTV*, 221 F.R.D. at 527 (quoting *Manual for Complex Litigation, Third* § 30.42 (1995)). "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Id.* (quoting 5 *Moore's Federal Practice*, §23.85[2][e] (Matthew Bender 3d ed.)).  With regard to discovery, this case was resolved after meeting the Court imposed deadline for substantially completed document production. SIE has represented during the course of the litigation that it has fully complied with this deadline. And Plaintiffs' counsel reviewed all the SIE and third party documents prior to reaching resolution in this case.

Given that the Court has requested more fulsome discussion of the following eight "collusion factors" identified in *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F. 3d 935, 938 (9th Cir. 2011), that discussion follows below.

**1. Strength of the Plaintiffs' Case**

The assessment of the strength of a case is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez,* 563 F.3d at 965. This is a Section 2 refusal to deal antitrust case under *Aspen Skiing Co. v. Aspen Highland Skiing Corp*., 472 U.S. 585 (1985), which is recognized as an extremely challenging standard. To establish an *Aspen Skiing* refusal to deal claim, a plaintiff must show: (i) "the unilateral termination of a voluntary and profitable course of dealing"; (ii) "a willingness to sacrifice short term profits in order to obtain higher profits in the long run from the exclusion of competition"; and (iii) a refusal to deal pertaining to "products that were already sold in a retail market to other customers" *Metronet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1132-33 (9th Cir. 2004). As Defendant repeatedly quoted from Chief Judge Seeborg's second motion to dismiss decision, this case "just barely" survived the motion to dismiss. *See* ECF. No. 80 at 3. Defendant also routinely noted in its filings, and this is also relevant to Procedural Guidance 11 (Comparable Cases), that

the Ninth Circuit has rejected every single refusal-to-deal claim it has considered since the Supreme Court decided *Verizon v. Trinko* in 2004. 540 U.S. 398 (2004).[3] This case undoubtedly faced significant legal challenges as it proceeded.

In addition, SIE filed a motion to preemptively deny class certification on the grounds that arbitration and class waiver provisions in certain contracts precluded certification of a class. The Court resolved that motion by denying it insofar as it pertained to compelling arbitration, but deferred ruling on the class waiver claim, thereby leaving a serious issue which the Plaintiffs would need to address in the future that the Court indicated may go against Plaintiffs.[4] At the time these issues were argued and adjudicated, Plaintiffs were reviewing documents, preparing for depositions and conducting a damages analysis based upon the information and data received through discovery. The discovery, produced in phases, plus additional discovery received at roughly the same time from the non-party retailers of SIE games, indicated that: (i) only a select number of digital games were available at retail; and (ii) there were major retailers charging prices at or above manufacturer's suggested resale prices, thereby drastically minimizing damages in the case. Moreover, SIE also stated its intent to file an early motion for summary judgment based solely on an element of an *Aspen Skiing* claim regarding whether the "only conceivable rationale or purpose" for its decision to end game-specific download codes was to sacrifice short-term benefits under *Federal Trade Commission v. Qualcomm, Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2004). SIE also reserved the right to file an additional summary judgment motion.[5]

### 2.     The Risk Expense and Complexity

At the time of the Settlement, Plaintiffs had completed class certification document discovery. Class certification, *Daubert*, additional potential discovery and summary judgment

---

[3] *See* Defendant's Reply in Support of its Motion to Dismiss at 7, ECF No. 52; Defendant's Motion to Dismiss at 9, ECF No. 67.
[4] *Caccuri v. Sony Interactive Ent. LLC*, 735 F. Supp. 3d 1139, 1150, 1155 (N.D. Cal. 2024).
[5] *See, e.g.* First Joint Case Management Statement at 6, ECF No. 89; Second Joint Case-Management Statement at 5, ECF No. 98; Third Joint Case-Management Statement at 5, ECF No. 106; Fourth Joint Case Management-Statement at 4, ECF No. 142; Fifth Joint Case Management-Statement at 5, ECF No. 157.

motions were on the horizon. This three-year-old case would have likely faced at least another two to three years of hard-fought litigation concerning complex antitrust and economic issues described in the preceding point.

### 3. The Risk of Maintaining the Class Action Status Through Trial

At the time the parties entered into the proposed Settlement, Plaintiffs had not filed a motion for class certification and the Court indicated that it was taking seriously SIE's argument that due to contractual provisions the Class might not be able to be certified at all when ruling on SIE's preemptive motion to deny class certification. The Order on the motion left unresolved a serious contractual issue concerning whether Plaintiffs agreed to waive the ability to pursue certification of a Class. Given the outstanding issues concerning waiver and class damages there was significant risk of not obtaining and maintaining class action status throughout the trial.

### 4. The Settlement Amount

"[I]t is well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTTV*, 221 F.R.D. at 527 (collecting cases). At the time of the proposed Settlement, it was Plaintiff's understanding from consultation with their undisclosed economic expert that there were, at best, small damages under the Class definition as plead. One viable antitrust damages figure that Plaintiffs had confidence in during settlement negotiations was a $29.6 million overcharge, based on the number of existing games that increased prices at least $5 post April 2019. *See* Procedural Guidance 1(c).

In early 2024, Plaintiffs engaged in the Court Ordered ENE. *See* ECF Nos. 121, 137. In August, 2024, as depositions were about to get underway, counsel for SIE contacted Plaintiffs to discuss potential resolution of the matter. Counsel for SIE and Plaintiffs' counsel spoke that afternoon and agreed no settlement discussions should be had in the absence of Mr. Hockett given his understanding of the case through the ENE process.

On August 21, 2024, the parties communicated with Mr. Hockett to determine his interest and availability to serve as a settlement mediator. Mr. Hockett expressed his interest and availability and was engaged by the parties on or about August 21, 2024. Over the next three

weeks, the parties met and participated in numerous communications with Mr. Hockett concerning potential settlement, reaching an agreement in principle on September 15, 2024. The $7,850,000 proposed Settlement represents a significant recovery in light of the estimated damages and legal hurdles awaiting Plaintiff and members of the Class at class certification and summary judgment.

### 5.    The Extent of Discovery Completed

Plaintiffs served document requests on Defendant on April 28, 2023 and aggressively pursued discovery. Defendant produced over 100,000 documents on a rolling basis.  The retailers and a SIE consultant produced over 6,000 documents. At the time the proposed Settlement was reached, Plaintiff had reviewed all of the documents produced by SIE and the third parties and provided relevant documents to the damages expert for evaluation and guidance. The parties were scheduled to start taking depositions in the United States, Canada and the U.K. as the settlement discussions were commencing. The parties agreed to reschedule the first few depositions in order to determine whether the matter could be resolved and to avoid potential unnecessary costs. Ultimately, considerable travel and deposition costs were avoided. In sum, significant document discovery was fully completed at the time the proposed Settlement was reached, and counsel was able to spare the Class impending deposition related expenses.

### 6.    The Experience and Views of Counsel

The primary Plaintiffs' lawyers working on this case were at three different firms and each individually has more than twenty-five years of large firm antitrust and/or complex class action experience. Based upon the risks and rewards presented in this case it was the view of seasoned counsel that this case faced significant risk: (i) at class certification based on the class waiver ruling alone, without even getting to the normal challenges of satisfying the elements of class certification; (ii) on a summary judgment motion on the case law about the sole purpose of SIE's change of retail sales model; and (iii) the *Aspen Skiing /Qualcomm* standards. Moreover, Chief Judge Seeborg's motion to dismiss rulings foreshadowed the difficulties of these types of claims. In addition, Plaintiffs' undisclosed economic expert was of the private view that the case, as plead, would produce nominal damages. All these factors combined indicated that the

1    proposed Settlement would be a very good result relative to the risk of recovering nothing. This

2    proposed Settlement also provided the opportunity to cut off significant discovery expenses that

3    would be requested to be paid from any future award. Plaintiff's counsel concluded that it is in

4    the best interests of the Class to present this proposed Settlement to the Court for consideration

5    rather than face the uncertainty and time delay of future litigation and risk of no recovery at all.

6    **7.      The Presence of Governmental Participation**

7        At all relevant times, this case has been prosecuted by private plaintiffs. There is no

8    known government effort.

9    **8.      The Reaction of the Class Members to the Proposed Settlement**

10       No notice, with an objection or opt-out period, has been issued from which one can glean

11   the reaction of the Class until a final approval hearing.

12       The *Bluetooth* case identifies three warning signs of a potentially collusive settlement: (i)

13   whether counsel receives a disproportionate distribution of the settlement, or the class receives

14   no monetary distribution but class counsel are amply rewarded; (ii) when the parties negotiate a

15   clear sailing arrangement providing for the payment of attorneys' fees separate and apart from

16   class funds, which carries the potential of enabling a defendant to pay class counsel excessive

17   fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

18   (iii) when the parties arrange for fees not awarded to revert to defendants rather than being added

19   to the class fund.

20       Here, the Class is receiving the placement of cash equivalent credit in their PSN accounts

21   for use at the PlayStation Store.  The Class is receiving a monetary benefit that is larger than the

22   proposed twenty-five percent fee that will be requested in this case. The requested fee is well

23   below the approximately $8 million in actual time Class Counsel has spent litigating this case.

24   Counsel obtained this benefit for the Class at a loss to themselves. The parties have not

25   negotiated a "clear sailing" provision as part of the proposed Settlement. And there is no

26   reversion of any monies to SIE. For any deactivated accounts entitled to receive a check from

27   SIE, any monies which cannot be distributed will escheat to the State of California for the benefit

28   of the respective class members. Thus, there are no collusion "red flags" under *Bluetooth*, and

1    Plaintiffs' counsel readily represent directly to the Court that there was no collusion. *See*

2    Buchman Decl., Exhibit D, Hockett Declaration ¶¶ 5-8.

3        In sum, the parties engaged in good faith, arm's-length settlement negotiations through

4    Mr. Hockett. *Id*. This case involved three years of hard-fought litigation involving: (i) two fully

5    briefed and argued motions to dismiss; (ii) a motion to preemptively deny class certification

6    which deferred ruling on a key issue that the Court signaled could ultimately preclude class

7    treatment; (iii) two discovery related motions to compel (related to additional custodians and the

8    relevant time period) where the Plaintiffs' requests were scaled back by the Court; and (iv)

9    challenging damages.

10       **D.**    **Whether The Settlement's PSN Credits Are "Coupons" Under Ninth Circuit Law**

11

12       The Court has expressed a view that it considers that PSN account credits akin to

13   "coupons" and raised the issue whether they are disfavored. Order at 2; *see also* 28 U.S.C.

14   § 1712. Under the Class Action Fairness Act, Congress required heightened scrutiny of coupon-based settlements although Congress did not define the term "coupon" in 28 U.S.C. § 1712.

15   When assessing whether settlement relief constitutes a "coupon," the Ninth Circuit established

16   the following three factors for courts to consider in totality (i) whether class members have 'to

17   hand over more of their own money before they can take advantage of the relief; (ii) whether the

18   relief is only valid for 'select products or services'; and (iii) how much flexibility the relief

19   provides, including whether it expires or is freely transferrable.[6] No single factor is dispositive.

20   *McKnight,* 54 F. 4th at 1075. Plaintiff respectfully submits that when the Ninth Circuit test is

21   applied, the PSN account credits are not "coupons", and even if viewed as coupons they should

22   not be disfavored because of their positive characteristics in light of this Ninth Circuit test. The

23   credits here are fair, reasonable, and adequate relief in this case.

24       The following is an analysis to determine if the settlement credits are coupons under the

25   9th Circuit's three factors.

26

27

28

---

[6] *See McKnight v. Hinojosa,* 54 F. 4th 1069, 1075 (9th Cir. 2022)*; In re Online DVD Rental Antitrust Litig.*, 779 F.3d 934, 949-53 (9th Cir 2015).

*The First Factor:* Class members will have a credit deposited directly into their respective PSN account(s) without the burden of completing and mailing a claim form. Thus, the credits are readily available for purchases and not subject to potential loss of use for failure to complete a claim form, or inability to evidence a purchase. The estimated range of recovery for each eligible account is $0.91 to $33.66 dollars assuming the attorneys' fee is 25% of the proposed settlement, expenses are approximately $660,000, Named Plaintiff service awards are $10,000 each and settlement administration expenses are $160,000. The average recovery is estimated to be $1.14.

A Class member does not need to hand over more of their money to take advantage of the PSN account credit. There is  PSN digital content that Class Members have been historically purchasing (*i.e.* games and add-on content) at the PlayStation Store that costs less than $1.[7] *See also Hendricks*, 754 F. App'x  at 512 (finding vouchers for Tuna "had sufficient value that class members could use them to purchase [the product] without additional out-of-pocket expense."). Here, it bears mentioning that PSN digital games are prone to frequent purchases by consumers. According to SIE, on average the accounts covered by the proposed Settlement Agreement purchased 22.2 games and 43.5 distinct products during the Class Period. To be sure, this factor weighs against calling the credits a coupon because Class members can avoid spending additional out of pocket money on products to use their credits and take advantage of this proposed Settlement. Settlement Class members will also benefit from the administrative ease of having the credit automatically deposited in their account and applied to the next purchase they are already prone to make on their own. Additionally, Class members who no longer maintain a PSN account can contact the Settlement Administrator to obtain their entitlement as a check, which augers against deeming this credit a coupon. *See McKnight*, 54 F. 4th at 1075-76 (a coupon settlement does not arise under the first factor where class members can request their reward up-front in cash).

---

[7] *See infra* n.11 (providing example games and prices).

*The Second Factor:* the credit which will be placed in the PSN accounts of eligible Class members *is not* limited to "select products or purchases." *McKnight*, 54 F.4th at 1075. The PSN account credits can be freely used by the eligible Class member concerning any digital game or add-on content available for sale at any time on the PlayStation Store. There are no product, price, timing, black-out dates or other restrictions. Indeed, once the credit is deposited into a Class member's account, it is immediately part of the other funds that a Class member may have in his or her digital wallet for general use. Simply put, the proposed Settlement consideration provided to Settlement Class members may be used whenever and however an eligible Class member decides without restriction in the PlayStation Store. This factor weighs against being considered a coupon.

*The Third Factor:* this factor concerns the flexibility the credit provides such as whether it expires or is freely transferrable. Here, although the PSN account credit is not transferrable, the credit never expires. Lack of expiration weighs against being a coupon when considered with lack of transferability, this factor is at worst neutral as to the two indicators split.

For many of the reasons elucidated above, the Ninth Circuit has affirmed district court determinations that a Settlement does not constitute a form of coupon relief. In *Henricks v. Ference*, for example, the Ninth Circuit agreed that a voucher for tuna should not be deemed a coupon Settlement. *Hendricks v. Ference*, 754 F. App'x 510, 512 (9th Cir. 2018). There, as is the case with PlayStation Network credits, vouchers never expired. *See id.* Class members could purchase the tuna product without additional out-of-pocket expense. *See id.* Here, because there is digital gaming content available for nominal amounts, a class member can purchase PlayStation digital gaming content without additional out-of-pocket expense. The Ninth Circuit similarly affirmed the district court's ruling in *In re Online DVD-Rental Antitrust Litig.*, finding that the settlement gift cards in question were not coupons because class members could use the gift card "on any item carried on the website of a giant, low cost retailers" and a "class member need not spend any of his or her own money and can choose from a large number of potential items to purchase." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949-51 (9th Cir. 2015). These

facts are just as true for the Settlement here. Class members can apply these settlement credits to purchase any item on the PlayStation Store—which is a large online retailer of digital gaming content. As noted above, because content is available for nominal PlayStation gaming credits, a class member can procure gaming content through the use of these credits alone (*i.e.* without the use of additional funds).

Should the Court determine that the Settlement here constitutes a form of coupon relief, then CAFA requires that before a district court may approve a "coupon settlement," it must "determine whether, and mak[e] a written finding that, the settlement is fair, reasonable, and adequate for class members." 28 U.S.C. § 1712(e). If, and after, a determination is made that the settlement relief consists of coupons, courts typically identify "three primary concerns with coupon settlements": (1) they can fail to provide meaningful compensation to class members; (2) they can fail to disgorge ill-gotten gains from the defendant; and (3) they can require class members to do future business with the defendant in order to receive compensation.[8]  None of these concerns is a reason to deny preliminary approval here.

*First*, the settlement provides meaningful compensation to class members.  There are games and add-on items available on the PSN Store that cost less than $1 at any given time.[9]  Games and other content regularly go on sale on the PSN Store, so class members have a constantly changing selection of low-price content available for purchase.  Given the "low prices common to much of [SIE's] inventory," the credits give class members "adequate purchasing power."  *Rael*, 2021 WL 1226475, at *8.  Indeed, class members can use the credits to purchase content from the PSN Store without spending any of their own money—one of the main factors

---

[8] *Rael v. Children's Place, Inc.*, 2021 WL 1226475, at *8 (S.D. Cal. Mar. 30, 2021) (citing *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1302 (S.D. Fla. 2007).

[9] For example, as of August 15, 2025, the following games are all available on the PSN Store for less than $1:  World Explorer Challenge (Sale Price: $0.49; Regular Price: $0.99); Twins of Legacy: Elemental (Sale Price: $0.49; Regular Price: $0.99); and Simple Dominoes (Sale Price: $0.74; Regular Price: $2.49).  PSN Store, World Explorer Challenge (accessed Aug. 15, 2025), https://store.playstation.com/en-us/concept/10012969; PSN Store, Twins of Legacy: Elemental (accessed Aug. 15, 2025), https://store.playstation.com/en-us/concept/10012150; PSN Store, Simple Dominoes (accessed Aug. 15, 2025), https://store.playstation.com/en-us/concept/10012348.

1    in determining whether settlement relief even constitutes a coupon subject to heightened

2    scrutiny.  *See McKnight,* 54 F. 4th at 1075.

3         *Second*, SIE incurs a financial loss in profit equal to the amount of each redeemed credit,

4    which "adversely impacts [SIE's] bottom line."  *Rael*, 2021 WL 1226475, at *8.  Where, as here,

5    the alleged "ill-gotten gains" imposed "little cost on class members," this is more than sufficient

6    to mitigate this concern.  *Salmonson v. Bed Bath and Beyond, Inc.*, 2013 WL 12171817, at *5

7    (C.D. Cal. Mar. 14, 2013).

8         *Third*, while class members receiving PSN credits necessarily will have to conduct

9    business with SIE to spend the credit, nearly all these class members already have an ongoing

10   consumer relationship with SIE such that this should not raise concern.  Only class members

11   with active PSN accounts will receive credits; all other class members will be entitled to a check

12   in the amount of the credit.  In other words, the credits are going to class members who have

13   elected to continue doing business with SIE.  The credit is not forcing any class member to do

14   business with SIE who would rather have no relationship with SIE.

15        Ultimately, "one must ask whether the value of relief in the aggregate is a reasonable

16   approximation of the value of plaintiffs' claim."  *See In re Mexico Money Transfer Litigation*,

17   267 F.3d 743, 748–49 (7th Cir. 2001) (approving a coupon settlement which was likely to

18   provide only 10% net value of the face value of the coupons); *Mendez v. C-Two Group, Inc.*,

19   2017 WL 1133371, at (N.D. Cal. Mar. 27, 2017) (preliminarily approving settlement where

20   coupon value was "substantially lower than their ... face value" given the "substantial

21   unlikelihood that Plaintiff would survive Defendant's motion for summary judgment").  Given

22   the significant litigation risk Plaintiffs face and the resulting value of Plaintiffs' claims, Plaintiffs

23   believe the settlement provides meaningful value to class members similar to the value of their

24   claims. Thus, the proposed Settlement Agreement warrants preliminary approval regardless of

25   whether it involves "coupons."

26

27

28

### E.    The Settlement Is Fair, Reasonable and Adequate/Procedural Guidance

On December 13, 2024, Plaintiff filed a motion for preliminary approval of the proposed Settlement with SIE, preliminary approval of the form and manner of notice to the Class, preliminary approval of a plan of allocation, to schedule a fairness hearing for final approval and certification of a proposed Settlement Class. ECF No. 191. Following scheduling direction from the Court, Plaintiff refiled that motion on March 13, 2025 and noticed the motion for a new hearing date on July 17, 2025. ECF No. 195. The hearing, initially set for July 17, 2025, was vacated by the Court which later issued an Order on the motion on July 17, 2025. ECF No. 199.

The Order denied Plaintiff's motion with leave to refile by August 18, 2025. *Id*. at 3. The motion was denied for not adequately addressing the Procedural Guidance. *Id*. at 1. Plaintiff files this renewed motion to strictly adhere to the Court's directive, address the substantive issues raised by the Court in the Order and to comprehensively address *seriatim* each Procedural Guidance.

As demonstrated below, Plaintiff respectfully submits that the Procedural Guidance factors are satisfied in this case and preliminary approval should be granted.

### 1.    Identity of the Settlement Class – Procedural Guidance 1(a)

This Court's Procedural Guidance requires that where, as here, a class has not been certified, a motion for preliminary approval must state "any differences between the settlement class and the class proposed in the operative complaint ... and an explanation as to why the differences are appropriate." Procedural Guidance § 1(a).

The Settlement Class appropriately differs from the class initially proposed by Plaintiffs. Plaintiffs originally defined the proposed class (the "Original Class") as follows:

> All persons in the United States, exclusive of Sony and its employees, agents and affiliates, and the Court and its employees, who purchased any digital video game content directly from the PlayStation Store at any time from April 1, 2019 through the present.

CACAC ¶ 78.

After conducting extensive discovery, the parties stipulated to the filing of a Second Consolidated Amended Class Action Complaint containing an amended class definition, which

1    this Court Ordered.  ECF Nos. 188-189.  The proposed Settlement Class is identical to the now-

2    operative class definition and is defined as follows:

3         All persons in the United States who purchased through the PlayStation Network
          ("PSN") Store one or more video games for which a game specific code voucher
4         ("GSV") was available at retail prior to April 1, 2019, for which a total of at least
          200 GSV redemptions were made prior to April 1, 2019, and for which the post-
5         discount price increased by at least fifty cents from: (a) the period between January
          1, 2017 and March 31, 2019; as compared to (b) the period between April 1, 2019
6         and December 31, 2023.  The class period shall be April 1, 2019 to December 31,
7         2023.

8    Buchman Decl., Exhibit C, Revised Settlement Agreement at 3; *see also* SCACAC ¶ 78.

9         The primary differences between the Original Class and the Settlement Class are as

10   follows:  (1) the Settlement Class is limited to persons who purchased a video game through the

11   PSN Store for which a GSV was once available at retail, whereas the Original Class included all

12   persons who purchased any digital video game content through the PSN Store regardless of

13   whether that content was ever purchasable via a GSV; (2) the Settlement Class requires that the

14   purchased game had at least 200 GSV redemptions prior to April 1, 2019; and (3) the Settlement

15   Class requires that the post-discount price of the purchased game increased by at least fifty cents

16   between the pre-period (January 1, 2017 to March 31, 2019) and the class period (April 1, 2019

17   to December 31, 2023).[10]

18        Plaintiff alleges that SIE's decision to discontinue the sale of GSVs eliminated retail

19   competition for digital video game content and allowed SIE to sell such content on the PSN

20   Store at supracompetitive prices. However, discovery revealed that a number of persons who

21   purchased digital video game content from the PSN Store were not harmed by SIE's decision to

22   halt the sale of GSVs, and, therefore, the Original Class was overbroad for two reasons. *First*,

23   discovery showed that SIE only stopped selling GSVs for digital video games, rather than for all

24   digital video game *content*, and that many of the digital video games available on the PSN Store

25   were never capable of being purchased via GSV. Persons who did not purchase a digital video

26   game on the PSN Store, or who purchased a digital video game that was never offered as a GSV,

27   _____

28   [10] The only other difference between the Original Class and the Settlement Class is the class
     period, which was revised to include an end date.

therefore, do not appear to have been harmed by SIE's decision to stop the sale of GSVs. The presence of uninjured class members can render a class definition overbroad, and "can and often should be solved by refining the class definition", which is the approach Plaintiff has taken here.[11]  Had these persons remained in the Settlement Class, then they would have been required to release their claims without any entitlement to recovery because class members may not recover under a settlement unless they were legally harmed by the alleged conduct. *See In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1155-1156 (N.D. Cal. 2001) (recognizing that "a class member should be legally harmed in order to recover, a principle in keeping with other courts").[12]  Amending the Class definition was the appropriate way to resolve this concern while allowing non-class members to pursue their claim if they so desire without giving a release here.

Even for the digital video games that had been purchasable via a GSV, Plaintiffs learned that there is a significant number of digital games for which there were *de minimis* GSV redemptions during the two-year pre-period.  Many digital games were purchased almost exclusively on the PSN Store even though they could be purchased at retail.  SIE's decision to halt the sale of GSVs thus would have had very little—if any—impact on the price of such games because there already was no actual retail competition.  In recognition of this fact, Plaintiff agreed to a nominal GSV-redemption requirement to ensure the Class is limited to persons with colorable legal claims. The parties concluded that digital games with fewer than 200 GSV redemptions could not support a colorable legal claim because the PSN Store accounted for more than ninety-nine percent of total sales of these games *before* SIE decided to stop the sale of GSVs. *Second*, the Original Class was overbroad in that it included persons who only purchased digital games on the PSN Store whose post-discount price went *down* between the pre-period and the Class Period. Discovery showed that the average post-discount purchase

---

[11] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)).

[12] S*ee also In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982) (finding it "would have been an abuse of the court's discretion" to allow persons "without any colorable legal claims" to receive settlement proceeds).

price of PSN Store games *decreased* after April 1, 2019, which ran counter to Plaintiffs' theory that PSN Store games would become more expensive once retail competition was eliminated. To the extent the average post-discount price increased at all, the change was minimal. To ensure the Class is limited only to persons who potentially paid a supracompetitive (*i.e.*, higher) price for a digital game because of SIE's decision to stop the sale of GSVs, the parties agreed to impose a *de minimis* price-increase threshold of fifty cents. Fifty cents was selected as the threshold to reduce the potential that small price fluctuations between the pre-period and the class period—in other words, noisy data—would have a significant impact on the Settlement Class and the amount each class member would recover.

In addition to resolving concerns that the Original Class included persons who experienced no legal harm, the differences between the Original Class and the Settlement Class also ensure that Settlement Class members will obtain a more meaningful recovery.[13]  Indeed, not imposing these *de minimis* requirements would significantly increase the size of the Settlement Class and reduce the recovery for persons with colorable legal claims. Removing the GSV-redemption requirement would add more than two million class members and result in most class members receiving a credit of less than a dollar. Removing the price-increase threshold would have even more significant repercussions, adding approximately twenty million class members and reducing the average recovery to less than a quarter. Removing both requirements would further reduce class member recovery and result in a settlement class consisting mostly of persons who could not have been plausibly harmed by the decision to stop selling GSVs. Because the differences between the Settlement Class and the Original Class are tailored to ensure the class encompasses the persons who may have been harmed by SIE's conduct and to provide a meaningful recovery for those persons, the changes to the Class definition are appropriate.

---

[13] *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2019 WL 536661, at *4 (N.D. Cal. Feb. 11, 2019) (granting preliminary approval of settlement in which the class was narrowed to ensure "sufficient compensation remains available" for class members).

## 2.    Release of Claims – Procedural Guidance 1(b)

The Procedural Guidance requires Plaintiff to state any differences between the claims to be released and the claims in the complaint and explain why the differences are appropriate. Procedural Guidance §1(b).

The Settlement Agreement provides that Plaintiff and Class members will release:

> SIE and its respective past, present, and future, direct and indirect, parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, insurers, joint ventures, and stockholders, and their respective past, present, and future officers, directors, management companies, financial or investment advisors, co-investors, bankers, accountants, executors, trustees, administrators, supervisory boards, insurers, general or limited partners, employees, agents, trusts, trustees, associates, attorneys and any of their legal representatives, or any other representatives thereof ... from any and all past, present, or future liabilities, claims, demands, obligations, suits, injuries, damages, levies, executions, judgments, debts, charges, actions, or causes of action of every nature and description, at law or in equity, whether arising under federal, state, common, or foreign law, whether class, individual, or otherwise in nature, and whether known or unknown, foreseen or unforeseen, suspected or unsuspected, contingent or non-contingent, arising out of or relating to any of the allegations, transactions, facts, matters, occurrences, representations, or omissions involved, set forth, or referred to in any complaint, pleading, or motion filed in this action at any time prior to October 10, 2024.

Buchman Decl., Exhibit C, Revised Settlement Agreement ¶ 16.

The released claims differ from the claims asserted in the Complaint only in that the Settlement Agreement releases claims arising out of or related to the allegations in the Complaint that could have been, but were not, asserted against SIE or other released parties.  The scope of the release is consistent with governing standards in this Circuit.[14]  Class Recovery – Procedural Guidance 1(c).

---

[14] *See e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (approving class settlement release of claims "related to or arising from any of the facts alleged in any of the Actions"); *Custom LED, LLC v. eBay, Inc.*, 2013 WL 6114379, at *4 (N.D. Cal. Nov. 20, 2013) (approving release of claims "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action, or any legal theories that could have been raised based on the allegations of the Action."); *see also Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (claims appropriately included in scope of release can include any claim "based on the identical factual predicate as that underlying the claims in the settled class action").

1

### 3.    Class Recovery – Procedural Guidance 1(c)

Had Plaintiffs fully prevailed on each of their claims, Plaintiff believes the potential recovery on the original claims nonetheless would have been nominal, at best, as explained in Section II.E(1).  The $7,850,000 settlement amount, less fees and costs, represents an excellent recovery for the proposed Class, with Plaintiffs' anticipated damages models estimating a ceiling of $29.6m based on the number of existing games that increased in price at least $5 post April 2019. This approximately 25% single damages recovery falls within the range of reasonableness.

### 4.    Cases Affected by the Settlement - Procedural Guidance 1(d)

To the best of Plaintiff's knowledge, there are no other presently filed cases which will be affected by the settlement in this case. Counsel for SIE confirmed that this is SIE's belief as well.

### 5.    Allocation Plan - Procedural Guidance 1(e)

The Agreement provides for a fair allocation of the Settlement Amount among all Class Members whether they have an active PSN account or not. The parties propose that the Settlement Amount will be distributed *pro rata* based on the number of eligible games ("Covered Games") purchased by each Settlement Class member. Buchman Decl., Exhibit E. Covered Games are defined as games for which there were at least 200 GSV redemptions on the PlayStation Store prior to April 1, 2019, and which increased in average post-discount price by at least fifty cents between: (a) the period between January 1, 2017 and March 31, 2019; as compared to (b) the period between April 1, 2019 and December 31, 2023. Based on SIE's preliminary analysis, there are approximately 103 Covered Games.

SIE will identity all PlayStation accounts that have purchased Covered Games and will directly distribute, with the assistance and oversight of a Court appointed Settlement Administrator, the Settlement credits—net of Court-approved attorneys' fees, costs, expenses, and services awards for the Named Plaintiffs—to each eligible PSN account. *Id*.  Based on SIE's preliminary analysis, 4,407,533 individual PSN accounts purchased at least one Covered Game during the Class Period.  Some class members may have multiple eligible PlayStation accounts, so the number of Class members may be less than 4.4 million persons.

This amount will be distributed in the form of PSN account credits, which can be redeemed for any content available for purchase in the PlayStation Store, and will be deposited directly in Settlement Class members' PSN accounts. Any Settlement Class member who previously had a PSN account, but who deactivated that account can contact the case 877 number, the case specific email address, or the case specific mailing address to provide qualifying account and game purchase information as well as a current mailing address to obtain monies, via U.S. mail, under the proposed Settlement.

### 6.    Submission of Claim Form - Procedural Guidance 1(f)

No claim form is required to collect under the proposed Settlement. Class members who maintain an active PSN account will have credits automatically deposited into their accounts. Funding the PSN accounts under the proposed Settlement to the eligible class members is frictionless.

As referenced immediately above, the Class members who do not maintain a current PSN account may contact the Settlement Administrator to request a check for their respective portion of the Settlement benefit. Accordingly, Class members who will likely receive their settlement benefit in this case is close to 100%, the exception being only those individuals who closed accounts and either: (i) did not leave current contact information; or (ii) do not contact the Claims Administrator based upon publication notice. The funds of people with deactivated accounts that do not claim their monies under the proposed Settlement will escheat to the State of California.

### 7.    Reversions - Procedural Guidance 1(g)

No money will revert to SIE under the proposed Settlement.

### 8.    Settlement Administration – Procedural Guidance 2

A.B. Data is the proposed Settlement Administrator. A.B. Data was selected based upon a two firm competitive bidding process. A.B. Data was ultimately selected following evaluation of the bids based upon its years of experience, work with Plaintiffs' Counsel, and also the willingness and confidence of SIE to rely on A.B. Data to competently administer the settlement and handle SIE's confidential customer data related to administration.

This case presents a rather unique situation where the Settlement Administrator will be working closely with Plaintiff's Counsel, but more importantly directly with SIE in connection with the funding of Class members' PSN accounts. This will be necessary to ensure most Class members will, without any effort, receive their settlement allotment automatically in their PSN account. The Settlement Administrator will also work closely with SIE to administer settlement funds to Class members who no longer possess active PSN accounts. The need for seamless coordination with both counsel for Plaintiff and SIE is an important consideration here. A.B. Data has worked with Plaintiffs' Counsel on other matters over the past two years which will ensure the level of coordination and accuracy necessary to distribute the settlement credits to Class members' PSN accounts.[15]

A.B. Data possesses the administrative tools, physical controls, retention, destruction, audit and crisis response ability, requested by the Court in the Procedural Guidance. *See* Buchman Decl., Exhibit F, Declaration of Elaine Pang dated August 18, 2025 ("Pang Decl.,") ¶¶ 22-24. A.B. Data also accepts responsibility for maintaining Class member information and data while also maintaining adequate errors and omissions insurance, a fidelity bond for employee dishonesty and network/information liability coverage. The anticipated administrative costs in this case are estimated to be $160,000.

**9.    Notice – Procedural Guidance 3**

The Notices have been prepared in plain language which can be easily understood by potential Class members. *See* Exhibit F, Pang Decl., ¶ 20. Paragraphs 6-14, 16 and 19 of the Pang Declaration provide the manner in which the proposed notice shall be effectuated in this case. Direct mail notice will be provided through email communications with specific Class members who hold PSN accounts. This is robust direct contact since SIE has confirmed that the e-mail addresses bounce-back rate is approximately 10% or less. This direct email notice will be

---

[15] The matters worked on together include: *In re Xyrem (Sodium Oxybate) Antitrust Litigation*, No. 20-md-02966 (N.D. Cal.); *In re Qualcomm Inc. Sec. Litig.*, No. 3-17-00121 (S.D. Cal.); *In re Zetia Antitrust Litigation*, No. 18-md-2836 (E.D. Va.); *In re Suboxone Antitrust Litigation*, No. 13-md-02445 (E.D. Pa.); *Holwill v. AbbVie Inc. et al.*, No. 1:18-cv-06790 (N.D. Ill.); and *Neil Leventhal et al. v. Bayside Cemetery et al*, New York County Index No. 100530/2011E. ECF 195 at 16.

coupled with paid and earned media notice in order to effectuate comprehensive notice and the best notice practicable. The paid media, print and digital advertising will complement the email notice. This component of the notice will involve publication of a one page, full-page publication of the Short Form Notice in PC Gamer Magazine with a circulation of 158,767. Digital banner advertisement will appear on targeted gaming related websites such as Wired.com, PC Gamer.com and others with an estimated 1.5 million impressions electronically delivered to potential Settlement Class members. The banner advertisements will include an embedded link to the case specific website in order to provide more detailed information. A news release will also issue on PR Newswire's US1 Newsline and reach traditional television, radio, newspaper and magazine, media outlets across the United States. News of the settlement will also be tweeted on X, formerly known as Twitter, and on PR Newswire and A. B.'s Data's X accounts. Notably, the Notices incorporate the comparable language recommended by the Procedural Guidance. *See* Exhibit F, Pang Decl., Exhibit D, Long Form Notice ¶ 19, p. 10; s*ee also* Exhibit F, Pang Decl., Exhibit C, Short Form Notice pp. 1 & 2.  The contact information for Plaintiffs' counsel is contained on page 8 of the Long Form Notice, which is Exhibit F, Pang Decl., Exhibit D, and will be on the proposed case website. The case website address, with the key documents for the case, is listed on pages 1, 2, 5, 6, 7, 8, 9, and 10 of the Long Form Notice, which is Exhibit F, Pang Decl., Exhibit D. The case website address is also found on page 2 of the Short Form Notice, which is Exhibit F, Pang Decl., Exhibit C.

The date and time of the Final Approval hearing and the need to check the case website or contact the Settlement Administrator for such information is found at page 9, paragraph 16 of the Long Form Notice which is Exhibit F, Pang Decl.,Exhibit D and page 1 of the Short Form Notice which is Exhibit F, Pang Decl., Exhibit C.

### 10.    Opt-Outs – Procedural Guidance 4

The Long Form and Short Form Notices provide the required information under the Procedural Guidance. *See* Exhibit F, Pang Decl., Exhibit D, Long Form Notice, p 2, p.6  ¶¶ 8, 9 & 10; s*ee also* Exhibit F, Pang Decl., Exhibit C, Short Form Notice, p. 2.

1

### 11.    Objections – Procedural Guidance 5

The Long Form and Short Form Notices provide the required information under the

Procedural Guidance. *See* Exhibit F, Pang Decl., Exhibit D, Long Form Notice, p 2, p.7 ¶ 11; s*ee*

*also* Exhibit F, Pang Decl., Exhibit C, Short Form Notice, p. 2.

### 12.    Attorneys' Fees and Costs – Procedural Guidance 6

Plaintiff will respectfully seek the payment of attorneys' fees not to exceed 25% of the

Settlement Amount. The estimated loadstar is approximately $8.7 million. Even if the Court

were to award a 25% fee, that fee award would be $1,962,500 which is well below the $8.7

million estimated lodestar and would result in a negative multiplier. Costs and expenses are

estimated to be around $660.000. Pursuant to the Court's Order below is a chart identifying the

potential attorneys' fees, costs, service awards, and administrative costs:

| Attorneys' Fees (25%) | $1,962,500.00 |
|---|---|
| Costs/Expenses | Approx. $660,000 |
| Service Awards | $30,000 ($10,000 each) |
| Administration Costs | Approx. $160,000 |

### 13.    Service Awards – Procedural Guidance 7

Plaintiff will respectfully request service awards not to exceed $10,000 for each of the

three Named Plaintiffs. The proposed awards are also consistent with similar service awards

regularly approved in class actions in this district.[16] The three Named Plaintiffs worked with

Class Counsel on all aspects of the case including: (i) the ENE process; (ii) collection and

production of their documents; and (iii) deposition preparation for their appearance at a

deposition. Messrs. Caccuri, Cendejas, and Neumark spent considerable time and effort

throughout this litigation complying with discovery propounded on them, which included

imaging of their phones and computers, and conferring about case status and the settlement

discussions. They attended the ENE while facing the risk of negative publicity and notoriety.

Their collective participation enabled this case to proceed for the benefit of the proposed

Settlement Class and facilitated this proposed Settlement. While only Mr. Cendejas is in the

---

[16] *E.g.*, *Alvarez v. Farmers Ins. Exchange*, 2017 WL 2214585, at *1 (N.D. Cal. Jan. 18, 2017)
(approving nine $10,000 service awards); *In re Animation Workers Antitrust Litig.*, 2016 WL
6663005, at *9 (N.D. Cal. Nov. 11, 2016) (approving $10,000 service awards).

Settlement Class, all of the Named Plaintiffs participated in the case to achieve this result for the benefit of the proposed Settlement Class.

### 14.    *Cy Pres* – Procedural Guidance 8

In the rare event that a Settlement Class member no longer has a PSN account and the Settlement Administrator/SIE is unable to distribute a check to that Class Member, monies will not revert to SIE, but will escheat to the State of California unless the Court desires that the money be distributed to a charitable organization.

### 15.    Timeline – Procedural Guidance 9

The proposed opt-out and objection period in this case complies with the Procedural Guidance of at least a 35-day requirement. Here, it has been proposed that the Class members have 60 days to opt-out or object to the proposed Settlement.

### 16.    CAFA – Procedural Guidance 10

SIE timely provided notice of Plaintiffs' prior motion for preliminary approval of the Settlement (ECF No. 195) as required by the Class Action Fairness Act ("CAFA"), 28. U.S.C. § 1711 *et seq.* Upon filing of the instant motion, SIE will again provide timely notice of such motion as required by CAFA. To the extent this Court construes the proposed Settlement Agreement to include coupons, such coupons comply with 28 U.S.C. § 1712. *See supra* § II.D.

### 17.    Comparable Outcomes – Procedural Guidance 11

Below, Plaintiff provides "information about comparable cases, including settlements and litigation outcomes." This establishes the reasonableness, fairness, and adequacy of the settlement amount, particularly in light of the significant challenges Plaintiffs would face in obtaining a meaningful recovery through litigation.

| | *Pecover et al. v. Electronic Arts, Inc.*, No. 08-cv-2820-CW (N.D. Cal.) | *In re Lenovo Adware Litigation*, No. 4:15-md-02624 (N.D. Cal.) | *Weeks v. Google LLC*, No. 5:18-CV[1]00801-NC, 2019 WL 8135563 (N.D. Cal. Dec. 13, 2019) | *Ramirez v. Trans Union LLC*, No. 3:12- cv-00632-JSC (N.D. Cal.) |
|---|---|---|---|---|
| **Total Settlement Fund** | $27 million | $8.3 million | $7.25 million | $9 million |
| **Number of Class Members** | 14.076 million | 797,000 Computers | Approx. 800,000 | 8,193 |

| | Pecover et al. v. Electronic Arts, Inc., No. 08-cv-2820-CW (N.D. Cal.) | In re Lenovo Adware Litigation, No. 4:15-md-02624 (N.D. Cal.) | Weeks v. Google LLC, No. 5:18-CV[1]00801-NC, 2019 WL 8135563 (N.D. Cal. Dec. 13, 2019) | Ramirez v. Trans Union LLC, No. 3:12- cv-00632-JSC (N.D. Cal.) |
|---|---|---|---|---|
| Potential Class Members to Whom Notice Was Sent | 14.076 million | 500,000 | 596,361 | 8,186 |
| Method(s) of Notice | Mail, Email, Publication, Online | Email, Mail, Online | Email, Mail, Online | Email, Mail, Online |
| Number and percentage of Claim Forms Submitted | 143,775 / 1.02% | 101,600 / 12% | 41,971 / 5.25% | 731 / 4.8% |
| Average Recovery Per Class Member | $80.63 | $45 minimum per computer | $142.76 | $2,200 to each class member for whom there was evidence of publication of an OFAC record to a third party |
| Amounts Distributed to Cy Pres Recipients, If Any | N.A. | N.A. | N.A. | $14,365.60 |
| Administrative Costs | $1.17 million | Estimated $300,000 | $310,000 | $85,000 (settlement administration costs) |
| Attorneys' Fees and Costs | Fees: $2 million Costs: N.A. | Fees: $2.49 million Costs: $340,800 | Fees: $2.175 million Costs: $364,855.97 | Fees: $4.2 million Costs: $3 million |
| Injunctive and Non-Monetary Relief, If Any | N.A. | N.A. | N.A. | N.A.[17] |

### F. The Court Should Preliminarily Approve the Proposed Settlement

The Ninth Circuit maintains a "strong judicial policy that favors settlements" in class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). At the preliminary approval stage, the Court "need not make a final determination regarding the fairness, reasonableness or adequateness of the proposed settlement." *In re High-Tech Emp. Antitrust Litigation*., No. 11-cv-02509, 2015 WL 12991307, at *1 (N.D. Cal. Mar. 3, 2015). To grant preliminary approval, the Court need only determine that the proposed settlement substantively falls "within 'the range of reasonableness.'" *Id.* (quoting 4 Albert Conte & Herbert

---

[17] *See also In re California Gasoline Spot Market Antitrust Litig*., 20-cv-03131-JSC (N.D. Cal. 2025) (Corley, J.) (granting $13.9 million settlement on 33% single damages recovery).

Newberg, *Newberg on Class Actions* § 11.25 (4th ed. 2002)).[18] The proposed Settlement is well within the range of fair, reasonable, and adequate. *See* Section II.C.

### 1.    Procedural Considerations

The Court may consider whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)-(B). As the Advisory Committee notes suggest, these are "matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A)-(B) advisory committee's note to 2018 amendment. These concerns implicate factors such as the non-collusive nature of the negotiations, as well as the extent of discovery completed and stage of the proceedings. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). *See* Section II. B., and C.

### a.    Adequate Representation of the Class

As described above, Plaintiff is an adequate representative of the proposed Settlement Class. Mr. Cendejas and the proposed Settlement Class members suffered the same injuries in the form of overcharges and have the same interest as every other member of the proposed Settlement Class in proving that Defendant acted unlawfully. Furthermore, Plaintiff is represented by seasoned counsel with extensive antitrust and complex litigation experience. The three primary lawyers on this case each have: (i) more than twenty-five years of class action antitrust experience; (ii) worked at two of the largest class action firms in the country; and (iii) have been involved in some of the largest U.S. antitrust and complex litigations. Counsel here have tenaciously pursued Plaintiff's claims, and those of the Class, for over three years. The efforts undertaken thus far in this case should give the Court confidence in the adequate representation of the proposed Settlement Class.

---

[18] S*ee also Smith v. Kaiser Found. Hosps.*, No. 18CV780-KSC, 2020 WL 5064282, at \*5 (S.D. Cal. Aug. 26, 2020) (emphasis in original); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 966 (N.D. Cal. 2019) ("The court's task at the preliminary approval stage is to determine whether the settlement falls 'within the range of possible approval.'") (citing *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)).

1

2

### 2.    Substantive Considerations

Rules 23(e)(2)(C) and (D) set forth factors for preliminarily conducting "a 'substantive'

review of the terms of the proposed settlement." Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory

committee's note to 2018 amendment. In determining whether "the relief provided for the class

is adequate," courts consider: "(i) the costs, risks, and delay of trial and appeal; (ii) the

effectiveness of any proposed method of distributing relief to the class, including the method of

processing class-member claims; (iii) the terms of any proposed award of attorney's fees,

including timing of payment; and (iv) any agreement required to be identified under Rule

23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). In addition, the Court must consider whether "the

proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

#### a.    Strength of Class Plaintiffs' Case and Risks of Continued Litigation

In determining the likelihood of a plaintiff's success on the merits of a class action, "the

district court's determination is nothing more than an amalgam of delicate balancing, gross

approximations and rough justice." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625

(9th Cir. 1982) (internal quotations omitted). The court may "presume that through negotiation,

the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering

Plaintiff's likelihood of recovery." *Garner v. State Farm. Mut. Auto. Ins. Co.,* 2010 WL

1687832, at *9 (N.D. Cal. Apr. 22, 2010) (citing *Rodriguez*, 563 F.3d at 965).

Here, a favorable outcome at class certification and trial, and a damages award against

Defendant was far from assured and there were significant uncertainties and difficult issues as

detailed above. In addition*,* Defendant, and experts it is likely to offer, would surely contest

every theory of liability and measure of damages. There are, for example, substantial disputes as

to: (i) whether the alleged market for digital PlayStation games is a valid antitrust market; (ii)

whether SIE monopolized or attempted to monopolize the alleged market for digital PlayStation

games; (iii) whether Plaintiffs and members of any certified class suffered causal antitrust injury

as a result of  SIE's alleged monopolization of the alleged market for digital PlayStation games;

and (iv) whether there was an established Section 2 refusal-to-deal claim based on the

termination of GSVs at retailers when general purpose voucher codes (gift/cash cards) were still

available that could be used to buy any game in the PlayStation Store rather than just specific named games. There was also the additional question of the *quantum* of damages given that retailers were charging consumers SIE's manufacturer's suggested retail prices or prices higher than SIE was charging.[19] The discovery revealed that potential damages in this case were, therefore, smaller than initially contemplated. *See also* Section II.B.2.

        **b.**       **The Settlement Provides Adequate Relief to the Settlement Class**

The proposed Settlement provides substantial consideration for the benefit of the Settlement Class. The Settlement Amount ($7,850,000) is constituted in the form of cash-value PSN account credits to be distributed directly to the PSN accounts of the eligible members of the proposed Settlement Class. *See* Buchman Decl., Exhibit C, Revised Settlement Agreement ¶ 3. Significant discovery has been conducted in this case to afford counsel the ability to understand the pros and cons of proceeding with the litigation.[20] Relying on years of experience and extensive efforts in this litigation, counsel recommend approval of the proposed Settlement. Given the uncertainties facing class certification and establishing damages using economic experts, this proposed Settlement is far more attractive than no settlement at all given the potential looming difficulties on the horizon.

        **c.**       **Attorney Fees and Service Awards**

Plaintiff intends to move for an award of reasonable attorneys' fees, costs, and expenses[21] as well as service awards from the Settlement Amount. Plaintiff will respectfully seek an award

---

[19]  Expert analysis from data provided by GameStop and Amazon (which, according to SIE documents, together account for over 95% of SIE digital game retail sales) found that in over 99% of sales, the sales price was the same or higher than the price SIE charged in the PlayStation Store.

[20] *See In re Lyft Securities Litig.,* Docket No. 19-cv-02690-HSG, 2023 WL 5068504 at *12 (N.D. Cal. Aug. 7, 2023); *See also Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34, 40 (D.P.R. 1993) ("In view of the fact that competent and experienced counsel have been able to conduct ample discovery which allowed them to properly assess the probability of success on the merits of the putative class claim . . . their recommendation should be entitled to substantial weight").

[21] A preliminary estimation of Plaintiff's time (including Attorney, Contract Attorney, and Staff time) indicates approximately 13,700 hours were spent pursuing this action. The estimated loadstar is approximately $8.7 million. If the Court awards a 25% fee award, that fee award would be $1,962,500 which is well below the $8.7 million estimated loadstar and would result in a negative multiplier. Costs incurred are estimated to be around $660,000.

of attorneys' fees not to exceed twenty-five percent of the Settlement Amount. This is not the product of a "clear sailing" arrangement and SIE reserves the right to challenge the amount of attorneys' fees, costs, and expenses should it so choose. As to service awards, Plaintiff will seek modest awards for Agustin Caccuri, Adrian Cendejas, and Allen Neumark, not to exceed $10,000 each, which SIE also reserves the right to challenge. The service awards are subject to this Court's discretion, and their approval (in whole or in part) is not a material term of the Settlement. Service awards are appropriate to compensate Messrs. Caccuri, Cendejas, and Neumark for the substantial time and effort they spent participating in this litigation, including the risk of negative publicity and notoriety. They have each collected and produced documents in response to Defendant's discovery requests and each was prepared to appear for a deposition in this matter. Their participation facilitated this proposed Settlement. The remainder of the Settlement Amount, after deducting notice and administration fees, would be directly distributed to Settlement Class members' PSN accounts in the form of credits pursuant to a Plan of Allocation ordered by the Court. *See* Section II.E.4.

### d.    Equitable Treatment of Settlement Class Members

The Settlement Amount will be distributed to members of the Settlement Class in accordance with the Plan of Allocation which governs that distribution will be based directly on the overcharges to each claimant, thus ensuring equitable treatment among Settlement Class members. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). *See* Section II.E.5.

### G.    The Plan of Allocation is Fair, Reasonable, and Adequate

The standard for approving a plan of allocation for a settlement amount in a class action, like the one governing approval of the settlement as a whole, is that the plan must be fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2). Generally, when recommended by competent and experienced counsel, counsel's assessment is entitled to considerable weight and the plan of allocation need only have a reasonable, rational basis. [22]

---

[22] *See, e.g. Giusti-Bravo v. U.S. Veterans Admin*., 835 F. Supp. 34, 39-40 (D.P.R 1993); *In re Imprelis Herbicide Mktg. Sales Pracs. & Prods*., 296 F.R.D. 351, 364 (E.D.P.A. 2013); *Rolland v. Celluci*, 191 F.R.D. 3, 10 (D. Mass. 2000); *In re Southeastern Milk Antitrust Litig*., Docket No. 2:08–MD–1000, 2013 WL 2155379, at * 5 (E.D. Tenn. May 17, 2013).

The parties propose that the Settlement Amount will be distributed *pro rata* based on the number of eligible games ("Covered Games") purchased by each Settlement Class member. *See* Buchman Decl., Exhibit E, 4,1-4; and the discussion of the plan of allocation under the N.D. Procedural Guidance 1(e), above. For these reasons, Plaintiff respectfully requests that the Court approve the Plan of Allocation.

### H.    The Proposed Form and Manner of Notice Should be Approved

Members of the proposed Settlement Class are entitled to reasonable notice of the Settlement before the Court, including notice of the Fairness Hearing. *See Manual for Complex Litigation* §§ 21.312, 21.633 (4th ed. 2004). Plaintiff has prepared Short and Long Form Notices to advise Class members of the proposed Settlement. *See* Exhibit F, Pang Decl., Exhibits C & D. Rule 23(e)(1) instructs the Court to "direct notice in a reasonable manner to all members of the Class who would be bound by the proposal." To meet Rule 23(e) and due process requirements, "all that the notice must do is fairly apprise the prospective members of the class of the terms of the proposed settlement so that members of the class may come to their own conclusions about whether the settlement serves their interests." *In re Outer Banks Power Outage Litig.*, Docket No. 4:17-CV-141, 2018 WL 2050141, at *6 (E.D.N.C May 2, 2018).

In this case, the proposed Settlement Agreement provides for direct notice to eligible Settlement Class members to the email address associated with her or his PSN Account. Notice and the manner of notice are fully discussed under the Procedural Guidance Section II. E.7. above.

In sum, this tailored and robust Notice Plan provides for favorable notice anticipated to reach upwards of 70% of Settlement Class members.[23] This frequency is similar to those that other courts have approved that are recommended by the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010). *Id.* at 8 n.3. Accordingly, the Proposed Form and Manner of Notice should be approved.

---

[23] Plaintiffs understand from SIE that it validates email addresses from customers upon account setup, and that it anticipates a relatively low bounce back rate—likely under10%—based on its experience sending emails to comparable groups of its customers.

1

## I.    The Court Should Approve A.B. Data, Ltd. as Notice and Settlement Administrator

2

3
Plaintiff respectfully requests that the Court appoint A.B. Data as the Notice and

4
Settlement Administrator in connection with the proposed Revised Settlement Agreement. The

bidding selection and qualifications of A.B. Data are discussed above. *See* Section II.E.6.

5

6
Accordingly, A.B. Data should be appointed the Notice and Settlement Administrator in the

case.

7

## J.    The Court Should Adopt a Schedule for Final Approval of the Proposed Settlement

8

9
The proposed Preliminary Approval Order details a proposed schedule with the hearing

10
date to be set at the Court's preference.  This proposed schedule is fair to Settlement Class

11
members and provides to each member of the Class an opportunity to review the Preliminary

12
Approval papers and the proposed Settlement as well as the amount of attorneys' fees, costs,

13
expenses and service awards before an objection is due. *See* Buchman Decl., Exhibit A at ¶ 22.

14
## III.    The Proposed Settlement Class Should be Preliminarily Certified

15
### A.    Legal Standard

16
At the preliminary approval stage, the Court may direct notice of a proposed settlement to

17
the Class if it concludes that it will likely be able to certify the settlement class under Rule

18
23(e)(1) and to approve the settlement as fair, reasonable, and adequate under Rule 23(e)(2).

19
To assess the proposed settlement Class under 23(e)(1), the Court conducts a two-step analysis

20
under Rules 23(a) and 23(b). *First*, the Court must determine whether the proposed class meets

21
the Rule 23(a) requirements:

22
(1) the class is so numerous that joinder of all members is impracticable;

23
(2) there are questions of law or fact common to the class;

24
(3) the claims or defenses of the representative parties are typical of the claims or defenses

25
of the class; and

26
(4) the representative parties will fairly and adequately protect the interests of the class.

27
Fed. R. Civ. P. 23(a).

28

1      *Second,* if those four conditions are satisfied, the Court considers whether the proposed

2  settlement class satisfies one of the requirements listed in Rule 23(b). In relevant part, under

3  Rule 23(b)(3), a proposed settlement class may be maintained if "questions of law or fact

4  common to class members predominate over any questions affecting only individual members,

5  and . . . a class action is superior to other available methods for fairly and efficiently adjudicating

6  the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry is less demanding in the

7  settlement context than in the litigation context. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926

8  F.3d 539, 556-57 (9th Cir. 2019) (*en banc*) (finding that manageability concerns are not an issue

9  for a settlement class).

10      **1.    The Proposed Class Satisfies Fed. R. Civ. P. 23.**

11      The proposed Settlement Class should be certified because it meets all the requirements

12  under Fed. R. Civ. P. 23(e)(1). The proposed Settlement Class is cohesive and objectively

13  defined. *See* Fed. R. Civ. P. 23(e)(1).

14      **a.    The Proposed Settlement Class Satisfies Rule 23(a)'s Requirements.**

15      Under Rule 23(a), certification is appropriate where: (i) the class is so numerous that

16  joinder of all members is impracticable; (ii) there are questions of law or fact common to the

17  class; (iii) the claims or defenses of the representative parties are typical of the claims or

18  defenses of the class; and (iv) the representative parties will fairly and adequately protect the

19  interests of the class. Fed. R. Civ. P. 23(a). Because settlement classes are routinely certified,[24]

20  

21  [24] *See, e.g., In re Aggrenox Antitrust Litig.*, No. 14-MD-2516 (D. Conn, Mar 6, 2018) (ECF No. 766); *Ryan-House v. GlaxoSmithKline PLC,* No. 02-cv-442, 2005 U.S. Dist. LEXIS 33711 (E.D.

22  Va. Jan. 10, 2005); *Ryan-House v. GlaxoSmithKline PLC,* No. 02-cv-442 (E.D. Va. July 28, 2004) (ECF No. 137); *In re Tricor Indirect Purchaser Litig.,* No. 05-cv-360 (D. Del. May 8,

23  2009) (ECF No. 509); *In re Abbott Labs. Norvir Antitrust Litig.,* No. 04-cv-1511 (N.D. Cal., Aug. 27, 2008) (ECF No. 612); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.,* 246 F.R.D. 349,

24  357 (D.D.C. 2007); *In re Children's Ibuprofen Oral Suspension Antitrust Litig.,* No. 04-mc-535 (D.D.C. Dec. 11, 2006) (ECF No. 33); *In re Remeron End Payor Antitrust Litig.*, Nos. 02-2007,

25  04-5126, 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sep. 13, 2005); *Nichols v. Smithkline Beecham Corp.*, Docket No. 00-cv-6222, 2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005); *In re*

26  *Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 517 (E.D. Mich. 2003); *In re Buspirone Antitrust Litig.*, No. 01-md-01413 (S.D.N.Y. April 21, 2003) (ECF No. 148); *In re Warfarin Sodium*

27  *Antitrust Litig.*, 212 F.R.D. 231, 264 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004); *In re*

28  *Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 374, 396 (D.D.C. 2002).

the proposed Settlement Class, which satisfies all Rule 23 requirements, should be certified as demonstrated below.

### i.    Numerosity

Rule 23(a)(1) requires that members of a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While numerosity does not require a specific number of class members, courts in the Ninth Circuit generally agree that numerosity is satisfied if the class includes 40 or more members. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, No. 19-MD-02913-WHO, 2022 WL 2343268, at 959 (N.D. Cal. June 28, 2022). The proposed settlement Class is comprised of more than 4 million accounts with purchases of one or more digital games on the PSN Store for which a GSV was available at retail prior to April, 2019, for which at least 200 GSV redemptions were made prior to April 1, 2019, and for which the post-discount price increased by at least fifty cents from: (a) the period between January 1, 2017 and March 31, 2019; as compared to (b) the period between April 1, 2019 and December 31, 2023. SIE's data confirms that approximately 4,407,533 individual accounts meet this definition. Given the size of the proposed Settlement Class, which exceeds forty persons, the proposed Settlement Class easily satisfies Rule 23(a)(1).

### ii.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). For purposes of Rule 23(a)(2), even a single common question will suffice to satisfy the requirement. *Id.* at 359; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 14-md-02503-DJC, 2017 WL 4621777 at *12, n.12 (D. Mass. 2017). "Antitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke'" because proof of the violation "'will focus on defendants' conduct and not on the conduct of individual class members.'" *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (citing *Dukes*, 564 U.S. at 349).

This case presents numerous common questions of fact and law that relate to the Defendant's alleged anticompetitive conduct, including whether Defendant: (i) unlawfully created, maintained and continues to maintain monopoly power in the relevant market; (ii) unlawfully maintained a monopoly which caused anticompetitive effects in the relevant market; (iii) has procompetitive justifications or whether there were less restrictive means of achieving them; and (iv) caused antitrust injury through overcharges to the business or property of Plaintiff and the proposed Settlement Class members. The same questions of law and fact also apply to all members of the Settlement Class who will necessarily use the same evidence to prove the Defendant's alleged conduct "in one stroke." *Dukes*, 564 U.S. at 350. Thus, the proposed Settlement Class satisfies Rule 23(a)(2).

### iii.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Castillo v. Bank of America, NA*, 980 F.3d 723, 729 (9th Cir. 2020). Class Plaintiffs' claims are typical of the class when they "arise[ ] from the same event, practice or course of conduct that gives rise to the claims of the absent class members" and is "based on the same legal or remedial theory." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *4 (N.D. Cal. June 5, 2006) (alteration in original) (citation omitted). "[C]laims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

Here, the alleged claims are typical of the claims of the proposed Settlement Class because their: (i) injury (supracompetitive prices) arises from the same course of alleged conduct (Defendants' anticompetitive conduct); (ii) claims rely on the same legal theories (alleged violation of the antitrust laws) and (iii) claims allege damages in the form of overcharges. Thus, the Rule 23(a)(3) requirement is satisfied.

### iv.  Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (finding Rule 23(a)(4) "serves to uncover conflicts of interest between

named parties and the class they seek to represent"). To determine whether the representation meets this standard, courts ask two questions: (i) do representative plaintiffs have any conflicts of interest with other class members; and (ii) will they prosecute the action vigorously on behalf of the class. *See Boston Retirement System v. Uber Technologies, Inc.*, 19-cv-06361-RS, 2022 WL 2954937, at * 4 (N.D. Cal. July 26, 2022) (Seeborg, C. J.).

No conflicts of interest exist between Class Representative Plaintiff and the proposed Settlement Class members. Mr. Cendejas and the Settlement Class members have the same objectives: to prove that Defendant acted unlawfully and that Settlement Class members paid supracompetitve prices for PlayStation digital games as a result. And adequacy is also presumed where, as here, a fair settlement was negotiated at arm's length with the assistance of a mediator. 2 *Newberg on Class Actions,* § 11.28, 11-59.

### 2.    The Settlement Class Satisfies Rule 23(b)(3)'s Requirements.

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Settlement Class easily satisfies these requirements.

### a.  Predominance

Predominance exists when plaintiffs' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "Even if just one common question predominates, 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'" *Hyundai & Kia*, 926 F.3d at 557 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)). "[M]onopolization claims readily lend themselves to common evidence. They require: (i) the possession of monopoly power in the relevant market; and (ii) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. So,

the state of the market and defendants' use and maintenance of monopoly power, as opposed to individual plaintiff's conduct, drives the claim." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).

The predominance inquiry is less demanding in the settlement context because, unlike certification for litigation, "manageability is not a concern in certifying a settlement class where, by definition, there will be no trial." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556-57 (9th Cir. 2019). The predominant question at this stage will be whether this settlement is fair, adequate, and reasonable. *See, e.g., Just Film, Inc. v. Buono,* 847 F.3d 1108, 1117 (9th Cir. 2017).

The focus is on Defendant's conduct and the effect on the market which is common to all Settlement Class members. The focus is not on the actions of individual Settlement Class members. *See In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (citing *Alaska Airlines v. United Airlines*, 948 F.2d 536, 540 (9th Cir. 1991)).

### b.    Superiority

The "superiority" requirement of Rule 23(b)(3) "ensures that litigation by a class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Solodyn*, 2017 WL 4621777, at *21 (quoting *Amchem*, 521 U.S. at 615). But in a certification for settlement, "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

Certifying the Settlement Class is superior to resolving Settlement Class members' claims through individual litigation. Considerations of judicial efficiency favor concentrating this litigation in one forum. Allowing this case to move forward as a class action would: (i) avoid congesting a court with the need to repetitively adjudicate such actions; (ii) prevent the possibility of inconsistent results; and (iii) allow class members an opportunity for redress they might otherwise be denied.

1    Accordingly, the proposed Settlement Class satisfies each certification requirement, and

2   Proposed Class Plaintiff respectfully submits that the Court should certify the proposed

3   Settlement Class. *See* Fed. R. Civ. 23(e)(1).

4   **IV.    CONCLUSION**

5    For the above-stated reasons, Class Representative Plaintiff Adrian Cendejas respectfully

6   requests that the Court enter an Order granting this motion.

7   Dated: August 18, 2025                    Respectfully submitted,

8                                             */s/ Michael M. Buchman*

9                                             Michael M. Buchman (admitted *pro hac vice*)
                                              **MOTLEY RICE LLC**
10                                            800 Third Avenue, Suite 2401
                                              New York, NY 10022
11                                            Tel: (212) 577-0050
                                              mbuchman@motleyrice.com
12
                                              *Interim Lead Counsel for Plaintiffs and the*
13                                            *Proposed Class*

14
                                              Jeff S. Westerman (State Bar No. 94559)
15                                            **ZIMMERMAN REED**
                                              6420 Wilshire Blvd.
16                                            Suite 1080
                                              Los Angeles, CA 90048
17                                            Tel: (310) 752-9385
                                              jeff.westerman@zimmreed.com
18
                                              *Counsel for Plaintiff Agustin Caccuri*
19

20                                            Joseph R. Saveri (State Bar No. 130064)
                                              Ronnie S. Spiegel (WSBA No. 33721)[25]
21                                            Elissa A. Buchanan (State Bar No. 249996)
                                              **JOSEPH SAVERI LAW FIRM, LLP**
22                                            601 California Street, Suite 1000
                                              San Francisco, California 94108
23                                            Tel: (415) 500-6800
                                              jsaveri@saverilawfirm.com
24                                            abuchanan@saverilawfirm.com

25                                            *Counsel for Plaintiff Adrian Cendejas*

26

27

28   [25] Located in Washington State

Proposed Class Plaintiff's Notice of Motion & Motion for Preliminary Approval of Class Certification Settlement
Case No. 3:21-cv-03361-AMO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Peggy J. Wedgworth (admitted *pro hac vice*)
Elizabeth McKenna (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel: (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com

*Counsel for Plaintiff Allen Neumark*

Proposed Class Plaintiff's Notice of Motion & Motion for Preliminary Approval of Class Certification Settlement

1

**ATTESTATION**

2

I, Michael M. Buchman, am the ECF User whose identification and password are being

3

used to file this Notice of Unopposed Motion and Unopposed Motion for Preliminary Approval.

4

I attest under penalty of perjury that concurrence in this filing has been obtained from all

5

counsel.

6

7

Dated: August 18, 2025            */s/ Michael M. Buchman*
                                   Michael M. Buchman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28